# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| 74 PINEHURST LLC; 141 WADSWORTH LLC; 177 WADSWORTH LLC; DINO PANAGOULIAS; DIMOS PANAGOULIAS; VASILIKI PANAGOULIAS; EIGHTY MULBERRY REALTY CORPORATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> STATE OF NEW YORK; NEW YORK DIVISION OF HOUSING AND COMMUNITY RENEWAL; RUTHANNE VISNAUSKAS, individually and in her official capacity as Commissioner of New York State Division of Housing and Community Renewal; CITY OF NEW YORK; NEW YORK CITY RENT GUIDELINES BOARD; DAVID REISS, CECELIA JOZA, ALEX SCHWARTZ, GERMAN TEJEDA, MAY YU, PATTI STONE, J. SCOTT WALSH, LEAH GOODRIDGE, and SHEILA GARCIA, in their official capacities as Chair and Members of the Rent Guidelines Board, <br><br> *Defendants*. | No. 19-cv-6447 <br><br> November 14, 2019 |

## COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND JUST COMPENSATION

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................... 1

THE PARTIES ............................................................................ 6

JURISDICTION AND VENUE ................................................... 9

LEGAL AND FACTUAL BACKGROUND ............................. 10

    A.    History of Rent Regulation in New York .......................... 10

    B.    The Housing Stability and Tenant Protection Act of 2019 ............... 16

    C.    The RSL's Unconstitutional Regulatory Scheme ............................. 20

        1.    The RSL Prevents Property Owners From Using Their Own Rent-Stabilized Apartments. ............................................. 20

        2.    The RSL Prevents Property Owners From Exercising The Right To Exclude. .................................................... 28

        3.    The RSL Prevents Owners From Using Their Apartments For Purposes Other Than Rent-Stabilized Housing................ 33

        4.    The RSL Significantly Reduces the Value of Rent-Stabilized Apartments. .............................................. 38

        5.    The RSL Interferes With Property Owners' Investment-Backed Expectations. .................................................. 39

        6.    The RSL's Hardship Process Does Not Cure the Law's Constitutional Defects............................................... 59

    D.    Rent-Stabilization Laws Are Economically Self-Defeating ............. 63

    E.    The RSL Does Not Substantially Advance Its Stated Objectives. ........................................................................ 68

CLAIMS FOR RELIEF ............................................................ 76

    COUNT ONE: Facial Physical Taking Without Just Compensation........... 76

COUNT TWO: As-Applied Physical Taking Without Just
Compensation ................................................................................ 78

COUNT THREE: Facial Regulatory Taking Without Just
Compensation ................................................................................ 81

COUNT FOUR: As-Applied Regulatory Taking Without Just
Compensation ................................................................................ 85

COUNT FIVE: Violation of Contract Clause ............................................. 89

COUNT SIX: Violation of Due Process ...................................................... 93

PRAYER FOR RELIEF .......................................................................... 95

Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, 177 Wadsworth LLC, Dino Panagoulias, Dimos Panagoulias, Vasiliki Panagoulias, and Eighty Mulberry Realty Corporation (collectively, "Plaintiffs") by their undersigned attorneys, bring this civil action for declaratory relief, injunctive relief, and just compensation, and allege as follows:

## INTRODUCTION

1.     This lawsuit presents facial and as-applied constitutional challenges to New York's Rent Stabilization Law ("RSL"), a collection of intertwined state and local laws that together govern nearly one million apartment units in New York City.

2.     On June 14, 2019, New York enacted the Housing Stability and Tenant Protection Act of 2019, which made existing provisions of the RSL permanent and added or modified other features, also on a permanent basis.  We refer to the Housing Stability and Tenant Protection Act, together with technical corrections signed into law on June 25, 2019, as the "2019 Amendments."

3.     The 2019 Amendments made unprecedented changes to the RSL. Although New York law has authorized varying forms of rent stabilization for more than 50 years, the law has long taken a more balanced approach by seeking to protect tenants while *also* providing incentives for investment in rent-stabilized housing and preserving core attributes of property ownership.  The 2019 Amendments upset that balance by imposing unparalleled new restrictions on property owners and depriving

1

them of fundamental property rights.  The end result is a regime in which tenants, not property owners, control who occupies the property, how it is used, and who may be excluded from it.  That scheme is unconstitutional.

4.      The RSL, both facially and as applied to Plaintiffs, violates Plaintiffs' rights under the Fifth Amendment's Takings Clause by authorizing a permanent physical occupation of the apartments Plaintiffs own, and by effectively eliminating Plaintiffs' ability to use the apartments for any purpose other than rent-stabilized housing.  The 2019 Amendments repealed property owners' longstanding right to deregulate rent-stabilized units when the legal rent reached a prescribed level, such that rent-stabilized apartments must now forever remain rent stabilized.  Under the RSL, a tenant has the right to renew his or her lease in perpetuity, and to transfer the lease to family members and others—all without the property owner's consent.  The RSL likewise prohibits owners from using rent-stabilized apartments for their own homes or other, non-rental purposes in all but the narrowest circumstances—and in many cases, not at all.  In the rare instances where the RSL allows alternative use, owners must pay each tenant tens of thousands of dollars (or more) in stipends for the privilege.

5.      As one sponsor of the 2019 Amendments explained, the purpose of these restrictions is "to ensure that rent-stabilized apartments remain stabilized." And as New York's highest court recently observed, the RSL "provide[s] a benefit

2

*conferred by* the government through regulation" of "private owners of real property," even though it "do[es] not provide a benefit *paid for* by the government." *Santiago-Monteverde v. Pereira*, 22 N.E.3d 1012, 1016–17 (N.Y. 2014). The RSL thus singles out a class of citizens—owners of residential buildings constructed before 1974—and conscripts their property in the service of an off-budget public-assistance program, forcing these owners "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

6.    The RSL, both facially and as applied to Plaintiffs, also inflicts a regulatory taking by negating Plaintiffs' reasonable, investment-backed expectations in the apartments they own. Collectively, Plaintiffs invested millions of dollars in those apartments at a time when the RSL did not exist or, at a minimum, provided mechanisms to remove units from rent stabilization, to recover the cost of capital improvements, and to earn a reasonable return on the capital invested. The 2019 Amendments eviscerated these safeguards—for example, by repealing provisions that removed vacant apartments from rent stabilization when the legal regulated rent exceeded $2,774. The 2019 Amendments likewise prohibit owners from recouping more than $15,000 in renovation costs for improvements to individual apartments in a 15-year period, even when the actual cost of the improvements is several times greater, and even when improvements are required to

meet state or local code requirements.  Together, these provisions radically alter the scope of Plaintiffs' property rights and significantly diminish the value of Plaintiffs' investments—demonstrating that the RSL "has gone too far" and must be invalidated.  *Murr v. Wisconsin*, 137 S. Ct. 1933, 1950 (2017).

7.     The RSL also violates the Contract Clause of the United States Constitution because it prohibits property owners, including Plaintiff 74 Pinehurst LLC, from enforcing otherwise valid rental contracts.  Under the 2019 Amendments, property owners who previously agreed to special, often one-time rent reductions known as "preferential rent," and who later executed contracts requiring a tenant to pay a higher rate (but still at or below the legal regulated rent), must disregard the new contract and charge the prior preferential rate instead, as adjusted only by the annual guidelines set by the Board.  The result is a new, government-mandated relationship that neither party agreed to, and that substantially impairs Plaintiffs' ability to enforce the most important terms of their rental contracts.

8.     Finally, the RSL violates the Due Process Clause of the Fourteenth Amendment because its onerous restrictions fail to advance the law's stated purposes.  Although the RSL is purportedly designed to increase housing availability, assist low-income renters, and facilitate a transition to an open market for apartment housing, the law undermines each of those objectives.  That failure is longstanding and well-documented:  the RSL was enacted to address a temporary

4

housing "emergency" a half-century ago, yet lawmakers have renewed and re-declared that emergency countless times since. These repeated renewals are necessary because the RSL's scheme is self-perpetuating: the law relies on low vacancy rates to justify comprehensive restrictions that in turn *keep* vacancy rates below an arbitrarily set five-percent emergency threshold. In short, the RSL creates and perpetuates a permanent "emergency" that is then invoked as the RSL's justification—all without producing any corresponding public benefit. That illogical scheme fails to meet the Due Process Clause's minimum requirement of rationality.

9. The 2019 Amendments do not serve constitutionally permissible purposes, and there is reason to think they were not intended to do so. One of the sponsors of the 2019 Amendments—a self-described Marxist—explained in the course of describing the 2019 Amendments that land "doesn't truly belong to" those that "have the monetary resources to purchase it and, to put it really bluntly, to take it away from … the collective." That view is irreconcilable with the Constitution's bedrock protections for private property.

10. Plaintiffs seek declaratory relief, injunctive relief, and just compensation to remedy the RSL's constitutional violations. That relief can, and should, be fashioned to protect the interests of property owners and tenants alike, and that paves the way for New York to adopt a new framework that fully respects contractual rights, private property, and due process of law.

5

11.    Although courts have turned aside some prior challenges to rent regulations, no court has addressed the 2019 Amendments' unprecedented restrictions, which impose what one legislator described as "the strongest tenant protections in history." Courts have not granted governments *carte blanche* to seize property under the guise of rent regulation, and the Constitution provides owners redress where, as here, the government oversteps its authority.

## THE PARTIES

12.    Plaintiff Dino Panagoulias is a resident of Long Island City, New York. Mr. Panagoulias is the manager of a residential apartment building located in Long Island City, New York. His parents, Plaintiffs Dimos and Vasiliki Panagoulias, are the owners of the building; Mr. Panagoulias has a personal stake in the building's financial success. The building is 89 years old and contains 10 apartments, six of which are stabilized pursuant to the RSL. Mr. Panagoulias grew up living in the building and continues to live there today with his family. As a result, he knows the tenants—many of whom are longtime renters—well and considers them his extended family. Mr. Panagoulias has a full-time job separate from his duties as building manager, and does handyman work on the building in his spare time. Although Mr. Panagoulias has consistently sought to follow the rules while keeping the building up, his tenants in place, and his rents low, the new restrictions imposed by the 2019 Amendments make it difficult or impossible to achieve those goals.

6

13.    Plaintiffs Dimos and Vasiliki Panagoulias are residents of Pennsylvania.  Mr. and Mrs. Panagoulias emigrated from Greece to the United States in 1970 and 1967, respectively.  They own the building managed by their son, Plaintiff Dino Panagoulias, described in the paragraph above.  Plaintiffs Dimos and Vasiliki Panagoulias have owned this building since 1974.

14.    Plaintiff 74 Pinehurst LLC is a limited liability company organized under the laws of New York.  Plaintiff 74 Pinehurst LLC owns a residential apartment building in the Washington Heights neighborhood of New York, New York.  The building contains 27 residential units, all of which are stabilized pursuant to the RSL.  Plaintiff 74 Pinehurst LLC has owned this building since 2008.

15.    Plaintiff 141 Wadsworth LLC is a limited liability company organized under the laws of New York.  Plaintiff 141 Wadsworth LLC owns a residential apartment building in the Washington Heights neighborhood of New York, New York.  The building contains 21 residential units, all of which are stabilized pursuant to the RSL.  Plaintiff 141 Wadsworth LLC has owned this building since 2003.

16.    Plaintiff 177 Wadsworth LLC is a limited liability company organized under the laws of New York.  Plaintiff 177 Wadsworth LLC owns a residential apartment building in the Washington Heights neighborhood of New York, New York.  The building contains 14 residential units, all of which are stabilized pursuant to the RSL.  Plaintiff 177 Wadsworth LLC has owned this building since 2007.

7

17.    Plaintiff Eighty Mulberry Realty Corporation is a New York corporation.   Plaintiff Eighty Mulberry Realty Corporation owns a residential apartment building in New York, New York. The building contains 33 units, 15 of which are stabilized pursuant to the RSL.   Plaintiff Eighty Mulberry Realty Corporation has owned the building since at least 1950.

18.    Defendant State of New York is the governmental body on whose behalf the RSL is enacted and enforced.

19.    Defendant Division of Housing and Community Renewal ("DHCR") is a New York State agency charged with administering and enforcing the RSL.

20.    Defendant RuthAnne Visnauskas is the Commissioner of the DHCR and is sued in her official and individual capacities.  As Commissioner of the DHCR, Defendant Visnauskas is responsible for administration and enforcement of the RSL.

21.    Defendant New York City is the government entity vested with authority to trigger application of the RSL to apartments in New York City and to establish regulations implementing the RSL's scheme.

22.    Defendant New York City Rent Guidelines Board (the "Rent Guidelines Board," or "Board") is the agency required by the RSL to establish annually allowable rent adjustments for renewal leases for apartments subject to the RSL in New York City.

23.    Defendant David Reiss is the Chair and Chief Administrative Officer of the Rent Guidelines Board, and is sued in his official capacity.

24.    Defendants Cecilia Joza, Alex Schwarz, German Tejeda, May Yu, Patti Stone, J. Scott Walsh, Leah Goodridge, and Shelia Garcia are Members of the Rent Guidelines Board, and are sued in their official capacities.

## JURISDICTION AND VENUE

25.    This action is brought pursuant to 42 U.S.C. § 1983, *Ex parte Young*, 209 U.S. 123 (1908), the Contract Clause of the United States Constitution, the Takings Clause of the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a).

26.    This Court has personal jurisdiction over each Defendant in New York and in this judicial district because Defendants regularly transact business in this judicial district, and because the claims asserted in this action arise from Defendants' conduct in and actions relating to this judicial district.

27.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred, and will continue to occur, in this judicial district; because a substantial part of the property that is the subject of this action is situated in this judicial district; and because at least one Defendant resides in this judicial district.

9

## LEGAL AND FACTUAL BACKGROUND

### A.     History of Rent Regulation in New York

28.     Two separate systems of rent regulation apply to apartments in New York City: rent stabilization and rent control.  The claims asserted in this suit address only the former regime, which governs nearly one million apartments, and do not challenge New York City's rent-control framework, which governs fewer than 25,000 apartments.

29.     As amended and in effect at the time this Complaint is filed, New York's rent-stabilization laws are codified in Title 23 of the Unconsolidated Laws of New York and Title 26 of the New York City Code.  Additional regulations issued under the Emergency Tenant Protection Act of 1974 ("ETPA"), as amended, are published in Chapter 249-B of the Unconsolidated Laws of New York and Title 9 of the New York Codes, Rules and Regulations. Parts M and N of the 2019 Amendments amend other New York laws regarding the procedures for evicting tenants who breach their lease agreements (Part M) and converting apartments to condominiums and co-ops (Part N).  Throughout the remainder of this Complaint, Plaintiffs refer to these laws collectively as the "Rent Stabilization Law" or the "RSL."

30.     Rent regulation in New York traces its roots to the 1920s, when the State adopted emergency housing laws restricting apartment owners to "reasonable"

10

rent increases.  In the years that followed, the State took steps to increase the housing supply, including by providing tax incentives for constructing new housing.  Those incentives worked, and vacancy rates increased to a point that the State allowed the emergency housing laws to expire by 1929.

31.    During and following World War II, the federal government and the State enacted rent regulations to prevent speculation and profiteering in the housing market.  The federal laws expired in the 1950s, and the State slowly allowed units to become deregulated.

32.    In 1969, New York City appointed the first Rent Guidelines Board to evaluate a self-regulation program proposed by a group representing owners of unregulated apartments.  Following the owners' report and review by the Rent Guidelines Board, and pursuant to authority granted by a 1962 state statute, New York City enacted the predecessor to the modern-day RSL.  New York City's 1969 law restricted the rents that property owners could charge tenants living in designated apartments.  It also established a standing Rent Guidelines Board and charged the Board with establishing guidelines for rent increases within prescribed limitations.  The maximum stabilized rents that property owners could charge came to be known as the legal regulated rent.

33.    The 1969 law adopted by New York City was a "compromise solution" between rent control and an unregulated market.  The law was intended to "permit a

great deal of freedom for property owners to increase rents within reasonable limits and thus to enjoy quite profitable operations of their properties." *8200 Realty Corp. v. Lindsay*, 27 N.Y.2d 124, 136–37 (N.Y. 1970).

34. However, Governor Rockefeller explained that the 1969 law caused "all new private housing construction in the City … [to] ceas[e]" and that the law was a "major cause" of "fear on the part of investors and builders that new housing may in the future be made subject to rent regulation and control." Report of the New York State Temporary Commission on Rental Housing, Vol. 1 at 1-83 (Mar. 1980). Thus, in 1971, the State "remov[ed] the City's power to take such action in the future," in part by preventing localities, including New York City, from enacting new rent regulations stricter than those in effect at the time. *See* N.Y. Unconsol. Law § 8605.

35. In 1974, the State enacted ETPA, which the 2019 Amendments modify. ETPA allows localities to declare a housing emergency and impose rent stabilization if vacancy rates are under five percent and additional statutory criteria are met. *See* N.Y. Unconsol. Law § 8623. ETPA further provides that a declaration of emergency must end once vacancy rates exceed five percent.

36. Pursuant to ETPA, the RSL applies to buildings with six or more units that were constructed prior to 1974 and are no longer subject to rent control. *See* 9 NYCRR § 2520.11; N.Y.C. Admin. Code § 26-504(a)(1).

37.    Further legislation established incentives for property owners to improve and maintain rent-stabilized apartments, which by definition are situated in older buildings likely to require costly upkeep.  This legislation authorized, among other things:

- rent increases of up to 20 percent after a unit became vacant, *see* N.Y.C. Admin. Code § 26-511-c(5-a) (repealed June 14, 2019);

- longevity increases, which allowed property owners, upon vacancy, to increase the rent for units that had been continuously occupied by the prior tenant for eight years, *see id.* (repealed June 14, 2019); and

- rent increases to recover the cost of major capital improvements (MCIs), large-scale projects such as replacement of a roof or boiler that benefit all tenants in a given building, and individual apartment improvements (IAIs), upgrades to particular units, such as kitchen renovations or flooring replacements, *id.* § 26-511-c(6) (amended June 14, 2019).

38.    In 1993, the State enacted "luxury decontrol" provisions that permitted rent-stabilized units to transition to market-rate rentals once the rent exceeded $2,000 per month (later increased to $2,700 per month, with further increases indexed to the Rent Guidelines Board's annual lease-renewal adjustments) and either (a) the unit became vacant or (b) the tenant's income exceeded $250,000 (later decreased to $200,000) in consecutive years. *See, e.g.*, N.Y.C. Admin. Code §§ 26-504.1, 26-504.2, and 26-504.3 (repealed June 14, 2019).

39.    Through the interaction of the luxury decontrol provisions and the incentives described in paragraph 37 above, the RSL provided a pathway for rent-

stabilized apartments to be deregulated and leased at market rates, in keeping with the RSL's purpose of facilitating a "transition from regulation to a normal market of free bargaining between landlord and tenant." N.Y. Unconsol. Law § 8622.

40.     Prior to the 2019 Amendments, the RSL included sunset provisions, which required the State legislature periodically to reevaluate whether and to what extent rent stabilization remains necessary.

41.     The RSL permits municipalities to trigger application of rent stabilization by declaring a "public emergency requiring the regulation of residential rents" based on a local vacancy rate of less than five percent. N.Y. Unconsol. Law § 8623(a). This provision directs that the municipality's determination "shall be made … on the basis of the supply of housing accommodations within such city," "the condition of such accommodations," and "the need for regulating and controlling residential rents within such city." A municipality must revisit this determination every three years. *See id.* § 8603.

42.     The State legislature provided no basis for its selection of a five-percent vacancy rate as the threshold for imposition of rent stabilization, and likewise has not revisited that threshold since 1974 to determine whether it remains appropriate in light of current market dynamics.

43.    Rent stabilization applies in New York City because the City Council has made the required emergency determination every three years since 1974, including most recently in 2018.

44.    As of 2017, there were 966,000 rent-stabilized units in New York City, representing about 44 percent of rental apartments in New York City.

45.    Even before the 2019 Amendments, rent-stabilization laws were a source of, rather than a solution to, New York City's low vacancy rates.  In 2017, for instance, the vacancy rate in non-stabilized apartments was 6.07 percent—above the 5 percent threshold for an emergency—but the vacancy rate in rent-stabilized units was a mere 2.06 percent, leading to a total vacancy rate of 3.63 percent—thus ensuring that the statutory threshold for an emergency remained satisfied.  *See* NYC Dept. of Housing Preservation and Development, Selected Initial Findings of the 2017 York City Housing and Vacancy Survey, Table 6 (Feb. 9, 2018).

46.    The RSL artificially depresses vacancy rates, including by providing a financial incentive for tenants to remain in a rent-stabilized apartment even when the apartment is not well-suited to the tenant's housing needs.  This incentive structure creates a feedback loop in which low vacancy rates are invoked as a purported justification for regulation that in turn depresses vacancy rates, perpetuating the emergency that the laws are supposedly designed to solve.

15

**B.     The Housing Stability and Tenant Protection Act of 2019**

47.     On June 14, 2019, New York enacted the 2019 Amendments.  These amendments radically altered New York's rent-stabilization regime, narrowing property owners' rights in unprecedented ways and imposing new restrictions that make it difficult or impossible for property owners to earn a return on their investments.

48.     Among other things, the 2019 Amendments:

a. **Significantly Narrow Property Owners' Right to Reclaim Apartments for Personal Use.**  Prior to the 2019 Amendments, the RSL permitted property owners to reclaim multiple apartments—up to and including all apartments in a rent-stabilized building, *see Pultz v Economakis*, 10 N.Y. 3d 542, 548 (2008)—if the owner or an immediate family member demonstrated a good-faith intention to occupy the units as a primary residence.  However, under the 2019 Amendments owners may reclaim only a single unit for personal or family use, and only if they show an "immediate and compelling necessity" for use of the apartment as their primary residence.  N.Y. Reg. Sess. § 6458, Part I (2019) (hereinafter "Ch. 36 of the Laws of 2019").  Thus, an owner who occupies a rent-stabilized unit and seeks to reclaim another—for example, to accommodate a growing family or

16

house an elderly parent—is prohibited by law from recovering that second unit.

b. **Eliminate Luxury- and High-Income Decontrol.**  As noted in Paragraph 38 above, prior to the 2019 Amendments the RSL provided a mechanism to deregulate luxury apartments when the legal regulated rent exceeded a prescribed threshold and additional criteria were satisfied.  The 2019 Amendments repealed these decontrol provisions, and therefore removed the only option available to property owners to convert a rent-stabilized apartment into a market-based rental.  *See id.*, Part D.  As a result, rent-stabilized units are now stabilized in perpetuity.

c. **Eliminate Vacancy and Longevity Increases.**  As described in Paragraph 37 above, prior to the 2019 Amendments the RSL permitted property owners to increase the legal regulated rent when an apartment became vacant and even more so if a prior tenancy exceeded eight years.  The 2019 Amendments repeal these provisions, thereby eliminating two important ways in which property owners could increase legal regulated rents beyond the increases permitted by the Board, which have been minimal over the last six years.  *See id.*, Part B, §§ 1, 2.  In doing so, the 2019 Amendments substantially impair an

17

owner's ability to earn a reasonable return on investment, and eliminate the upside necessary to provide a meaningful incentive to invest in rent-stabilized housing—a change that, in the long run, will harm tenants by reducing the quality and availability of affordable housing.

d. **Significantly Reduce Cost Recovery and Incentives for Building and Unit Improvements.** As described in Paragraph 37 above, prior to 2019 the RSL provided incentives for property owners to make major capital improvements and individual apartment improvements by allowing owners to fully recoup the costs of those investments through rent adjustments. The 2019 Amendments enact severe cuts to these provisions and impose new limitations that, in most or all instances, will prevent property owners from recovering the full cost of improvements. *See id.*, Part K, §§ 1, 2, 4, 11. These changes, too, substantially impair an owner's ability to earn a return on investment, and will deter property owners from updating rent-stabilized apartments. The legislation will also harm tenants by reducing opportunities to rent apartments with modern amenities and forcing many renters to settle for apartments with outdated kitchens and appliances.

e. **Lock-In Preferential Rents.** Prior to the 2019 Amendments, the RSL permitted property owners to offer "preferential" rents below an apartment's legal regulated rent, while reserving the right to charge higher rates (up to and including the legal regulated rent) in subsequent lease terms. The 2019 Amendments eliminate that right and require owners to lock in a preferential rent for the duration of a tenancy even when prior leases expressly stated that the preferential rent was a one-time concession. *See id.*, Part E. Owners who agreed to preferential rents for a limited period with an express termination date are now bound to those terms for as long as a tenant chooses to stay.

f. **Significantly Curtail Conversion to Condominiums or Co-Ops.** Prior to the 2019 Amendments, New York law permitted owners to convert rent-stabilized apartments to co-ops or condominiums upon obtaining written purchase agreements for at least 15 percent of residential apartments offered for sale, either by existing tenants or purchasers who represented that they or one or more immediate family members intended to occupy the apartment being purchased (subject to additional conditions and exceptions not relevant here). Following enactment of the 2019 Amendments, however, property owners may convert rent-stabilized apartment buildings into co-ops or

19

condominiums only if 51 percent of tenants agree to purchase units in the building. *See id.*, Part N. These provisions shift to tenants control over use of the building by effectively eliminating the possibility of condominium and co-op conversions.

## C.     The RSL's Unconstitutional Regulatory Scheme

49.     Plaintiffs challenge the RSL as revised by the 2019 Amendments. In its present form, the RSL transfers core elements of property ownership from owners to tenants and forces owners to serve as caretakers of apartments that, as a practical matter, are now permanently conscripted into to the service of an off-budget public-assistance program. That regime is unprecedented and, as described in detail below, unconstitutional.

### 1.     The RSL Prevents Property Owners From Using Their Own Rent-Stabilized Apartments.

50.     As amended by Part I of the 2019 Amendments, the RSL prevents property owners from using and occupying their own apartments, even for use as a primary residence or a home for immediate family members. These provisions provide that a property owner may reclaim an apartment for personal or family use— i.e., decline to renew a tenant's lease and take over possession of the apartment— only in extremely narrow circumstances.

51.     *First*, only "natural persons," not corporations or other artificial entities, may recover rent-stabilized apartments for residential use, such that an

owner may do so only by owning an apartment in his or her own name, or through a partnership.  *See S&J Realty Corp. v. Korybut*, 555 N.Y.S. 2d 589, 591 (Civ. Ct. 1990) ("The application of [9 NYCRR §] 2524.4(a)(1) as set forth in the statue is clearly limited to an owner who is a natural person."); *1077 Manhattan Assocs., LLC v. Mendez*, 798 N.Y.S. 2d 714 (App. Div. 2004) (Housing Court "correctly determined that only a natural person and not a corporation can recover an apartment for personal use").

52.    Corporations cannot recover apartments even where the principal of the corporation is the sole stockholder.  *See Henrock Realty Corp. v. Tuck*, 52 A.D. 2d 871, 872 (N.Y. App. Div. 1976) ("A corporation, unlike an individual, cannot be viewed in a familial perspective, even though such corporation may consist of a sole shareholder.").

53.    On information and belief, most rent-stabilized apartments are owned through limited-liability companies or other corporate forms as a means of limiting the owners' personal liability.  Rent-stabilized apartments owned in this fashion cannot be recovered for personal or family residential use.

54.    *Second*, when more than one person owns an apartment, either directly or through a partnership, only one of the owners may recover a rent-stabilized unit for personal or family residential use.  *See* N.Y. Admin. Code § 26-511(c)(9)(b).

21

55.   *Third*, an owner may recover *only one* unit for personal or family use. *See* Ch. 36 of the Laws of 2019, Part I, § 2.  As a result, an owner who occupies one rent-stabilized unit as his or her home may not recover additional rent-stabilized units for use by parents, grandparents, children, or other family members, regardless of the property owner's circumstances or those of his or her family.  And although the owner may recover that one unit for use by his or her "immediate family," that phrase encompasses many fewer individuals than the "family member[s]" who have succession rights with respect to a tenant's interest in a rent-stabilized unit.  *Compare* 9 NYCRR § 2520.6(n) (defining "immediate family" as including "spouse, son, daughter, stepson, stepdaughter, father, mother, stepfather, stepmother, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law or daughter-in-law"), *with id.* § 2520.6(o) (defining "family member" as including members of the immediate family plus "[a]ny other person residing with the tenant or permanent tenant in the housing accommodation as a primary or principal residence, respectively, who can prove emotional and financial commitment, and interdependence between such person and the tenant or permanent tenant").  Thus, the universe of relatives to whom tenants may pass their possessory interest is broader than the universe of relatives for whom an owner can enjoy a possessory interest in the owner's own property.

22

56.  *Fourth*, a property owner may recover a rent-stabilized unit only if the owner uses it as his or her primary residence.  *See* Ch. 36 of the Laws of 2019, Part I, § 1.  Owners, or immediate family members, cannot use the apartments they own as second homes, vacation homes, or for any residential use other than as a primary residence.  *See* 9 NYCRR § 2520.6(u).

57.  *Fifth*, an owner may recover an apartment only by demonstrating to the satisfaction of DHCR and its Commissioner, Defendant RuthAnne Visnauskas, that the owner has an "immediate and compelling necessity" to use that single unit as his or her primary residence.  *See* Ch. 36 of the Laws of 2019, Part I, § 2.  That burden is especially difficult to meet:  In the rent-*control* context, where the "immediate and compelling necessity" standard has long applied, New York courts have held that property owners must show an "air of urgency," "verging upon stark necessity." *Hammond v. Marcely*, 58 N.Y.S. 2d 565 (Mun. Ct. 1945).  Thus, for example, courts have held that serious overcrowding in a property owner's current residence is not sufficient to satisfy the "immediate and compelling necessity" standard, *see, e.g.*, *Boland v. Beebe*, 62 N.Y.S. 2d 8, 12 (Mun. Ct. 1946), and that the property owner's financial hardship is not an "immediate and compelling necessity" but instead a "mere matter of convenience," *Zinke v. McGoldrick*, 141 N.Y.S. 2d 479, 480 (Sup. Ct. 1954).

23

58.    *Sixth*, property owners must take additional steps before recovering a
rent-stabilized apartment where the incumbent tenant is 62 years old or older or has
an impairment resulting from "anatomical, physiological or psychological
conditions" that "are expected to be permanent" and "prevent the tenant from
engaging in any substantial gainful employment."   N.Y.C. Admin. Code § 26-
511(c)(9)(b); Ch. 36 of the Laws of 2019, Part I, § 1.   In those circumstances, the
property owner must "offe[r] to provide and if requested, provid[e] an equivalent or
superior housing accommodation at the same or lower stabilized rent in a closely
proximate area" as a precondition of recovering the unit for personal residential use.
N.Y.C. Admin. Code § 26-511(c)(9)(b).   If the property owner cannot meet these
stringent requirements, for example due to the artificially low vacancy rate in rent-
stabilized units caused by the RSL, the owner loses the right to regain possession of
the apartment.   The age, physical, and physiological conditions of the *property
owner*, by contrast, play no role in determining whether a property owner may
recover a rent-stabilized apartment under this provision—the circumstances of the
tenant control.

59.    *Seventh*, a property owner may not recover possession of a rent-
stabilized apartment—even when all the preceding criteria are met—if the
incumbent tenant has been living in the building "for fifteen years or more."   Ch. 36
of the Laws of 2019, Part I, § 2.   The RSL thus vests long-term tenants with superior

24

rights to the owner with respect to use, occupancy, and leasing of an apartment. These tenure rights are not tailored to serve the RSL's stated purposes, but instead apply automatically, regardless of the tenant's age, income, disability status, or other characteristics.

60. *Eighth*, even when a property owner can recover a rent-stabilized apartment for use as his or her primary residence, for a period of three years from the date of recovery, the owner is prohibited from "rent[ing], leas[ing], sublateas[ing] or assign[ing]" the apartment "to any person" other than the person for whose "benefit recovery of the dwelling unit is permitted" or "the tenant in occupancy at the time of recovery under the same terms as the original lease." N.Y.C. Admin. Code § 26-511(c)(9)(b). The restriction on subleasing applies to property owners even though a tenant would have the right to sublease the same apartment.

61. The RSL thus prevents property owners from reclaiming their own property, even when they desire to use it as a primary residence for themselves or their families. In this way, the RSL fundamentally deprives the owner of one of the core elements of property ownership—the right to "possess" and "use" one's property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).

62. The RSL's interference with property owners' rights to possess and use their property has injured and will continue to injure Plaintiffs.

25

63.     For example, the restrictions described above prevented Plaintiffs Dino, Dimos, and Vasiliki Panagoulias from occupying one of the rent-stabilized apartments they own.  Approximately eight years ago, Plaintiff Dino Panagoulias applied to recover a two-bedroom rent-stabilized apartment in his family-owned building for use as a primary residence.  Housing authorities rejected this application, citing Mr. Panagoulias' failure to take possession of a different, one-bedroom apartment in the same building that had previously been available, notwithstanding that the one-bedroom apartment would not have met his family's needs.

64.     In addition, Maria Panagoulias, the sister of Plaintiff Dino Panagoulias and the daughter of Plaintiffs Dimos and Vasiliki Panagoulias, has considered occupying a rent-stabilized unit in her family's building in Long Island City, New York, and remains interested in doing so because relocating to the building would allow her to be with family and live closer to her job.  Due to the restrictions discussed above, however, that option is not available.

65.     The RSL's restrictions also adversely affect Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, 177 Wadsworth LLC, and Eighty Mulberry Realty Corporation by prohibiting those entities, due to their ownership through the corporate form, from using and occupying rent-stabilized apartments in the buildings they own.

26

66.     The RSL's restrictions deprive Plaintiffs of core property rights by limiting them to use and possession of at most one rent-stabilized apartment in each building, and by requiring that such use and possession be exclusively as a primary residence.

67.     Each Plaintiff rents one or more rent-stabilized apartments to a tenant who is age 62 or older, is disabled or impaired within the meaning of N.Y.C. Admin. Code § 26-511(c)(9)(b) and Ch. 36 of the Laws of 2019, Part I, § 1, or who has lived in the apartment for fifteen years or longer.  As a result, the RSL prohibits Plaintiffs from recovering possession of these apartments at all (in the case of long-term tenants) or permits Plaintiffs to do so only after providing the accommodations set forth in N.Y.C. Admin. Code § 26-511(c)(9)(b).   In this respect, too, the RSL deprives Plaintiffs of core attributes of property ownership.

68.     As Commissioner of DHCR, Defendant RuthAnne Visnauskas is charged with implementing and enforcing this unconstitutional scheme. *See* N.Y.C Admin. Code § 26-511(b) ("no such amendments shall be promulgated except by action of the commissioner of the division of housing and community renewal"); *id.* § 26-511(c)(9)(b) (any code adopted by DHCR must include the personal-use limitations set out in Part I).

### 2. The RSL Prevents Property Owners From Exercising The Right To Exclude.

69.    The RSL also deprives property owners of "the power to exclude," which "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto*, 458 U.S. at 435. In particular, the RSL, including under regulations promulgated by DHCR and continued under Defendant RuthAnne Visnauskas, mandates that property owners must offer either a one- or two-year renewal each time a rent-stabilized tenant's lease ends. *See* N.Y. Unconsol. Law § 8623; 9 NYCCR § 2522.5(b). This renewal right has no endpoint, such that a tenant has the right to renew a lease for as long as he or she lives—i.e., a life estate.

70.    The lease renewal must be "on the same terms and conditions as the expired lease, except where the owner can demonstrate that the change is necessary to comply with a specific requirement of law or regulation applicable to the building or to leases for housing accommodations subject to the RSL, or with the approval of the DHCR." 9 NYCRR § 2522.5(g)(1). The RSL thus freezes lease terms—often going back decades—and removes property owners' ability to change such terms even when the passage of time renders the terms unreasonable.

71.    The RSL's lease-renewal rights extend beyond the original tenant to a broad range of individuals and family members, all of whom have statutory "succession" rights to take over a tenant's lease. *See id.* § 2520.6(o), § 2523.5(b). In particular, the RSL grants succession rights to "any member" of the "tenant's

28

family … who has resided with the tenant in the housing accommodation as a primary residence for a period of no less than two years, or where such person is a 'senior citizen,' or a 'disabled person' … for a period of no less than one year, immediately prior to the permanent vacating of the housing accommodation by the tenant, or from the inception of the tenancy or commencement of the relationship, if for less than such periods."  9 NYCRR § 2523.5(b)(1).  The statute further defines eligible "family" members as any "spouse, son, daughter, stepson, stepdaughter, father, mother, stepfather, stepmother, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law or daughter-in-law of the tenant." *Id.* § 2520.6(o).  Additional persons entitled to succession rights include "[a]ny other person residing with the tenant or permanent tenant in the housing accommodation as a primary or principal residence, respectively, who can prove emotional and financial commitment, and interdependence between such person and the tenant or permanent tenant." *Id.*

72.    Family members do not need to satisfy the two-year residency requirement if they fall within one of many exceptions, including if the individual "(i) is engaged in active military duty; (ii) is enrolled as a full-time student; (iii) is not in residence at the housing accommodation in accordance with a court order not involving any term or provision of the lease, and not involving any grounds specified in the Real Property Actions and Proceedings Law; (iv) is engaged in employment

29

requiring temporary relocation from the housing accommodation; (v) is hospitalized for medical treatment; or (vi) has such other reasonable grounds that shall be determined by the DHCR upon application by such person."   9 NYCRR § 2523.5(b)(2).

73.   A successor tenant need not acquire the property owner's consent to exercise these succession rights.  As a consequence, property owners lack the right to select their tenants, and must allow strangers, their families, and other acquaintances to occupy and possess rent-stabilized apartments indefinitely.

74.   In addition, tenants in rent-stabilized apartments have the right at any time to sublet their apartments for two out of any four years.  *See* N.Y.C. Admin. Code § 26-511(c)(12)(f).  A tenant who exercises this option retains the automatic right to renew his or her lease, even if the sublease extends beyond the lease's end, as long as the tenant "has maintained the unit as his or her primary residence and intends to occupy it as such at the expiration of the sublease." *Id.*

75.   Under the RSL, the tenant's subleasing rights are broader than the property owner's rights.  For example, a tenant may offer a sublet to any person he or she chooses (subject to the property owner's reasonable withholding of consent), whereas a property owner generally may rent an apartment only to the current occupant.

76.     Property owners may decline to renew a lease or recover an apartment from an existing tenant only in narrow circumstances, most of which are in the tenant's control.  In particular, a property owner may terminate a tenant's lease if the tenant fails to pay rent, violates a material obligation of the lease agreement, commits a nuisance, or uses the apartment for unlawful purposes.  *See* 9 NYCRR § 2524.3.  But these claims often cost tens of thousands of dollars to pursue, and even if the property owner wins on the merits, courts still offer tenants the opportunity to cure their breach, further cementing the tenant's perpetual lease.  Under the 2019 Amendments, courts may allow tenants to remain in an apartment for up to one year after the tenant has been determined by a court to be in breach of the lease, which is typically many months after the breach occurs.  *See* N.Y. RPAPL § 753.

77.     As a result of the RSL's lease-renewal, succession, and eviction provisions, as implemented and continued by DHCR and Defendant RuthAnne Visnauskas, property owners lack the ability to exclude others from their property in all but a handful of extreme circumstances, effectively depriving them of the right to exclude.

78.     The RSL's transfer of property rights from owners to tenants is reflected in the large payments that rent-stabilized tenants routinely extract from property owners who wish to use their buildings for other purposes.  For example, in 2015, two tenants in rent-stabilized apartments in Manhattan refused to vacate

their units, thus blocking a major redevelopment project, until the owner paid them $25 million to move out. In another case, a family of four paying $1,500 for a rent-stabilized apartment in the Upper East Side obtained a buyout of $1,075,000. And a group of tenants living in Williamsburg, paying $1,800 a month, banded together and refused to be bought out until the property owner paid each person $188,000.

79. The RSL's lease-renewal and eviction restrictions injure Plaintiffs in several ways. For example, in or about 2010, Plaintiffs Dino, Dimos, and Vasiliki Panagoulias were required to offer a renewal lease to a tenant to whom they would not have voluntarily offered such a lease. Each of the other Plaintiffs has likewise been required on one or more instances to offer a renewal lease to tenants to whom they would not have voluntarily offered such a lease. Given the number of rent-stabilized apartments owned by Plaintiffs, the RSL's intrusion on Plaintiffs' right to exclude will continue for as long as the challenged RSL provisions remain in effect.

80. Plaintiffs are likewise injured by the RSL's successorship provisions. For example, an elderly tenant living in a rent-stabilized apartment owned by Plaintiff Eighty Mulberry Realty Corporation passed away, at which point the tenant's children exercised succession rights with respect to the tenancy. These children, now well into adulthood, continue to live in the apartment. The successorship provisions have thus extended the period during which Plaintiff

Eighty Mulberry Realty Corporation has been deprived of its rights to use and occupy the apartment, and to exclude others from occupying it.

### 3. The RSL Prevents Owners From Using Their Apartments For Purposes Other Than Rent-Stabilized Housing.

81.     The RSL imposes additional restrictions that prevent property owners from using their apartments for purposes other than rent-stabilized housing.  These restrictions demonstrate that the RSL's core function is, as supporters of the 2019 Amendments indicated, "to ensure that rent stabilized apartments remain rent stabilized" and "protect" New York City's "regulated housing stock."

82.     The RSL generally requires that the owner of a rent-stabilized apartment must continue renting the apartment out to third parties.

83.     There are four exceptions to that general rule, each of which is so narrow that it is of little or no practical value to property owners.

84.     *First*, a property owner may remove an apartment building from rent stabilization—with the approval of DHCR—if the owner "seeks to demolish the building."  9 NYCRR § 2524.5(a)(2)(i).  However, to exercise this option, the property owner must proceed through a wall of red tape *and* go out of pocket to both cover the costs of tenants' relocation and pay them an additional cash stipend:  The owner must (1) submit to DHCR proof of financial ability to demolish the building and that the appropriate city agency has approved the plans for demolishing the building, *id.*; (2) serve each tenant with a termination notice at least 90 but not more

33

than 150 days prior to the expiration of the tenant's lease term, *id.* § 2524.2(c)(3); (3) "pay all reasonable moving expenses" for tenants in the building and afford the tenants "a reasonable period of time within which to vacate the housing accommodation," *id.* § 2524.5(a)(2)(ii)(a); (4) "relocate the tenant[s] to a suitable housing accommodation … at the same or lower legal regulated rent in a closely proximate area, or in a new residential building if constructed on the site, in which case suitable interim housing shall be provided at no additional cost to the tenant[s]," *id.* § 2524.5(a)(2)(ii)(b); and (5) make a "payment of a $5,000 stipend" to the tenant, *id.* If the owner cannot find a suitable unit at the same or lower legal regulated rent, then the owner must "pay the tenant a stipend equal to the difference in rent, at the commencement of the occupancy by the tenant of the new housing accommodation, between the subject housing accommodation and the housing accommodation to which the tenant is relocated, *multiplied by 72 months*." *Id.* (emphasis added). And if the owner cannot find any suitable unit, then the owner must "pay the tenant a stipend" calculated based on a "demolition stipend chart, at a set sum per room per month multiplied by the actual number of rooms in the tenant's current housing accommodation, but *no less than three rooms*" and then "*multiplied by 72 months*." *Id.* (emphasis added). These stipends often exceed tens of thousands of dollars and can range as high as $342,720. *See, e.g.*, N.Y. State Division of Housing and Community Renewal, Operational Bulletin 2009-1 at 6 (Feb. 10, 2009).

34

85.    The cost associated with complying with the RSL's requirements for demolishing a building containing rent-stabilized apartments can exceed the value of the original building, the property owner's available capital, or both. Furthermore, these costs can dramatically increase if a single tenant challenges whether the owner has complied with the requirements set forth in the preceding paragraph, in which case the owner's costs include not only the cost of buying out the tenant, but also the costs of operating the building and servicing debt while the tenant holds out.  In all events, requiring an owner to demolish its building in order to avoid the unconstitutional effects of the RSL is *itself* a taking.

86.    *Second*, the RSL permits property owners to remove a building from rent stabilization—without demolishing it—if the property owner "establishe[s] to the satisfaction of the DHCR after a hearing, that he or she seeks in good faith to withdraw any or all housing accommodations from both the housing and nonhousing rental market without any intent to rent or sell all or any part of the land or structure" *and* that the owner requires the property for use in "connection with a business he or she owns and operates." *Id.* § 2524.5(a)(1).  Property owners thus cannot use this provision to convert a rent-stabilized apartment building to commercial rental space, or to any use other than a business that the property owner "owns and operates."

87.    Zoning requirements further limit the practical value of this exception. On information and belief, the vast majority of rent-stabilized apartment buildings

35

are in areas zoned for residential, rather than commercial use. Where applicable zoning requirements do not permit commercial use, a property owner is unable to make use of the personal-business-use exception. For example, the Certificate of Occupancy for the apartment building owned and operated by Plaintiffs Dino, Dimos, and Vasiliki Panagoulias permits two ground-level commercial occupancies, but requires all other space within the building to be used for residential, rather than commercial, purposes.

88.     Running a business in a residential zone is highly restricted: A property owner is limited to using 25 percent of his or her residence, or 500 square feet, whichever is less, for the business, and New York City Zoning law excludes a host of professions, including real estate offices, from being operated out of the home. *See* Zoning Resolution of City of N.Y. § 12–10 (defining "home occupation").

89.     Even a property owner who can satisfy the stringent requirements of § 2524.5(a)(1) must "pay all reasonable moving expenses," and either pay "a reasonable stipend" or relocate tenants to "a suitable housing accommodation at the same or lower regulated rent in a closely proximate area." 9 NYCRR § 2524.5(c). If such housing is unavailable, "the owner may be required to pay the difference in rent between the subject housing accommodation and the new housing accommodation to which the tenant is relocated for such period as the DHCR determines, commencing with the occupancy of the new housing accommodation by

36

the tenant." *Id.* These significant cost impositions further demonstrate the illusory character of the personal-business-use exception. And these compelled payments to departing tenants are themselves a taking.

90. *Third*, a property owner may convert a rent-stabilized apartment building into a co-op or condominium if at least 51 percent of tenants agree to purchase their units. *See* Ch. 36 of the Laws of 2019, Part N, § 1 (amending § 352-eeee(2)(c)). Tenants who do not want their units converted to condominiums are entitled to continue renting the units at the rent-stabilized rate after the co-op or condominium conversion takes place. *See id.* (amending § 352-eeee(2)(c)). By requiring property owners to obtain purchase agreements from a majority of tenants, the 2019 Amendments shift yet another core property right to tenants from property owners.

91. *Fourth*, a property owner may withdraw a building from the rent-stabilized housing market if the owner demonstrates to the satisfaction of the DHCR that the owner is withdrawing the units in good faith without any intent to rent or sell all or any part of the land or structure, the building presents a serious safety hazard, and the cost of repairs "would substantially equal or exceed the assessed valuation of the structure." 9 NYCRR § 2524.5(a)(1)(ii). However, if the cost of repairs is less than the value of the building, the owner is compelled by law to make

the repairs and continue renting the apartments to third parties at the rent-stabilized rate.

92. As a consequence of these restrictions, the RSL prohibits property owners, including Plaintiffs, from retiring from the business of apartment leasing, closing his or her building to tenants, or holding the property as a long-term investment.

### 4. The RSL Significantly Reduces the Value of Rent-Stabilized Apartments.

93. By drastically limiting rent increases, curtailing the ability of property owners to recoup their costs, and making it virtually impossible to leave the rental business, the RSL, as revised by the 2019 Amendments, reduces the value of rent-stabilized apartments, including the rent-stabilized apartments owned by Plaintiffs.

94. New York City's own financial data—compiled before the 2019 Amendments were enacted—confirms the dramatic difference in the value of regulated buildings compared to unregulated buildings. The approximate value per square foot of a rent-stabilized apartment building ranges from $57 to $126, whereas the value of unregulated buildings of equivalent age ranges from $135 to $244.

95. The 2019 Amendments have further widened the gulf in property values, as the Amendments serve only to further restrict the rights of property owners.

96.    The 2019 Amendments have significantly reduced the value of the rent-stabilized apartments owned by Plaintiffs.

97.    The significant new restrictions imposed by the 2019 Amendments have reduced the value of the rent-stabilized buildings owned by Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, 177 Wadsworth LLC, the 2019 Amendments by 20 to 40 percent.

### 5.    The RSL Interferes With Property Owners' Investment-Backed Expectations.

98.    The restrictions imposed by the RSL, as amended by the 2019 Amendments, unduly interfere with property owners' reasonable investment-backed expectations, including by preventing property owners from earning a reasonable return on their investments.  The RSL therefore inflicts an uncompensated regulatory taking, both facially and as applied to Plaintiffs.

### a)    Rent Restrictions

99.    The RSL sets a legal rent for each rent-stabilized apartment, which is the maximum amount that can be charged on a monthly basis in a lease for the apartment.  The legal regulated rent is computed by adding increases—such as those set by the Rent Guidelines Board and other permitted increases that existed before the 2019 Amendments—to the initial legal regulated rent set under the RSL in 1974.  *See* N.Y. Unconsol. Laws § 26-512(b); N.Y.C. Admin Code § 26-513.

100. Each year, the Rent Guidelines Board determines permissible adjustments to the legal rent. *See* N.Y.C. Admin. Code § 26-510(b). Property owners are prohibited from increasing the rent at a rate in excess of the Board-approved adjustment, unless otherwise permitted by law. *See* 9 NYCRR §§ 2522.1, 2522.5.

101. The increases approved by the Board in recent years have not kept pace with the cost of owning and maintaining rent-stabilized apartments, including the apartments owned by Plaintiffs. Since 2008, property owners' operating costs have increased by over 45 percent, but the Board's permitted increases have not yet reached 20 percent, *see* N.Y.C. Rent Guidelines Board, *2019 Income and Expense Study* (Apr. 4, 2019), https://www1.nyc.gov/assets/rentguidelinesboard/pdf/ie19.pdf; N.Y.C. Rent Guidelines Board, *Rent Guidelines Board Apartment Orders #1 through #51 (1969 to 2020)*, https://www1.nyc.gov/assets/rentguidelinesboard/pdf/guidelines/aptorders.pdf:



102.   Prior to enactment of the 2019 Amendments, the RSL provided property owners with tools—such as vacancy increases and luxury decontrol—to increase rents beyond the level authorized in annual Board-authorized adjustments and thereby offset the shortfall shown in the graph above.  This system benefitted long-term tenants, too, because it provided meaningful incentives for property owners to invest in and improve rent-stabilized buildings over time.  By repealing or substantially narrowing these critical components of the RSL, the 2019 Amendments eliminated property owners' ability to earn a reasonable return on their investments—and in many instances to cover their operating costs.

103.   Defendants David Reiss, Cecelia Joza, Alex Schwarz, German Tejeda, May Yu, Patti Stone, J. Scott Walsh, Leah Goodridge, and Shelia Garcia, as Chair and Members of the Rent Guidelines Board, respectively, have limited the rent

increases for rent-stabilized units, thus preventing Plaintiffs from charging reasonable rates for their property, and from fully recovering their costs.

104.   Prior to enactment of the 2019 Amendments, the RSL provided additional mechanisms for property owners to adjust the rent for rent-stabilized apartments, including provisions that authorized rent increases upon a vacancy and an even greater increase upon a vacancy following a tenancy exceeding eight years. The 2019 Amendments repealed these provisions, further interfering with property owners' investment-backed expectations.

105.   The 2019 Amendments also eliminate the Rent Guidelines Board's discretion to increase the legal regulated rent based on a vacancy or the rental cost of a unit. *See* Ch. 36 of the Laws of 2019, Part C.  As amended, the RSL provides that the Board "shall not establish annual guidelines for rent adjustments based on the current rental cost of a unit or on the amount of time that has elapsed since another rent increase was authorized pursuant to this title." *Id.* Part C, § 4.

106.   These restrictions injure Plaintiffs by forcing them to lease the rent-stabilized apartments they own at substantially below-market rates.  For example, the legal regulated rent for one-bedroom rent-stabilized apartments owned and operated by Plaintiffs Dino, Dimos, and Vasiliki Panagoulias is as low as $890 per month, whereas similar apartments *in the same building* not governed by the RSL rent for approximately $1700 per month.   Plaintiff Eighty Mulberry Realty

Corporation likewise leases its rent-stabilized apartments for approximately $400-$500 per month, whereas comparable unregulated apartments *in the same building* rent for between approximately $1900 and $2800 per month.  There are similar disparities between the legal regulated rent and market-rate rents for rent-stabilized apartments owned by Plaintiffs  74 Pinehurst LLC, 141 Wadsworth LLC, and 177 Wadsworth LLC.

107.  Moreover, the reduction in property value caused by the 2019 Amendments jeopardizes the ability of Plaintiffs  74 Pinehurst LLC, 141 Wadsworth LLC, and 177 Wadsworth LLC to refinance their mortgages in the future.

### b)   *Elimination of Decontrol Mechanisms*

108.  The 2019 Amendments further undermine the investment-backed expectations of property owners, including Plaintiffs Dino, Dimos, and Vasiliki Panagoulias and Plaintiff Eighty Mulberry Corporation, by repealing the luxury- and high-income decontrol provisions described above, which permitted owners to remove apartments from rent stabilization when (a) an apartment with a maximum legal rent of more than $2,774.76 became vacant or (b) such an apartment was occupied by a tenant who earned more than $200,000 in two consecutive years. Many property owners, including Plaintiffs Dino, Dimos, and Vasiliki Panagoulias and Plaintiff Eighty Mulberry Realty Corporation, undertook significant capital improvements, improving the quality of their units, with the expectation that the

43

apartments could be converted to market-rate rentals under the luxury- and high-income decontrol provisions.

109.  Repeal of the luxury- and high-income decontrol provisions eliminated the only mechanisms to transition a rent-stabilized apartment into a market-rate rental unit.  Apartments subject to rent stabilization now must remain rent stabilized regardless of the monthly rent, the tenant's income, or other factors.  The luxury- and high-income decontrol provisions had been the law for over 25 years, and formed the backbone of property owners' reasonable investment-backed expectations that they could eventually charge market rents for their units.  Property owners, including Plaintiffs Dino, Dimos, and Vasiliki Panagoulias and Plaintiff Eighty Mulberry Realty Corporation, thus purchased and invested in their units with that understanding.  The 2019 Amendments undermine those expectations.  *See* Testimony of Benjamin Dulchin, N.Y. Sen. Hearing (May 16, 2019), https://www.nysenate.gov/transcripts/public-hearing-05-16-19-brooklyn-rent-regulation-finaltxt.  This change illustrates the conflict between the practical effects of the 2019 Amendments and the RSL's stated goal of facilitating a "transition from regulation to a normal market of free bargaining between landlord and tenant."  N.Y. Unconsol. Law § 8622.

110.  Eliminating the luxury- and high-income decontrol provisions will not increase the stock of affordable housing in New York City, but instead will permit

44

high-income individuals to take advantage of rents at below-market rates. *Cf. Stahl Assocs. Co. v. State Div. of Hous. & Cmty. Renewal, Office of Rent Admin.*, 148 A.D.2d 258, 261 (N.Y. App. Div. 1989) (rent-regulated apartment possessed by individual who owned a home and a "vacation retreat," whose "children spen[t] the summer in Europe with his wife"; and whose "four cars [we]re registered in upstate New York"). As the Appellate Division, First Department recognized in *Noto v Bedford Apartments Co.*, 21 A.D.3d 762, 765 (N.Y. App. Div. 2005), the 1993 amendments establishing luxury- and high-income decontrol provisions were "an attempt to restore some rationality to a system which provides the bulk of its benefits to high income tenants" and a "recogni[tion] that there is no reason why public and private resources should be expended to subsidize rents for [such] households." *Id.* (internal quotation marks omitted).

111. Plaintiffs Dino, Dimos, and Vasiliki Panagoulias and Eighty Mulberry Realty Corporation have been and will continue to be adversely affected by elimination of the decontrol provisions.

112. For example, before enactment of the 2019 Amendments, Plaintiffs Dino, Dimos, and Vasiliki Panagoulias utilized the RSL's decontrol provisions to deregulate four apartments in their building. These Plaintiffs would have continued to utilize the decontrol provisions to deregulate additional rent-stabilized apartments, including a three-bedroom apartment that likely would have been subject to luxury

decontrol upon the unit's next vacancy.   Due to the 2019 Amendments, that apartment will remain subject to the RSL.

113.   Similarly, Plaintiff Eighty Mulberry Realty Corporation removed apartments from rent stabilization pursuant to the decontrol provisions prior to enactment of the 2019 Amendments, and planned to continue doing so.   As a result of the 2019 Amendments, the 15 rent-stabilized apartments owned by Eighty Mulberry Realty Corporation will remain subject to the RSL.

c)   *Lock-In of Preferential Rents*

114.   The 2019 Amendments also frustrate the ability of property owners, including Plaintiffs, to earn a reasonable rate of return by requiring property owners to continue charging a reduced, "preferential" rent even after a lease expires.

115.   As a way of enticing new tenants to rent an apartment or for other purposes, property owners frequently offer a preferential rate below the legal regulated rent.   Prior to the 2019 Amendments, the RSL provided that the property owner could discontinue a preferential rent when a lease is renewed and instead charge any amount up to the legal regulated rent.   Accordingly, a property owner's agreement to a preferential rent during one lease term did not deprive the property owner of flexibility to offer other rents (whether preferential or not) in future lease terms.

46

116.   The 2019 Amendments strip property owners of that flexibility by locking in preferential rents for the life of a tenancy.  Under the 2019 Amendments, the amount charged to an existing tenant may not exceed the rent charged prior to renewal, adjusted by the applicable Board-authorized increase.  *See* Ch. 36 of the Laws of 2019, Part E, § 2.

117.   The 2019 Amendments thus create a strong incentive for property owners not to grant preferential rents for new tenancies, and likewise benefit affluent tenants with the resources to pay non-preferential rents, rather than low-income individuals most in need of aid.

118.   The 2019 Amendments lock in preferential rents (subject to increases at the discretion of the Rent Guidelines Board) regardless of the terms of past leases or the parties' course of dealing.  Under Part E of the 2019 Amendments, where a tenant is "subject to a lease on or after the effective date" of the Amendments or where a tenant "is or was entitled to receive a renewal or vacancy lease on or after such date," "upon renewal of such lease," the rent "shall be no more than the rent charged to and paid by the tenant prior to that renewal" (subject to increases at the discretion of the Rent Guidelines Board), unless the building is subject to a regulatory agreement with a local government agency, receives federal rental assistance, and the rents are set by a federal, state or local government agency.  Ch. 36 of the Laws of 2019, Part E, § 2.

119.   Accordingly, a property owner can no longer renew a tenant's lease at the legal regulated rent if the tenant's previous rent was at a lower, preferential rent. Property owners who offered preferential rents under the previous regime with the understanding that they could later raise rates up to the legal rent—or who included lease riders expressly stating that a preferential rent was valid only for a particular lease term—are now limited to the lower rate, subject only to increases at the discretion of the Rent Guidelines Board.

120.   Prior to enactment of the 2019 Amendments, all Plaintiffs leased one or more rent-stabilized apartments to a tenant at a preferential rate.  As a result of the 2019 Amendments, the preferential rate, rather than the legal regulated rent, must now serve as the basis for the rent for the duration of the tenancy—depriving Plaintiffs of significant income as a result.

121.   The 2019 Amendments do not exempt already signed contracts.  Thus, the RSL now forces property owners to reduce the rent for leases executed before the 2019 Amendments became effective on June 14, 2019, and which were operative on that date.

122.   A Fact Sheet published by DHCR confirms that "tenants that were paying a preferential rent as of June 14, 2019, retain the preferential rent for the life of the tenancy."  The Fact Sheet states that such a tenant retains his or her preferential rent even if, before June 14, 2019, the tenant executed a lease renewal that eliminated

or reduced the preferential rent.  DHCR's Fact Sheet illustrates this point with an example:

> Ms. Sanchez has a lease with a preferential rent of $1,000, set to expire on 6/30/19. Ms. Sanchez signed a one year renewal lease on 4/30/2019 and returned it the same day. The renewal lease was effective 7/1/19. The renewal lease cited a legal regulated rent of $1,218 but ended the preferential rent which was $1,000.
>
> . . . On July 1, 2019, when Ms. Sanchez's one year renewal lease begins, the legal regulated rent will increase by 1.5% From $1,200 to $1,218 due to the annual rent guidelines board increase. However, the preferential rent will also increase by 1.5% to $1,015. **Ms. Sanchez will pay the $1,015 preferential rent.**

(emphasis in original).

123.   Because lease renewal offers must by law be sent out months before a lease ends, many property owners and tenants executed leases beginning in July or August 2019 before the 2019 Amendments were enacted.  Where the rental rate in these contracts exceeds a preferential rent in the preceding lease agreement as adjusted by the Rent Guidelines Board annual increase, the rent charged under the new lease must now be changed.

124.   For example, in March 2019, a tenant of Plaintiff 74 Pinehurst LLC had a lease with a preferential rent that was due to expire on July 31, 2019.  On March 21, 2019, Plaintiff 74 Pinehurst LLC sent the tenant an offer to renew the lease for one year at a higher (but still preferential) monthly rent.  This amount represented

an increase greater than the increase now permitted by the Board's guidelines.  On May 11, 2019, the tenant signed the lease offer.  Following the 2019 Amendments to the RSL, however, Plaintiff 74 Pinehurst LLC may charge only the preferential rent from the parties' preceding lease agreement as adjusted by the Board's guidelines, notwithstanding the parties' executed lease agreement for a higher amount.

125.   Similarly, in May 2019, another tenant of Plaintiff 74 Pinehurst LLC had a lease with a preferential rent that was due to expire on August 31, 2019.  On May 15, 2019, Plaintiff 74 Pinehurst LLC sent the tenant an offer to renew the lease for one year at a higher (but still preferential) monthly rate.  This amount reflected an increase greater than the increase now permitted by the Board's guidelines.  On June 10, 2019, the tenant signed the lease offer.  Following the 2019 Amendments to the RSL, however, Plaintiff 74 Pinehurst LLC may charge only the preferential rent from the parties' preceding lease agreement as adjusted by the Board's guidelines, notwithstanding the parties' executed lease agreement for a higher amount.

126.   The requirements for owners to continue charging preferential rents are implemented and enforced by DHCR and Defendant RuthAnne Visnauskas.  *See* N.Y.C. Admin. Code § 26-511(b) ("no such amendments shall be promulgated except by action of the commissioner of the division of housing and community

50

renewal"); *id.* § 26-511(c)(14) (code must incorporate requirements on charging preferential rent).

        d)    *Changes to MCI and IAI Rules*

127. The 2019 Amendments exacerbate the harms described above by curtailing property owners' ability to recover the costs of individual apartment improvements (IAIs) and major capital improvements (MCIs). These limitations are implemented by DHCR and Defendant RuthAnne Visnauskas. *See* N.Y.C. Admin. Code § 26-511(b) ("no such amendments shall be promulgated except by action of the commissioner of the division of housing and community renewal"); *id.* § 26-511(c)(6), (14) (code must incorporate limitations on MCIs and IAIs).

128. As amended, the RSL prohibits property owners from factoring more than $15,000 in IAIs into an apartment's rent over a period of 15 years. The $15,000 cap applies regardless of the actual cost of the improvements and regardless of whether the improvements were necessary to comply with legal requirements. Moreover, a property owner may recover no more than 1/180th of the total cost (up to $15,000) of the IAIs each month for buildings with more than 35 units, as opposed to 1/60th of the cost (without limitation) prior to enactment of the 2019 Amendments. For buildings with 35 or fewer units, property owners can now recover 1/168th of the total cost (up to $15,000) of IAIs each month, as opposed to

1/40th of the cost (without limitation) prior to enactment of the 2019 Amendments. *See* Ch. 36 of the Laws of 2019, Part K, § 2.

129.   The 2019 Amendments further limit the "cost" that may be recovered by "excluding finance charges and any costs that exceed reasonable costs established by rules and regulations promulgated by the division of housing and community renewal." *Id*.   Those rules and regulations, implemented by DHCR and Defendant RuthAnne Visnauskas, must include "(i) requirements for work to be done by licensed contractors and prohibit common ownership between the landlord and the contractor or vendor" and "(ii) a requirement that the owner resolve within the dwelling space all outstanding hazardous or immediately hazardous violations." *Id.* In addition, property owners must obtain informed tenant consent to make IAIs to non-vacant units.

130.   Property owners also must discontinue these modest increases after 30 years "inclusive of any increases granted by the rent guidelines board." *Id.*

131.   The new, reduced cap for recovery of IAIs will not provide the revenue that property owners need to maintain their rent-stabilized units, which generally are located in aging, pre-1974 buildings and thus require constant upkeep and renovations.   As owners of market-rate units continue to improve their stock, the restrictions adopted by the 2019 Amendments will only increase the disparity in quality between rent-stabilized and market-rate housing.

132.    The 2019 Amendments also severely curtail property owners' ability to recover the cost of MCIs, such as roof replacements and installation of new boilers, heating and cooling systems, and electrical systems.   Under Part K of the 2019 Amendments, a property owner may increase the monthly rent of a stabilized apartment by only 2 percent in any twelve-month period to recoup the cost of such improvements, down from 6 percent under the prior regime.

133.    This limitation applies not only to future MCIs, but also retroactively to MCIs approved between June 16, 2012 and June 16, 2019, for renewal leases starting after June 14, 2019.  *See id.*, Part K, § 4 (as amended June 16, 2019).  This limitation further harms property owners, as it can take years for DHCR to process and approve MCI applications.   The 2019 Amendments also allow tenants to "answer or reply" to an application for an MCI increase, further slowing the process for MCI approvals.  *Id.*

134.    The Amendments have also lengthened the amortization period over which property owners may recoup their costs from 8 years to 12 years for buildings with 35 or fewer units and from 9 years to 12.5 years for buildings with more than 35 units.  *See* Ch. 36 of the Laws of 2019, Part K, § 11.

135.    As with charges to cover the cost of IAIs, rent increases for MCIs must be discontinued after 30 years inclusive of any increases granted by the rent guidelines board.  *See id.*, Part K, § 4.

136.   Moreover, these limitations are not applied to the *actual* costs that owners incur in MCIs.  Instead DHCR, under Defendant RuthAnne Visnauskas, must promulgate rules that "establish a schedule of reasonable costs for major capital improvements, which shall set a ceiling for what can be recovered through a temporary major capital improvement increase." *Id.*  Such "reasonable costs" do not take into account the specific circumstances of a building such as ancillary costs that owners encounter while making improvements.  The 2019 Amendments require DHCR to "establish the criteria for eligibility of a temporary major capital improvement increase including the type of improvement, which shall be essential for the preservation, energy efficiency, functionality or infrastructure of the entire building, … but shall not be for operational costs or unnecessary cosmetic improvements," further limiting the costs that can be recovered.  *Id.*  Moreover, any improvements must "be depreciable pursuant to the Internal Revenue Service," must "directly or indirectly benefit all tenants" and cannot be for "work done in individual apartments that is otherwise not an improvement to an entire building."  *Id.* No portion of MCI costs that are incurred but fall outside these parameters are recoverable.

137.   The MCI and IAI rules also fail to account for credit losses or vacancies.  For example, where a tenant does not pay his rent and the owner spends two years removing the tenant, the property owner has lost two of his 30 years for

recovering the cost of an improvement.  Nothing in the RSL permits the property owner to make up for those lost years.  Similarly, if a unit is vacant during the 30-year recovery period, the corresponding proportion of the MCI or IAI is lost.

138.  Property owners relied on prior law when making significant investments in rent-stabilized housing, based on rent rolls (i.e., a building's total rental income), decontrol mechanisms, and renovation-recapture provisions available under that regime.  These features of the prior law provided property owners and investors with certainty that investments in rent-stabilized housing would yield a modest, but nevertheless reasonable and predictable return.  The 2019 Amendments upset that framework and undercut the value of Plaintiffs' rent-stabilized apartments by substantially reducing rent rolls, eliminating decontrol mechanisms, and limiting property owners' ability to recapture the full cost of IAIs and MCIs.

139.  For example, Plaintiff 141 Wadsworth LLC completed a major electrical improvement project in early 2019 and promptly filed an application with DHCR for rent increases on the basis of this MCI.  The project cost approximately $80,000.  At the time of the project and at the time of Plaintiff 141 Wadsworth LLC's filing of its application with DHCR, Plaintiff 141 Wadsworth LLC reasonably believed that it would be entitled to rent increases consistent with the rules that governed MCIs prior to the 2019 Amendments.  DHCR, however, took no action on

Plaintiff 141 Wadsworth LLC's application prior to June 14, 2019, and indeed, DHCR still has not acted on the application.  Now, following the 2019 Amendments, Plaintiff 141 Wadsworth LLC cannot obtain the rent increases to which it reasonably believed it was entitled when it completed its MCI and filed its application with DHCR.

140.  In addition, before the enactment of the 2019 Amendments, Plaintiff 177 Wadsworth undertook an extensive replacement of gas piping for the distribution of cooking gas used in the stoves in the units in its building.  Plaintiff 177 Wadsworth's MCI application for this project remains pending and now will be governed by the MCI rules put in place by the 2019 Amendments, instead of the MCI rules that applied when Plaintiff 177 Wadsworth made the investment.  Had Plaintiff 177 Wadsworth known that the MCI rules would radically change in the 2019 Amendments, it would not have undertaken the gas piping project, and instead would have installed electric stoves.

141.  As another example, the 2019 Amendments have prevented Plaintiff Eighty Mulberry Realty Corporation from recovering investments made prior to the 2019 Amendments' enactment.  Plaintiff Eighty Mulberry Realty Corporation began multiple renovations of stabilized units in April and May 2019, under the reasonable belief that once the renovations were complete, it would be entitled to rent increases consistent with the IAI rules in place before the 2019 Amendments.  While the

renovations were in progress, the 2019 Amendments were passed and went into effect. Now, following the 2019 Amendments, Plaintiff Eighty Mulberry Realty Corporation cannot obtain the rent increases to which it reasonably believed it was entitled when it undertook the apartment renovations and has determined that it cannot recoup the costs of the renovations by renting out the renovated units indefinitely at the below-market rents mandated by the 2019 Amendments.

142.   The 2019 Amendments likewise have prevented Plaintiffs from making investments in their properties that they would have made under prior law but now can no longer afford. For example, before the 2019 Amendments, Plaintiffs Dino, Dimos, and Vasiliki Panagoulias were planning on undertaking two MCIs for their building: (i) a front and rear brick-pointing project estimated to cost more than $75,000, and (ii) a project to repair or replace a portion of the roof of the building and to install a new drainage system to prevent rainwater from entering the building. Under current conditions, whenever the building experiences heavy rain, Plaintiff Dino Panagoulias must manually remove rainwater from the building's roof to ensure that the rainwater does not overwhelm the drainage system and enter the building's stairwell. Because of the restrictions on MCI-related rent increases imposed by the 2019 Amendments, Plaintiffs Dino, Dimos, and Vasiliki Panagoulias no longer can afford to undertake either of the MCI projects that they had planned for their building, and consequently they have not proceeded with those projects.

143.   Plaintiffs similarly have dropped or cut back plans to undertake IAIs in their stabilized units as a result of the 2019 Amendments.

### e)   Changes to Eviction Procedures

144.   In addition to the changes described above, the 2019 Amendments also significantly alter the procedures for evicting tenants who fail to pay rent or breach their leases in other ways, and for recovering unpaid rent from such tenants. *See* Ch. 36 of the Laws of 2019, Part M.

145.   For example, as noted above, courts may allow tenants to remain in an apartment for up to one year after the tenant is determined by a court to be in breach of the lease, which typically occurs many months after the breach occurs. *See* N.Y. RPAPL § 753.   In exercising this authority, the court must consider, among other things, the tenant's health, enrollment of any resident children in local schools, and "any other life extenuating circumstance affecting the ability" of the tenant(s) "to relocate and maintain [their] quality of life." *Id.*

146.   The 2019 Amendments further provide that execution of a warrant of eviction is limited to the person (or persons) named, such that any person residing in an apartment other than the named parties—whether or not the person is lawfully entitled to occupy the unit—may not be evicted. *See* N.Y. RPAPL § 749.

147.   In addition, the 2019 Amendments provide that a court shall vacate a warrant of eviction if a tenant makes payment at any time prior to execution, unless the property owner can show that the tenant withheld payment in bad faith.  *See id.*

148.   These provisions, together with the remainder of Part M of the 2019 Amendments, severely limit—and in many instances effectively render unavailable—property owners' ability to recover rent-stabilized units from tenants who fail to pay any rent whatsoever or who otherwise violate the terms of their tenancies.

### 6.    The RSL's Hardship Process Does Not Cure the Law's Constitutional Defects

149.   The RSL's hardship exemption process, which is enforced and implemented by DHCR and Defendant RuthAnne Visnauskas, does not provide relief to property owners.   That process provides, in theory, a mechanism for property owners to ask DHCR to increase rents above the legal regulated rent in two narrow situations, where the property owners suffer a "comparative" or "alternative" hardship.

150.   DHCR's own Fact Sheet regarding the hardship process concedes that the process offers a remedy only in "unusual situation[s]."  *See* N.Y. Division of Housing and Community Renewal, Fact Sheet #39 (June 2019), https://hcr.ny.gov/system/files/documents/2019/11/fact-sheet-39.pdf.

151.   Under the comparative hardship test, the property owner must show that the legal regulated rent is "not sufficient to enable the owner to maintain approximately the same average annual net income (which shall be computed without regard to debt service, financing costs or management fees)" over a three-year period ending on, or within six months of, the date of the hardship application, as compared to either (1) the building's annual net income from 1968 to 1970 (for buildings constructed before 1968), (2) the building's annual net income from the first three years of operation (for buildings constructed after 1968), or (3) if title of the building has been transferred, the first three years of operation under the new owner, so long as there was (a) a bona fide transfer of the entire building, (b) the new owner cannot obtain the relevant records from 1968 to 1970 despite diligent efforts, and (c) the owner has six years of financial data from his or her continuous and uninterrupted operation of the building. *See* N.Y. Admin. Code § 26-511(c)(6).

152.   These requirements make the comparative hardship process a nullity. In general, property owners may obtain an increase only if their three-year annual net income is less than a similar period from 50 years ago.  With no adjustment for inflation, apartments seldom generate less net income than in 1970.  Furthermore, and critically, the application process excludes debt service, financing costs, and management fees, which are important parts of a property owner's costs.  An owner's interest payments on a mortgage thus are not includable expenses.  This

feature alone renders the comparative hardship exemption *de facto* unavailable for many properties subject to a mortgage.  And even if a hardship increase is granted, the resulting annual gross rents cannot exceed the sum of "(i) the annual operating expenses, (ii) an allowance for management services as determined by the commissioner, (iii) actual annual mortgage debt service (interest and amortization) …, and (iv) eight and one-half percent of that portion of the fair market value of the property which exceeds the unpaid principal amount of the mortgage indebtedness." N.Y.C. Admin. Code § 26-511(c)(6).

153.   The rent-stabilized apartments owned by Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, 177 Wadsworth LLC are owned subject to mortgages and thus the comparative hardship exemption is *de facto* unavailable.

154.   The alternative hardship exemption is equally unavailing.   Only property owners who have owned their buildings for three years are eligible for the exemption.  *See* 9 NYCRR § 2522.4(c)(2)(x).  Owners who purchase their buildings and immediately suffer losses as a result of rent regulation must suffer for three years before they may obtain relief under the alternative hardship process.

155.   For a property owner to be eligible to receive the exemption, the property owner must show that the Rent Guidelines Board increases are "not sufficient to enable the owner to maintain an annual gross rent income for such building which exceeds the annual operating expenses of such building by a sum

equal to at least five percent of such gross rent." N.Y.C. Admin. Code § 26-511(c)(6-a). Operating expenses "shall consist of the actual, reasonable, costs of fuel, labor, utilities, taxes, other than income or corporate franchise taxes, fees, permits, necessary contracted services and noncapital repairs, insurance, parts and supplies, management fees and other administrative costs and mortgage interest." *Id.* Capital improvement costs, a critical part of a building's expenses, are excluded. And an owner can only obtain an increase "as may be required to maintain" a five percent return, *id.*; but such a return—excluding capital improvement expenses—is not sufficient to maintain a profitable rental business.

156.   Under both the comparative and alternative hardship processes, any increase in rent "shall not exceed six percent" with any "dollar excess above" six percent "to be spread forward in similar increments and added to the rent as established or set in future years." *Id.* § 26-511(c)(6), (6-a). If an owner requires more than a six percent rent increase to stay profitable, he cannot obtain such a return until some unspecified time in the future.

157.   On information and belief, the restrictions on the comparative and alternative hardship processes result in few applications being filed, and even fewer being granted.

158.   More fundamentally, the RSL's hardship process is incapable of providing relief other than increased rental rates. Thus, a property owner aggrieved

by his or her inability to recover an apartment for personal use, by the inability to exclude tenants, or by restrictions preventing a building from being put to uses other than rent-stabilized housing, cannot obtain relief through the hardship process.

### D.  Rent-Stabilization Laws Are Economically Self-Defeating

159.  Basic principles of supply and demand demonstrate that rent stabilization laws are counterproductive and consistently fail to generate more affordable housing.  To the contrary, such laws lead to less and lower-quality housing.

160.  As economist and *New York Times* columnist Paul Krugman wrote in 2000, "[t]he analysis of rent control is among the best-understood issues in all of economics, and—among economists, anyway—one of the least controversial."  Paul Krugman, *Reckonings; A Rent Affair*, N.Y. Times (June 7, 2000).  According to Krugman, rent regulation "[p]redictabl[y]" causes "[s]ky-high rents on uncontrolled apartments, because desperate renters have nowhere to go—and the absence of new apartment construction, despite those high rents, because [property owners] fear that controls will be extended."  *Id.*

161.  Studies have demonstrated, time and again, that rent regulation reduces the quality and quantity of housing.  That consensus has existed since the inception of economic research regarding rent controls more than 70 years ago.  Rent

regulation causes these harms because rent laws artificially limit the supply of rental housing.

162.   A recent empirical study on the expansion of rent control in San Francisco in 1994 confirmed that "while rent control prevents displacement of incumbent renters in the short term, the lost rental housing supply likely drove up market rents in the long term, ultimately undermining the goals of the law."  Rebecca Diamond, Tim McQuaide, & Franklin Qian, *The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco* (Mar. 4, 2019), https://web.stanford.edu/~diamondr/DMQ.pdf (*Effects of Rent Control*).  According to the study's lead researcher, Professor Rebecca Diamond of Stanford University, the San Francisco rent regulations "dramatically limited the supply of rental housing" and effectively told property owners, "It's much more profitable to cater to high-income housing taste than low-income housing tastes."  Tanvi Misra, *Rent Control: a Reckoning*, CityLab (Jan. 19, 2018) (quoting Rebecca Diamond), https://www.citylab.com/equity/2018/01/rent-control-a-reckoning/551168/.        In effect, the rent regulations functioned as "a transfer from future renters in the city to renters in 1994," when the law took effect, "dr[iving] up citywide rents, damaging housing affordability for future renters, and counteracting the stated claims of the law."  *Effects of Rent Control*, *supra*, at 3, 24.

163.   The 1994 study concluded that although rent regulation "appears to help current tenants in the short run, in the long run it decreases affordability, fuels gentrification, and creates negative spillovers on the surrounding neighborhood." The study similarly concluded that "[f]orcing [property owners] to provide insurance to tenants against rent increases can ultimately be counterproductive."   Rebecca Diamond, *What Does Economic Evidence Tell Us About the Effects of Rent Control?*, Brookings Inst. (Oct. 18, 2018), https://www.brookings.edu/research/what-does-economic-evidence-tell-us-about-the-effects-of-rent-control/.

164.   A study on the elimination of rent control in Cambridge, Massachusetts in the 1990s likewise confirmed that rent regulation "decreases the quantity of rental housing supplied and decreases unit quality."  David P. Sims, *Out of Control: What Can We Learn from the end of Massachusetts Rent Control?*, 61 J. Urban Econ. 129, 130 (2007).   The study determined that rent regulation primarily assisted groups other than low-income families, with a greater percentage of rent-controlled units occupied by tenants in the top half of income distribution than by those in the lowest quartile.

165.   Studies of rent control and rent stabilization in New York City have produced similar results.  For example, a landmark study of New York's rent control system in the late 1960s concluded that rent control is a "very poorly focused redistribution device" because "[t]here is nothing approaching equal treatment of

equals among the beneficiaries of rent control." Edgar O. Olsen, *An Econometric Analysis of Rent Control*, 80 J. Pol. Econ. 6, 1096 (1972) (*Econometric Analysis*). Another study based on data from the late 1960s concluded that rent controls had "a large deleterious impact on rental structure quality, particularly in smaller buildings." Joseph Gyourko & Peter Linneman, *Rent Controls and Rental Housing Quality: A Note on the Effects New York City's Old Controls*, 27 J. Urban Econ. 398, 399 (1990). And a 1987 study concluded that the "targeting" of both rent control and rent stabilization benefits "was poor." Peter Linneman, *The Effect of Rent Control on the Distribution of Income among New York City Renters*, 22 J. Urban Econ. 14, 15 (1987).

166. A 2003 study by the Harvard economist Edward Glaeser and his colleague, Erzo Luttmer, determined that rent regulation in New York City has resulted in the misallocation of a significant proportion of apartments, meaning that tenants' units were either larger or smaller than they would be in the absence of rent control and stabilization. The study concluded that "this misallocation of bedrooms leads to a loss in welfare which could be well over $500 million annually to the consumers of New York, before we even consider the social losses due to undersupply of housing." Due to the existing rent control laws, approximately 20 percent of the apartments in New York City were "in the wrong hands." Edward L.

Glaeser & Erzo F.P. Luttmer, *The Misallocation of Housing Under Rent Control*, 93 Am. Econ. Rev. 1027 (2003).

167.   Research demonstrates that by distorting the rental marketplace, rent regulation also drives up prices in uncontrolled units.  A 1993 study by Steven B. Caudill, for example, concluded that rents in uncontrolled units in New York City were between 22 and 25 percent higher than they would be in the absence of New York's rent-stabilization and rent-control laws.  Steven B. Caudill, *Estimating the Costs of Partial-Coverage Rent Controls: A Stochastic Frontier Approach*, 75 Rev. Econ. & Stat. 727, 731 (Nov. 1993).

168.   Other studies have concluded that New York City's existing rent laws—perpetuated and expanded by the 2019 Amendments—leave lower-income tenants worse off than if there had been no regulation at all.  A 1999 paper determined that "due to the higher price in the unregulated market" for rental units driven by rent regulation, "on average, tenants in rent stabilized and 'old style' rent control units would be better off if controls had never been established," since they would have "faced a lower price of housing in the uncontrolled sector and would find units in the free sector that better fit their needs."  Dirk K. Early, *Rent Control, Rental Housing Supply, and the Distribution of Tenant Benefits*, 48 *J. Urban Econ.* 185, 202 (2000).

67

169.   Moreover, although the RSL applies only so long as the residential vacancy rate in New York City is below 5 percent, the regime itself causes and will continue to cause the vacancy rate to remain below 5 percent in perpetuity.  By guaranteeing tenants and their heirs substantially below-market rents with unlimited rights of renewal and succession, the rent stabilization regime distorts choices and impedes ordinary unit turnover.

170.   As noted above, New York City's most recently-published figures, for 2017, show that the vacancy rate for unregulated units is 6.07 percent. The vacancy rate for rent-stabilized units, however—which account for approximately 44 percent of all units in New York City—is 2.06 percent.  And because the RSL now prevents rent-stabilized apartments from transitioning to market-rate rentals, the law ensures that regulated units, with their artificially low vacancy rates, will remain a significant enough percentage of the total housing stock in New York City to keep the overall vacancy rate at or below 5 percent.  For this reason, the terms of the RSL itself ensure that the law's restrictions—and the constitutional violations that they inflict—are permanent.

### E.    The RSL Does Not Substantially Advance Its Stated Objectives.

171.   As amended by the 2019 Amendments, the RSL is arbitrary and irrational, in violation of the Fourteenth Amendment's Due Process Clause, because

it fails to substantially advance its stated purposes, and in many instances undermines those objectives.

172. The 2019 Amendments state that they seek to promote affordable housing for "working persons and families" who have lost "vital and irreplaceable affordable housing" due to "the deregulation of housing accommodations upon vacancy." Ch. 36 of the Laws of 2019, Part D, § 1. The Memorandum in Support of Legislation submitted with the bill in both the New York State Assembly and Senate justifies the bill as assisting the City of New York and surrounding counties in addressing their "struggle to protect their regulated housing stock, which provides and maintains affordable housing for millions of low and middle income tenants." N.Y. State Assembly, *Memorandum in Support of Legislation*, https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A08281&term=2019& Memo=Y.

173. Sponsors of the legislation in the Assembly and in the Senate have echoed these goals. State Assembly Speaker Carl Heastie, the sponsor of the 2019 Amendments, stated in a press release after the Amendments' passage that the legislation would "help keep families from being forced out of their homes and priced out of the communities they are a part of." News Release, Assembly Speaker Carl E. Heastie, *Assembly Passes Historic Affordable Housing Protections to Bring*

69

*Stability to Tenants Across New York State* (Jun. 14, 2019), https://nyassembly.gov/Press/files/20190614a.php.

174.   Another legislator, Assemblyman Steven Cymbrowitz, chair of the Assembly's Housing Committee, said the 2019 Amendments would allow lower-income citizens to remain in New York City.  "It reaffirms our commitment to ensuring that New York state remains a welcoming place for everyone who wants to live here, not just the wealthy."  Aidan Graham, *Political Leaders Celebrate Rent Law Agreement as a 'Historic' Victory for Tenants*, Brooklyn Paper (Jun. 14, 2019), https://www.brooklynpaper.com/stories/42/25/all-rent-law-agreement-2019-06-21-bk.html.

175.   Another co-sponsor, Senator Gustavo Rivera, stated that "[w]ith this package, we are defending and preserving our already depleted affordable housing stock to ensure that more New Yorkers are not unfairly displaced from their homes."  Press Release, New York State Senate Democratic Majority, *Senate Majority Passes Strongest Tenant Protections in State History* (Jun. 14, 2019), https://www.nysenate.gov/sites/default/files/press-release/attachment/06.14.19_housing_rent_regs_passing_release.pdf.

176.   As revised by the 2019 Amendments, however, the RSL will have the opposite effect: it will benefit the wealthiest tenants, decrease the supply of affordable housing, and reduce investment critical to maintaining existing rent-

stabilized units. Basic economics instructs that property owners will not rent out units where the marginal cost of doing so is higher than the rent they can charge. As a result, property owners will withdraw such units from the rental market, which will further lower supply—all without affecting the five percent vacancy determination that triggers the emergency. The RSL thus undermines its own purposes.

177. According to expert analysis, in recent years, the RSL's largest beneficiaries have not been low-income tenants but instead affluent residents of Manhattan. A recent analysis by the *Wall Street Journal*, for example, found that renters of rent-stabilized units in Manhattan receive a much greater discount from market rents, on average, than do those in working-class neighborhoods.

178. According to the *Wall Street Journal* analysis, "a typical renter with an income in the top quarter of all New York households" received a rent discount of 39 percent, whereas renters in the bottom quarter received only a 15 percent discount. Josh Barbanel, *Wealthy, Older Tenants in Manhattan Get Biggest Boost from Rent Regulations*, Wall Street J. (Jun. 12, 2019), https://www.wsj.com/articles/wealthy-older-tenants-in-manhattan-get-biggest-boost-from-rent-regulations-11560344400.

179. Analysts indicate that the 2019 Amendments will only deepen the housing inequality inherent in New York's rent-stabilization laws. According to Stijn van Nieuwerburgh, a professor of Real Estate at Columbia University's

Graduate School of Business, the "new law . . . does not address the misallocation of housing present in the current system," in which "many" rent-stabilized units "are taken up by affluent households" whose "incomes have risen since they moved in, often decades earlier." Stijn van Nieuwerburgh, *How New Rent Regulation Reforms Will Help Many of the Wrong Tenants*, N.Y. Daily News (June 18, 2019). Indeed, nearly 28,000 rent-stabilized units in New York are occupied by households who earn more than $200,000 per year. Sean Campion, Citizens Budget Commission, *Reconsidering     Rent     Regulation     Reforms* (Jan.     30,     2019), https://cbcny.org/research/reconsidering-rent-regulation-reforms.

180.   The *Wall Street Journal* study, meanwhile, notes that in 2017, nearly 18,500 tenants in older buildings had rents above the threshold that triggered decontrol under the previous version of the rent laws ($2,774 per month) with median incomes of $150,000 per year and average incomes of $210,000 per year. Under the 2019 Amendments, all of those tenants will be able to retain their rent-stabilized apartments.

181.   A recent report by the Citizens Budget Commission explains that "[e]nding high-rent vacancy decontrol will disproportionately benefit higher-income households," because, when these units become vacant, they "will continue to … be rented by households of similar economic status" rather than low-income renters. Over the last three years, the Commission found, "middle- and upper- income

households have accounted for 60 percent of households who moved into stabilized units with rents of $2,000 per month."

182.    The Citizens Budget Commission report also anticipates that ending luxury- and high-income decontrol will not increase the number of affordable units; instead, it will maintain an existing stock of higher-rent stabilized housing that only wealthier households can afford—thereby "doing little to address the rent burdens faced by the lowest-income households."

183.    By eliminating the only provisions that invoke any means testing, the 2019 Amendments again undermine the stated purposes of the RSL.

184.    Moreover, as a result of the RSL, both the State and New York City will lose income that otherwise would be generated by real estate tax revenue.  In 2010, the Citizens Budget Committee estimated that the City loses $283 million in property tax revenue per year due to rent regulation.  Citizens Budget Commission, *Rent Regulation: Beyond the Rhetoric* (Jun. 2010), https://cbcny.org/sites/default/files/REPORT_RentReg_06022010.pdf.    That revenue could be used to subsidize housing costs for low-income residents rather than forcing landlords to provide a public benefit to tenants without regard to income or wealth.

185.    According to the Citizens Budget Committee, restrictions on unit and building improvements—a central feature of the 2019 Amendments—will

73

"exacerbate the comparatively poorer condition of rent stabilized units," which "report 80 percent more maintenance deficiencies on average than market-rate units." That problem will only deepen as the aging stock of rent-stabilized units require increasingly extensive renovations to remain livable. The Real Estate Board of New York estimates that within five years, "approximately 414,000 units could be financially distressed" such that their owners will not "be able to afford any investment beyond basic maintenance, taxes, and utilities." Testimony of the Real Estate Board of New York Before the Assembly Standing Committee on Housing Regarding Rent Regulated Housing, REBNY News Room (May 2, 2019).

186. There are more effective alternatives to New York's rent-stabilization regime. One scholar, for example, argued over fifty years ago that "unrestricted cash grants or vouchers for particular goods would permit more equal treatment of equally situated families" than rent regulation. *See Econometric Analysis*, *supra*, at 1096. Adapting zoning laws to encourage new building of housing would also reduce price increases and make more units available to low-income individuals and families. In August 2018, researchers at New York University's Furman Center—including the newly appointed New York City Deputy Mayor of Housing and Economic Development—concluded "from both theory and empirical evidence, that adding new homes moderates price increases and therefore makes housing more affordable to low- and moderate-income families." Vicki Been, Ingrid Gould Ellen, &

74

Katherine O'Regan, *Supply Skepticism: Housing Supply and Affordability*, NYU Furman Center, at 1 (Aug. 20, 2018), http://furmancenter.org/files/Supply_Skepticism_-_Final.pdf. Such methods are better suited than rent stabilization to advance the goal of increasing affordable housing.

187. Indeed, New York tacitly acknowledges that the costs of providing affordable housing should be borne by the government. For instance, New York City has implemented the Senior Citizen Rent Increase Exemption ("SCRIE") and Disability Rent Increase Exemption ("DRIE") programs. *See* N.Y.C. Admin. Code § 26-509. Under those programs, individuals living in rent stabilized apartments who either have disabilities or are 62 years or older, and fall under certain income thresholds, may apply to have their rents frozen at the existing rate at the time of application to the programs. Under those programs, any rent increases in the regulated rent are paid by the City, rather than tenants, to property owners in the form of a property tax credit. *See id.* § 26-509(c).

188. The SCRIE and DRIE programs demonstrate that the cost of providing housing subsidies can, and should, be the burden of the government. In the RSL, however, the government has forced property owners to bear those costs. And, by eliminating many of the ways that property owners can increase rents, the RSL also

allows the government to avoid paying out credits under the SCRIE and DRIE programs, thus shifting to property owners costs that the City otherwise would bear.

## CLAIMS FOR RELIEF

### COUNT ONE: Facial Physical Taking Without Just Compensation
**Fifth and Fourteenth Amendments - 42 U.S.C. § 1983**
**(On Behalf of All Plaintiffs)**
**(Against State of New York, City of New York, Division of Housing and Community Renewal, and RuthAnne Visnauskas)**

189.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

190.   The Fifth Amendment to the Constitution of the United States provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

191.   The Fifth Amendment's prohibition on taking private property for public use without just compensation applies to the States through the Fourteenth Amendment to the Constitution of the United States.

192.   The Rent Stabilization Law, as amended by the 2019 Amendments, requires property owners to continue renting their property at government-regulated rents even if they object to doing so, and prevents them from exiting the rental business.   Such an evisceration of property rights is a taking and requires just compensation.

193.   Taken together, the provisions of the RSL as a whole and on their face effect a physical taking by depriving Plaintiffs of core aspects of property ownership, including the right to exclude others from their apartments, the right to possess and use those apartments for their own enjoyment, and the right to dispose of their property for purposes other than rent-stabilized housing.

194.   New York Compilation of Code, Rules, and Regulations, Title 9, § 2522.5, on its face effects a physical taking by requiring property owners, including Plaintiffs, to continually offer renewal leases to tenants in rent-stabilized units, resulting in a permanent physical occupation.

195.   New York Compilation of Code, Rules, and Regulations, Title 9, § 2524.5, on its face effects a physical taking by depriving property owners, including Plaintiffs, of the right to use their property for purposes other than rent-stabilized housing.

196.   Part I of the 2019 Amendments on its face effects a physical taking by depriving property owners, including Plaintiffs, of the right to possess, use and enjoy their property for personal use.

197.   The RSL does not provide Plaintiffs just compensation for these takings.

198.   Defendants State of New York, City of New York, Division of Housing and Community Renewal, and RuthAnne Visnauskas, acting under color of New

York law, have caused and will continue to cause, the constitutional violations described in this Count.

199.    Defendant RuthAnne Visnauskas has participated directly in the constitutional violation in this Count by enforcing the RSL against Plaintiffs. In addition, Defendant Visnauskas has created and continued policies and customs causing the unconstitutional practices in this Count through her implementation and enforcement of the RSL.

200.    Absent declaratory relief, just compensation, or injunctive relief, Plaintiffs will suffer irreparable harm caused by deprivation of their constitutional rights.

**COUNT TWO: As-Applied Physical Taking Without Just Compensation**
**Fifth and Fourteenth Amendments - 42 U.S.C. § 1983**
**(On Behalf of All Plaintiffs Other Than 177 Wadsworth LLC)**
**(Against State of New York, City of New York, Division of Housing and**
**Community Renewal, and RuthAnne Visnauskas)**

201.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

202.    The Fifth Amendment to the Constitution of the United States provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

203.   The Fifth Amendment's prohibition on taking private property for public use without just compensation applies to the States through the Fourteenth Amendment to the Constitution of the United States.

204.   The RSL, as amended by the 2019 Amendments, requires property owners to continue renting their property at government-regulated rates even if they object to doing so, and prevents them from exiting the rental business in perpetuity. Such an evisceration of property rights is a taking and requires just compensation.

205.   Taken together, the provisions of the RSL as a whole, as applied to Plaintiffs, effect a physical taking by depriving Plaintiffs of core aspects of property ownership, including the right to exclude others from their apartments, the right to possess and use those apartments for their own enjoyment, and the right to dispose of their property for purposes other than rent-stabilized housing.

206.   New York Compilation of Code, Rules, and Regulations, Title 9, § 2522.5, as applied to Plaintiffs, effects a physical taking by requiring property owners, including Plaintiffs, to continually offer renewal leases to tenants in rent-stabilized units, resulting in a permanent physical occupation.

207.   New York Compilation of Code, Rules, and Regulations, Title 9, § 2524.5, as applied to Plaintiffs, effects a physical taking by depriving property owners, including Plaintiffs, of the right to use their property for purposes other than rent-stabilized housing.

79

208.   Part I of the 2019 Amendments, as applied to Plaintiffs, effects a physical taking by depriving property owners, including Plaintiffs, of the right to possess, use and enjoy their property for personal use.

209.   The RSL does not provide Plaintiffs just compensation for these takings.

210.   Defendants State of New York, City of New York, Division of Housing and Community Renewal, and RuthAnne Visnauskas, acting under color of New York law, have caused and will continue to cause, the constitutional violations described in this Count.

211.   Defendant RuthAnne Visnauskas has participated directly in the constitutional violation in this Count by enforcing the RSL against Plaintiffs. In addition, Defendant Visnauskas has adopted and continued policies and customs causing the unconstitutional practices in this Count through her implementation and enforcement of the RSL.

212.   Absent declaratory relief, just compensation, or injunctive relief, Plaintiffs will suffer irreparable harm caused by deprivation of their constitutional rights.

## COUNT THREE: Facial Regulatory Taking Without Just Compensation
**Fifth and Fourteenth Amendments - 42 U.S.C. § 1983**
**(On Behalf of All Plaintiffs)**
**(Against All Defendants)**

213.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

214.   In addition to authorizing an uncompensated physical occupation of Plaintiffs' property, the RSL, as amended by the 2019 Amendments, also constitutes a regulatory taking.  In this regard, the mere enactment of the 2019 Amendments inflicts an uncompensated taking by denying property owners, including Plaintiffs, of an economically viable use of their apartments.

215.   The RSL inflicts a regulatory taking because it imposes a severe burden on private property rights.

216.   The RSL causes property owners, including Plaintiffs, significant economic harm. Even before the 2019 Amendments, the approximate value per square foot of a rent-stabilized apartment building ranged from $57 to $126, whereas the value of unregulated buildings of equivalent age ranged from $135 to $244.  The RSL thus results in a decrease of 50 percent or more of a unit's value.  The 2019 Amendments exacerbate this decrease in value and have caused rent-stabilized apartments to lose 20 to 40 percent (or more) of their value prior to enactment of the 2019 Amendments.

217.   The RSL drastically reduces property owners' ability to earn a reasonable rate of return, and thus further destroys the value of their investment.  The 2019 Amendments repealed the luxury- and high-income decontrol provisions, the two paths property owners had to obtain market rents for their current rent-stabilized units.  The 2019 Amendments also restrict property owners' ability to recover the costs of IAIs and MCIs by curtailing the availability of those basic cost recovery measures.

218.   Under the 2019 Amendments, property owners are required to continue charging reduced "preferential" rents, which are less than the legal regulated rent, even after a lease expires, and even when a lease rider expressly provides that a preferential rent is valid only for a specific lease term.  Such property owners are now locked into rates below the legal regulated rent, thus hindering their ability to earn a reasonable return.

219.   The RSL likewise undermines the reasonable, investment-backed expectations of property owners, including Plaintiffs, who undertook significant capital investments to improve the quality of their buildings and units on the reasonable belief that New York's rent regulations would preserve their ability to earn a reasonable rate of return on these investments.  The 2019 Amendments facially prevent that outcome and impair the ability of property owners to refinance their mortgages in the future.

220.   The character of the government action under RSL is functionally equivalent to a direct appropriation of private property.  In effect, the RSL converts the apartments it governs, on a permanent basis, into public housing stock used to provide social-welfare benefits to tenants.

221.   The RSL is also facially invalid because it requires property owners to lease apartments at rents "below what would otherwise be a 'reasonable rent.'" *Pennell v. City of San Jose*, 485 U.S. 1, 21 (1988) (Scalia, J., concurring in part and dissenting in part).  By requiring property owners to subsidize tenant rents without regard to the reasonableness of those rents, and without providing corresponding benefits to property owners, the RSL unlawfully forces property owners "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Penn Central*, 438 U.S. at 123, and "us[es] the occasion of rent regulation . . . to establish a welfare program privately funded by" property owners," *Pennell*, 485 U.S. at 22 (Scalia, J., concurring in part and dissenting in part).

222.   Once a property owner "is receiving only a reasonable return, he can no longer be regarded as a 'cause' of exorbitantly priced housing; nor is he any longer reaping distinctively high profits from the housing shortage." *Id*. at 21.  As a result, property owners may not be constitutionally targeted as the remedy for such a societal problem, at their own expense, where they are not the root cause.

223.   And even if the problems the RSL attempts to fix are caused by property owners as a class, such issues are "not remotely attributable to the *particular* landlords that the [RSL] singles out"—owners of residential buildings constructed before 1974 or otherwise subject to the RSL.  *See id.* (emphasis in original).

224.   Defendants, acting under color of New York law, have caused and will continue to cause, the constitutional violations described in this Count.

225.   Each Defendant sued in his or her individual capacity has participated directly in causing the uncompensated taking of Plaintiffs' property or implemented and continued policies causing the uncompensated taking of Plaintiffs' property.

226.   Defendants David Reiss, Cecelia Joza, Alex Schwarz, German Tejeda, May Yu, Patti Stone, J. Scott Walsh, Leah Goodridge, and Shelia Garcia, as Chair and Members of the Rent Guidelines Board, respectively, have caused the uncompensated taking property by restricting rent increases for rent-stabilized apartments to levels that fail to keep up with the operating costs of those apartments.

227.   Defendant RuthAnne Visnauskas has participated directly in the constitutional violation in this Count by enforcing the RSL against property owners, including Plaintiffs.  In addition, Defendant Visnauskas has created and continued policies and customs causing the unconstitutional practices in this Count through her implementation and enforcement of the RSL.

228.   Absent declaratory relief, just compensation, or injunctive relief, Plaintiffs will suffer irreparable harm caused by deprivation of their constitutional rights.

## COUNT FOUR: As-Applied Regulatory Taking Without Just Compensation
### Fifth and Fourteenth Amendments - 42 U.S.C. § 1983
### (On Behalf of All Plaintiffs Other Than 177 Wadsworth LLC)
### (Against All Defendants)

229.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

230.   In addition to authorizing an uncompensated physical occupation of Plaintiffs' property, the RSL, as amended by the 2019 Amendments, also constitutes a regulatory taking as applied to Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, Dino Panagoulias, Dimos Panagoulias, Vasiliki Panagoulias, and Eighty Mulberry Realty Corporation.

231.   The RSL inflicts a regulatory taking because it imposes a severe burden on private property rights.

232.   The RSL has caused and will continue to cause Plaintiffs significant economic harm, including by (i) making it substantially more difficult, in light of existing tax burdens and onerous regulatory requirements, to comply with all applicable laws and regulations while also making ends meet; (ii) decreasing the resale value of Plaintiffs' properties; (iii) making preferential rents permanent, even when tenants agreed to higher rents before the 2019 Amendments were enacted, and

even when lease agreements expressly stated that a preferential rent is valid only for a specific lease term; and (iv) depriving Plaintiffs of the rights to use and possess the apartments they own, and to exclude others from occupying and using those apartments.

233.  The RSL likewise undermines Plaintiffs' reasonable, investment-backed expectations by precluding Plaintiffs from fully recovering the cost of improvements to their apartments, including improvements mandated by law or undertaken prior to enactment of the 2019 Amendments.

234.  For example, Plaintiff 141 Wadsworth LLC undertook significant capital investments to improve the quality of its units on the reasonable belief that New York's rent regulations would preserve its ability to recover and earn a reasonable rate of return on these investments.  The 2019 Amendments, as applied, prevent that outcome.  Likewise, the 2019 Amendments have reduced the value of the rent-stabilized apartments owned by Plaintiffs 74 Pinehurst LLC and 141 Wadsworth LLC by 20 to 40 percent, jeopardizing the ability of these Plaintiffs to refinance their mortgages in the future.

235.  The 2019 Amendments also have prevented and continue to prevent Plaintiffs Dino, Dimos, and Vasiliki Panagoulias from making improvements to their properties that they would have made under prior law but now can no longer afford.

236.   The 2019 Amendments prevent Plaintiff Eighty Mulberry Realty Corporation from fully recouping the cost of improvements to rent-stabilized apartments undertaken before enactment of the 2019 Amendments, and have made it uneconomical to undertake similar improvements in the future.

237.   The rent increases authorized by the Board and its members have not kept pace with Plaintiffs' operating expenses, further undermining Plaintiffs' investment-backed expectations.

238.   Individually and collectively, the RSL's restrictions result in confiscatory rents that are "below what would otherwise be a 'reasonable rent.'" *Pennell*, 485 U.S. at 21 (Scalia, J., concurring in part and dissenting in part), and prevent Plaintiffs from earning a reasonable rate of return on the rent-stabilized apartments they own.

239.   The character of the government action under RSL is functionally equivalent to a direct appropriation of private property.  In effect, the RSL converts the apartments it governs, on a permanent basis, into public housing stock used to provide social-welfare benefits to tenants.

240.   By requiring Plaintiffs to subsidize tenant rents without regard to the reasonableness of those rents, and without providing corresponding benefits to Plaintiffs, the RSL unlawfully forces Plaintiffs "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Penn Central*, 438

U.S. at 123, and "us[es] the occasion of rent regulation . . . to establish a welfare program privately funded by" property owners, *Pennell*, 485 U.S. at 22 (Scalia, J., concurring in part and dissenting in part).

241.   Even if the problems the RSL attempts to fix are caused by property owners as a class, such issues are "not remotely attributable to" Plaintiffs. *Id.*

242.   Defendants, acting under color of New York law, have caused and will continue to cause, the constitutional violations described in this Count.

243.   Each Defendant sued in his or her individual capacity has participated directly in causing the uncompensated taking of Plaintiffs' property or implemented and continued policies causing the uncompensated taking of Plaintiffs' property.

244.   Defendants David Reiss, Cecelia Joza, Alex Schwarz, German Tejeda, May Yu, Patti Stone, J. Scott Walsh, Leah Goodridge, and Shelia Garcia, as Chair and Members of the Rent Guidelines Board, respectively, have caused the uncompensated taking property by restricting rent increases for rent-stabilized apartments to levels that fail to keep up with the operating costs of those apartments.

245.   Defendant RuthAnne Visnauskas has participated directly in the constitutional violation in this Count by enforcing the RSL against Plaintiffs.  In addition, Defendant Visnauskas has created and continued policies and customs causing the unconstitutional practices in this Count through her implementation and enforcement of the RSL.

246. Absent declaratory relief, just compensation, or injunctive relief, Plaintiffs will suffer irreparable harm caused by deprivation of their constitutional rights.

### COUNT FIVE: Violation of Contract Clause
### U.S. Constitution, Article I - 42 U.S.C. § 1983
### (On Behalf of All Plaintiffs)
### (Against State of New York, City of New York, Division of Housing and Community Renewal, and RuthAnne Visnauskas)

247. Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

248. The Contract Clause of the United States Constitution provides that no State shall pass any "Law impairing the Obligation of Contracts." U.S. Const. art. I, cl. 10.

249. As applied to Plaintiffs, the RSL, as amended by the 2019 Amendments, violates the Contract Clause because it substantially impairs Plaintiffs' existing apartment-rental contracts, and such impairment does not reasonably advance a significant and legitimate public purpose. The RSL causes this violation by, among other things, prohibiting Plaintiff 74 Pinehurst LLC from charging monthly rents authorized by rental contracts executed before June 14, 2019, and by requiring all Plaintiffs to base future leases on preferential rents in effect or otherwise applicable on or after the date on which the 2019 Amendments were

enacted, even where lease agreements expressly stated that a preferential rent applied only to a specific lease term.

250.   In March 2019, a tenant of Plaintiff 74 Pinehurst LLC had a lease with a preferential rent that was due to expire on July 31, 2019.  On March 21, 2019, Plaintiff 74 Pinehurst LLC sent the tenant an offer to renew the lease for one year at a higher (but still preferential) monthly rent.  This amount represented an increase greater than the increase now permitted by the Board's guidelines.  On May 11, 2019, the tenant signed the lease offer.  That lease agreement remains in effect. Following enactment of the 2019 Amendments, however, Plaintiff 74 Pinehurst LLC may charge only the preferential rent from the parties' preceding lease agreement as adjusted by the Board's guidelines, notwithstanding the parties' executed lease agreement for a higher amount.

251.   Similarly, in May 2019, another tenant of Plaintiff 74 Pinehurst LLC had a lease with a preferential rent that was due to expire on August 31, 2019.  On May 15, 2019, Plaintiff 74 Pinehurst LLC sent the tenant an offer to renew the lease for one year at a higher (but still preferential) monthly rate.  This amount reflected an increase greater than the increase now permitted by the Board's guidelines.  On June 10, 2019, the tenant signed the lease offer.  That lease agreement remains in effect.  Following enactment of the 2019 Amendments, however, Plaintiff 74 Pinehurst LLC may charge only the preferential rent from the parties' preceding

lease agreement as adjusted by the Board's guidelines, notwithstanding the parties' executed lease agreement for a higher amount.

252. Nearly 270,000 apartment units may be affected in the same way.

253. The two most important terms of a lease are the monthly rent and the term, i.e., duration for which it will be paid. The 2019 Amendments mandate changes to both of these key contractual terms. Part E of the 2019 Amendments requires property owners, including Plaintiff 74 Pinehurst LLC, to change the monthly rent on contracts already signed and executed, where such rent is in excess of the preferential rent charged under prior lease agreements (plus any increase authorized by the Board). Accordingly, the law requires Plaintiff 74 Pinehurst LLC to charge a lower monthly rent than the rent provided in signed, executed, and operative lease agreements because the agreed-upon rent exceeds the preferential rent charged under the parties' prior lease agreements as adjusted by the Board's guidelines.

254. This government-mandated change to one of the two most important terms of each lease agreement—the monthly rent—is a substantial impairment of Plaintiff 74 Pinehurst LLC's lease contracts, which were executed before the 2019 Amendments were enacted, and which remain in effect.

255. The RSL's substantial impairment of Plaintiff 74 Pinehurst LLC's contracts does not reasonably advance a significant and legitimate public purpose.

91

256.   The RSL also violates the Contract Clause by extending the term of preferential-rent leases and thus mandating a change to the other most important term of a lease.

257.   The RSL requires property owners, including Plaintiffs, to continually renew leases based on the preferential rent of the previous lease, thereby extending the term of such contracts beyond that to which the parties agreed.

258.   Because tenants have a right to renewal, the RSL forces property owners, including Plaintiffs, to continue renting their property at preferential rates in perpetuity, substantially impairing their contractual rights.

259.   By forcing property owners, including Plaintiffs, to offer lower rents than previously agreed to, the 2019 Amendments will not advance the RSL's stated objectives, as property owners will be less likely to offer such lower rents if they are unable to increase those rents to the legal regulated rent in the future.  That incentive will only benefit affluent tenants with the resources to pay non-preferential rents.

260.   Defendants State of New York, City of New York, Division of Housing and Community Renewal, and RuthAnne Visnauskas, acting under color of New York law, have caused and will continue to cause, the constitutional violations described in this Count.

261.   Defendant Visnauskas has participated directly in the constitutional violation described in this Count by enforcing the RSL against Plaintiff 74 Pinehurst

LLC.   In addition Defendant Visnauskas has created and continued policies and customs causing the unconstitutional practices in this Count through her implementation and enforcement of the RSL.

262.   Absent declaratory or injunctive relief, Plaintiffs will suffer irreparable harm caused by deprivation of its constitutional rights.

**COUNT SIX: Violation of Due Process**
**Fourteenth Amendment - 42 U.S.C. § 1983**
**(On Behalf of All Plaintiffs)**
**(Against All Defendants)**

263.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

264.   The Due Process Clause of the Fourteenth Amendment to the Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.

265.   Defendants have caused, and will continue to cause, Plaintiffs to be deprived of their property without due process of law because the RSL, as amended by the 2019 Amendments, fails to substantially advance legitimate governmental interests.

266.   The RSL purports to promote the legitimate public purpose of preserving and providing affordable housing for lower-income individuals and households.  However, the RSL does not further that purpose, and in fact undermines it.

267.   The RSL protects and advances the interests of the wealthiest rent-stabilized tenants, diminishes the availability of affordable units for low-income renters, and degrades the existing stock of rent-stabilized units by discouraging vital investments in infrastructure.

268.   In addition, one of the key goals of the RSL is to provide for "transition from regulation to a normal market of free bargaining between landlord and tenant," N.Y. Unconsol. Law § 8622.  However, the RSL undermines rather than advances that objective.

269.   The 2019 Amendments eliminated the sole decontrol mechanisms by which rent-stabilized apartments could be transitioned from regulation to market-rate rentals.  Indeed, preventing that transition was one of the 2019 Amendments' goals; as one of the 2019 Amendments' sponsors indicated, the legislation was designed "to ensure that rent-stabilized apartments remain stabilized."  The RSL therefore fails to substantially advance—and indeed directly undercuts—one of its own stated goals.

270.   In addition, the RSL is irrational because it is predicated on a five percent "emergency" vacancy rate that is caused and perpetuated by the RSL's restrictions.

271.   The RSL thus subjects Plaintiffs to a deprivation of rights guaranteed to them by the Constitution.

272.   In the absence of declaratory or injunctive relief, Plaintiffs will continue to be irreparably harmed.

273.   Defendants, acting under color of New York law, have caused and will continue to cause, the constitutional violations described in this Count.

274.   Each Defendant sued in his or her individual capacity has participated directly in the constitutional violation described in this Count.

275.   Defendant RuthAnne Visnauskas has participated directly in the constitutional violation in this Count by enforcing the RSL against Plaintiffs.   In addition, Defendant Visnauskas has created and continued policies and customs causing the unconstitutional practices in this Count through her implementation and enforcement of the RSL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in Plaintiffs' favor and against Defendants and to:

A.     Declare that the Rent Stabilization Law, as amended by the 2019 Amendments, violates the Takings Clause of the Fifth Amendment of the United States Constitution, both facially and as applied to Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, Dino Panagoulias, Dimos Panagoulias, Vasiliki Panagoulias, and Eighty Mulberry Realty Corporation;

95

B.      Declare that the Rent Stabilization Law, as amended by the 2019 Amendments, violates the Contract Clause of Article I of the United States Constitution, as applied to Plaintiffs;

C.      Declare that the Rent Stabilization Law, as amended by the 2019 Amendments, violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

D.      Permanently enjoin Defendants from enforcing, or exercising any authority under, the provisions of the Rent Stabilization Law as amended by the 2019 Amendments;

E.      Award just compensation for Defendants' taking of Plaintiffs' property in violation of the Fifth Amendment of the Constitution;

F.      Award damages or restitution for Defendants' violation of Plaintiffs' rights under the Contract Clause of Article I of the Constitution;

G.      Award prejudgment interest at the maximum rate allowable by law;

H.      Award Plaintiffs their reasonable attorneys' fees, experts' fees, and other costs and expenses, *see, e.g.*, 42 U.S.C. § 1988; and

I.      Award any other relief that the Court deems just and proper.

November 14, 2019                    COVINGTON & BURLING LLP

                                      s/ Jonathan Sperling
                                     Jonathan M. Sperling
                                     Jordan S. Joachim

96

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 841-1000
Fax: (212) 841-1010
jsperling@cov.com
jjoachim@cov.com

Mark W. Mosier (*pro hac vice* forthcoming)
Kevin King (*pro hac vice* forthcoming)
Michael Maya (*pro hac vice* forthcoming)
Ivano Ventresca (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000
Fax: (202) 662-6291
mmosier@cov.com
kking@cov.com
mmaya@cov.com
iventresca@cov.com

*Attorneys for Plaintiffs*