ORAL ARGUMENT REQUESTED

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| 74 PINEHURST LLC; 141 WADSWORTH LLC; 177 WADSWORTH LLC; DINO PANAGOULIAS; DIMOS PANAGOULIAS; VASILIKI PANAGOULIAS; EIGHTY MULBERRY REALTY CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF NEW YORK; NEW YORK DIVISION OF HOUSING AND COMMUNITY RENEWAL; RUTHANNE VISNAUSKAS, individually and in her official capacity as Commissioner of New York State Division of Housing and Community Renewal; CITY OF NEW YORK; NEW YORK CITY RENT GUIDELINES BOARD; DAVID REISS, CECELIA JOZA, ALEX SCHWARTZ, GERMAN TEJEDA, MAY YU, PATTI STONE, J. SCOTT WALSH, LEAH GOODRIDGE, and SHEILA GARCIA, in their official capacities as Chair and Members of the Rent Guidelines Board,<br><br>Defendants,<br><br>-and-<br><br>N.Y. TENANTS AND NEIGHBORS; COMMUNITY VOICES HEARD; COALITION FOR THE HOMELESS,<br><br>Intervenor-Defendants. | No. 19-cv-6447-EK-RLM |

## PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000

Date of Service: March 6, 2020

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

STATEMENT OF FACTS.................................................................................................. 3

    A.    The Plaintiffs.......................................................................................... 3

    B.    The Rent Stabilization Scheme Before 2019 .......................................... 4

    C.    The 2019 Amendments ............................................................................ 5

    D.    The Effect of the 2019 Amendments ...................................................... 7

    E.    The RSL's Self-Defeating Economics .................................................. 10

    F.    Plaintiffs' Claims for Relief ................................................................. 11

STANDARD OF REVIEW ............................................................................................ 11

I.    Plaintiffs State Facial and As-Applied Physical-Takings Claims..................................... 12

    A.    Defendants Misstate The Law Governing Physical Takings................................ 13

        1.    *Loretto* Governs Physical-Taking Claims................................ 13

        2.    No Different Standard Applies to Owner-Tenant Relationships. ............. 16

    B.    Plaintiffs Adequately Allege That The RSL, On Its Face, Effects A Physical Taking......................................................................... 18

        1.    The RSL Deprives Owners of the Right to Exclude Others from Their Property. ................................................................. 18

        2.    The RSL Prevents Owners From Using and Possessing Their Property......................................................................... 22

        3.    Defendants' Purported Pathways Out of Rent Stabilization Do Not Avoid a Physical Taking. ................................................. 25

        4.    Defendants' Remaining Counterarguments Lack Merit. .......................... 29

    C.    Plaintiffs State As-Applied Claims.................................................... 34

II.    Plaintiffs State As-Applied and Facial Regulatory Takings Claims................................. 37

    A.    The Threshold for Pleading a *Penn Central* Claim Is Low. ............................... 37

    B.    Plaintiffs Plausibly Allege an As-Applied Regulatory Taking of Their Property......................................................................... 39

1.    The RSL Causes Significant Economic Harm to Plaintiffs. ..................... 39

2.    The RSL Interferes with Plaintiffs' Investment-Backed Expectations. ................................................................................ 42

3.    The Character of the RSL Supports a Taking. .......................... 45

C.    Plaintiffs Plausibly Allege a Facial Regulatory Taking Under all Three *Penn Central* Factors. ..................................................... 47

1.    The RSL Causes Significant Economic Harm to Property Owners. ........ 48

2.    The RSL Interferes with Property Owners' Investment-Backed Expectations. ............................................................ 49

3.    The Character of the RSL is One That Imposes a Severe Burden on Property Owners. .................................................. 49

III.    Plaintiffs State A Due Process Claim. ............................................... 51

A.    The RSL Is Subject To Heightened Scrutiny. ..................................... 51

B.    Plaintiffs State a Due Process Claim Even Under Rational-Basis Review. ......... 53

1.    Plaintiffs Plausibly Allege That the RSL Is Not a Rational Attempt to Remedy the Purported Housing Emergency ......................... 54

2.    Plaintiffs Plausibly Allege That the RSL Is Not Rationally Related to Any Other Purported Objective. ........................................... 58

C.    Plaintiffs' Due Process Claim is Not Duplicative of Their Takings Claims. ....... 60

IV.    Plaintiffs State As-Applied Contracts Clause Claims. ..................................... 61

A.    Plaintiffs Plausibly Allege That Retroactively Extending the Preferential Rate Amount in Perpetuity Is a Substantial Impairment. .................................... 61

B.    Plaintiff 74 Pinehurst LLC Plausibly Alleges That the Change to the Monthly Rent in Existing Lease Agreements Is a Substantial Impairment. ......... 63

C.    Plaintiffs Plausibly Allege That the 2019 Amendments Do Not Reasonably Advance a Legitimate Purpose. ....................................... 66

CONCLUSION ...................................................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*6914 Ridge Blvd. LLC v. Delao,*
   No. 86571/18, 2020 NYLJ LEXIS 182 (Civil Ct. Kings Cty. Jan. 28, 2020) ........................20

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg,*
   930 F.3d 812 (7th Cir. 2019) ...........................................................................................68, 69

*Allied Structural Steel Co. v. Spannaus,*
   438 U.S. 234 (1978) ...............................................................................................................65

*Anghel v. Sebelius,*
   912 F. Supp. 2d 4 (E.D.N.Y. 2012) .......................................................................................62

*Armstrong v. United States,*
   364 U.S. 40 (1960) ......................................................................................................3, 37, 46

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..........................................................................................................11, 54

*Bailey v. Spangler,*
   2015 WL 3545964 (E.D. Va. June 4, 2015) ..........................................................................35

*Balentine v. Tremblay,*
   2012 WL 1999859 (D. Vt. June 4, 2012) ..............................................................................53

*Baltimore Teachers Union v. Mayor and Council of Baltimore,*
   6 F.3d 1012 (4th Cir. 1993) ...................................................................................................64

*Bass Plating Co. v. Town of Windsor,*
   639 F. Supp. 873 (D. Conn. 1986) .........................................................................................56

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...............................................................................................................11

*Block v. Hirsch,*
   256 U.S. 135 (1921) ...............................................................................................................69

*Buffalo Teachers Fed'n v. Tobe,*
   464 F.3d 362 (2d Cir. 2006) ........................................................................................ *passim*

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014) ...............................................................................................................35

*Cablevision Systems Corp. v. FCC*,
   570 F.3d 83 (2d Cir. 2009) ......................................................................13, 15

*Cebe Farms, Inc. v. U.S.*,
   116 Fed. Cl. 179 (2014) ......................................................................................25

*Chevron USA, Inc. v. Cayetano*,
   224 F.3d 1030 (9th Cir. 2000) ................................................................51, 53, 60

*City of Los Angeles, Calif. v. Patel*,
   135 S. Ct. 2443 (2015) ........................................................................................31

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
   526 U.S. 687 (1999) ............................................................................................53

*Colony Cove Props., LLC v. City of Carson*,
   640 F.3d 948 (9th Cir. 2011) ................................................................31, 38, 60

*Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning
   Agency*,
   311 F. Supp. 2d 972 (D. Nev. 2004) ...................................................................52

*Connolly v. Pension Benefit Guaranty Corp.*,
   475 U.S. 211 (1986) ............................................................................................48

*Conte v. Newsday, Inc.*,
   703 F. Supp. 2d 126 (E.D.N.Y. 2010) ................................................................39

*Cornwell v. Hamilton*,
   80 F. Supp. 2d 1101 (S.D. Cal. 1999) ................................................................58

*CRV Enters., Inc. v. United States*,
   626 F.3d 1241 (Fed. Cir. 2010) ..........................................................................25

*Doe v. City of Albuquerque*,
   667 F.3d 1111 (10th Cir. 2012) ..........................................................................30

*Donohue v. Mangano*,
   886 F. Supp. 2d 126 (E.D.N.Y. 2012) ................................................................66

*Donohue v. Paterson*,
   715 F. Supp. 2d 306 (N.D.N.Y. 2010) ...............................................................68

*Duquense Light Co. v. Barasch*,
   488 U.S. 299 (1989) ............................................................................................40

*FCC v. Fla. Power Corp.*,
   480 U.S. 245 (1987) ......................................................................................13, 17

*Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*,
　　87 N.Y.2d 325 (1995) ............................................................................................57

*Federal Home Loan Mortgage Corp. v. N.Y. State Div. of Housing & Community
　　Renewal*, 83 F.3d 45 (2d Cir. 1996).......................................................................33

*First English Evangelical Lutheran Church v. Los Angeles Cnty.*,
　　482 U.S. 304 (1987)................................................................................................14

*Fried v. Lopez*,
　　106 N.Y.S.3d 591 (N.Y. Civ. Ct. 2019)..................................................................24

*GeorgiaCarry.Org, Inc. v. Georgia*,
　　687 F.3d 1244 (11th Cir. 2012) ..............................................................................52

*Goodwin v. Walton Cty. Fla.*,
　　248 F. Supp. 3d 1257 (N.D. Fla. 2017)...................................................................30

*Greystone Hotel Co. v. City of New York*,
　　13 F. Supp. 2d 524 (S.D.N.Y 1998).......................................................................57

*Halebian v. Berv*,
　　644 F.3d 122 (2d Cir. 2011)....................................................................................12

*Harmon v. Markus*,
　　412 F. App'x 420 (2d Cir. 2011) ................................................................... *passim*

*Heart of Atlanta Motel, Inc. v. United States*,
　　379 U.S. 241 (1964)................................................................................................36

*Herrington v. Sonoma Cty.*,
　　834 F.2d 1488 (9th Cir. 1987).................................................................................52

*Hodel v. Irving*,
　　481 U.S. 704 (1987)..............................................................................27, 29, 46, 47

*Horne v. Department of Agriculture*,
　　135 S. Ct. 2419 (2015).................................................................................. *passim*

*Huntleigh USA Corp. v. United States*,
　　63 Fed. Cl. 440 (2005) ............................................................................................45

*John R. Sand & Gravel Co. v. United States*,
　　457 F.3d 1345 (Fed. Cir. 2006)...............................................................................14

*Kaiser Aetna v. United States*,
　　444 U.S. 164 (1979)..............................................................................21, 37, 46

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987).................................................................47

*Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*,
    959 F.2d 395 (2nd Cir. 1992).......................................................64, 65

*Leibowitz v. Cornell Univ.*,
    445 F.3d 586 (2d Cir. 2006)........................................................11

*Lexjac, LLC v. Beckerman*,
    2008 WL 11313761 (E.D.N.Y. Sept. 30, 2008) .................................54

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)........................................................... *passim*

*Lucas v. S. Carolina Coastal Council*,
    505 U.S. 1003 (1992)..............................................................41

*Manocherian v. Lenox Hill Hosp.*,
    84 N.Y.2d 385 (1994).............................................................57

*Marcus Brown Holding Co. v. Feldman*,
    256 U.S. 170 (1921)..............................................................68

*Muchmore's Cafe, LLC v. City of New York*,
    2016 WL 11469539 (E.D.N.Y. Sept. 29, 2016) ...............................57

*Murr v. Wisconsin*,
    137 S. Ct. 1933 (2017).........................................................37, 45

*N.Y. State Corr. Officers & Police Benev. Ass'n, Inc. v. New York*,
    911 F. Supp. 2d 111 (N.D.N.Y. 2012)........................................67, 68

*Nashville, C. & St. L. Ry. v. Walters*,
    294 U.S. 405 (1935)..............................................................55

*Nollan v. Cal. Coastal Comm'n*,
    483 U.S. 825 (1987)...........................................................15, 52

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001).........................................................34, 41, 47

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)........................................................... *passim*

*Penn. Coal Co. v. Mahon*,
    260 U.S. 393 (1922).......................................................37, 48, 50

*Pennell v. City of San Jose*,
     485 U.S. 1 (1988)...................................................................................... *passim*

*Permian Basin Area Rate Cases*,
     390 U.S. 747 (1968)..........................................................................................40

*Petworth Holdings, LLC v. Bowser*,
     308 F. Supp. 3d 347 (D.D.C. 2018)..............................................................39, 47

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
     505 U.S. 833 (1992)..........................................................................................30

*Reno v. Flores*,
     507 U.S. 292 (1993)..........................................................................................58

*Rent Stabilization Ass'n of the N.Y.C. v. Dinkins*,
     5 F.3d 591 (2d Cir. 1993) ............................................................................33, 60

*Rent Stabilization Ass'n of New York City, Inc. v. Higgins*,
     83 N.Y.2d 156 (1993)........................................................................................57

*Richardson v. City & Cty. of Honolulu*,
     759 F. Supp. 1477 (D. Haw. 1991) ..................................................................58

*Romer v. Evans*,
     517 U.S. 620 (1996)..........................................................................................55

*Sal Tinnerello & Sons, Inc. v. Town of Stonington*,
     141 F.3d 46 (2d Cir. 1998)................................................................................65

*Sanitation & Recycling Indus., Inc. v. City of New York*,
     107 F.3d 985 (2d Cir. 1997)..............................................................................66

*Santiago-Monteverde v. Pereira*,
     24 N.Y.3d 283 (2014) ................................................................3, 23, 37, 46

*Seawall Assocs. v. City of New York*,
     74 N.Y.2d 92 (1989) ................................................................21, 35, 36

*Sherman v. Town of Chester*,
     752 F.3d 554 (2d Cir. 2014)..............................................................................32

*Southview Assocs., Ltd. v. Bongartz*,
     980 F.2d 84 (2d Cir. 1992)............................................................................14, 15

*St. John's Univ., New York v. Bolton*,
     757 F. Supp. 2d 144 (E.D.N.Y. 2010) ..............................................................31

*St. Joseph Abbey v. Castille,*
    712 F.3d 215 (5th Cir. 2013) ....................................................................53, 55, 56

*Sveen v. Melin,*
    138 S. Ct. 1815 (2018) ............................................................................61, 63, 66

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002) ...................................................................................... *passim*

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001)....................................................................................39

*TZ Manor, LLC v. Daines,*
    815 F. Supp. 2d 726 (S.D.N.Y. 2011) ....................................................................60

*U.S. Tr. Co. of New York v. New Jersey,*
    431 U.S. 1 (1977)....................................................................................................68

*United Health Servs. Hosps., Inc. v. Assessor of Town of Vestal,*
    122 A.D.3d 1177 (3d Dep't 2014) ..........................................................................25

*United States v. Alcan Aluminum Corp.,*
    990 F.2d 711 (2d Cir. 1993)....................................................................................32

*United States v. Carolene Prods. Co.,*
    304 U.S. 144 (1938)................................................................................................53

*United States v. Causby,*
    328 U.S. 256 (1946)................................................................................................15

*United States v. Decastro,*
    682 F.3d 160 (2d Cir. 2012)....................................................................................29

*United States v. Restrepo,*
    986 F.2d 1462 (2d Cir. 1993)..................................................................................62

*United States v. Salerno,*
    481 U.S. 739 (1987)................................................................................................29

*United States v. Stevens,*
     559 U.S. 460 (2010)..........................................................................................29, 48

*W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.,*
    2001 WL 664628 (S.D.N.Y. June 12, 2001) ...............................................57, 64, 65

*W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.,*
    31 F. App'x 19 (2d Cir. 2002) .........................................................................48, 64

*W.J.F. Realty Corp. v. Town of Southampton*,
    351 F. Supp. 2d 18 (E.D.N.Y. 2004) ........................................................53

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ..............................................................................29

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ..............................................................................52

*Winston v. City of Syracuse*,
    887 F.3d 553 (2d Cir. 2018) ..............................................................54, 59

*Wroblewski v. City of Washburn*,
    965 F.2d 452 (7th Cir. 1992) ...................................................................54

*Yee v. Escondido*,
    503 U.S. 519 (1992) ..................................................................... *passim*

**Statutes and Regulations**

9 NYCCR § 2522.5 ....................................................................................18

9 NYCRR § 2204.8 ...................................................................................26

9 NYCRR § 2520.11 ..................................................................................27

9 NYCRR § 2520.6 ......................................................................................9

9 NYCRR § 2523.5 ...................................................................................19

9 NYCRR § 2524 ......................................................................................24

9 NYCRR § 2524.3 ...................................................................................19

9 NYCRR § 2524.5 ...................................................................................27

9 NYCRR § 2524.5 ...................................................................................27

N.Y. Unconsol. Law § 8622 ...............................................................4, 22, 54

N.Y. Unconsol. Law § 8623 ...............................................................4, 18, 55

N.Y. RPAPL § 749. ..............................................................................19, 41

N.Y.C. Admin. Code § 26-511 ....................................................................8

N.Y.C. Admin. Code § 26-511 ..................................................................20

## PRELIMINARY STATEMENT

This is a lawsuit by a group of New York City property owners seeking redress for the confiscation of their property, and the destruction of its value, by the State and City of New York and the other Defendants.

In June 2019, the state legislature enacted amendments which fundamentally transformed New York's rent stabilization law (the "RSL") into the most confiscatory scheme in the State's history. As now amended, the RSL does far more than simply regulate rents: it prohibits owners in perpetuity from possessing, or excluding others from, their property. It also destroys the value of Plaintiffs' and other owners' property through a combination of below-market rents, the inability to recover investments in maintenance of the property, and the elimination of any possibility of using the property for any purpose other than rental housing at rates dictated by the government.

This unprecedented regime constitutes a taking of Plaintiffs' and other owners' property without just compensation, violates their due process rights, and violates the Contracts Clause of the Constitution, for which Plaintiffs now seek redress.

Rather than defend the changes specifically worked by the 2019 amendments, Defendants portray this case as an attempt "to dismantle the 50-year-old regime of rent stabilization" in New York City. State Br. 1. The strategy behind that framing is clear: to present the Court with a false choice between either upholding the current version of the RSL, or holding that the State may not enact rent-stabilization laws. This approach also permits Defendants to argue that Plaintiffs' case fails under existing precedent, because prior decisions have upheld rent-stabilization laws.

But that is not what this case is about. Plaintiffs have long operated under the RSL without challenging its constitutionality. Plaintiffs challenge only the RSL *as amended in 2019*. They seek to "dismantle" not a 50-year regime, but a 9-month one.

The little that Defendants do say about the radical changes made by the 2019 amendments is illogical.  Defendants deny that the current version of the RSL can constitute a taking of private property, because courts have upheld prior versions of the RSL.  But the *current* RSL is unprecedented in its confiscation of Plaintiffs' fundamental right to possess, and exclude others from, their property.  As a result, stabilized tenants now have a permanent possessory estate, in the form of a mandatory lease that they have the perpetual right to renew and can transfer to family members and others, all without the property owner's consent.  Indeed,  proponents of the 2019 amendments were open that this was exactly their goal:  "to ensure that rent-stabilized apartments remain stabilized."  No court has ever upheld these or similar features of the current law.

Defendants also defend the RSL as aimed at benefitting low-income residents.  But as now amended, the RSL contains no means-testing of any kind.  To the contrary, the 2019 amendments removed the "luxury decontrol" provisions that permitted the deregulation of units based on the amount of the rent and the tenant's income.

Defendants further claim that the RSL is necessary to address a housing "emergency" that supposedly has existed for the past *fifty* years.  The sole definitional criterion that the law provides to establish such an "emergency"—and thus the necessary condition for application of the RSL's restrictions—is a residential vacancy rate in New York City that does not exceed 5%.  But the vacancy rate for *non-stabilized* units in New York City is above 5%.  The overall vacancy rate is at or below 5% only because the vacancy rate for *stabilized* units is a mere 2.06%.  In plain English, and as the complaint alleges, the RSL thus *causes* the very "emergency" vacancy rate that it is intended to address.  And the 2019 amendments lock that into place by terminating the decontrol of stabilized units and making rent stabilization permanent.

That the 2019 amendments have the purpose and effect of confiscating control of stabilized units from their owners is thus undeniable. The law provides a public benefit at the expense of building owners; indeed, New York's highest court has expressly stated that the RSL "provide[s] a benefit *conferred* by the government through regulation" of "private owners of real property," even though it "do[es] not provide a benefit *paid for* by the government." *Santiago-Monteverde v. Pereira*, 24 N.Y.3d 283, 291 (2014) (emphasis added). The RSL as amended thus forces property owners "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole"—the hallmark of a taking. *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Plaintiffs state plausible claims that, as now amended, the RSL violates Plaintiffs' constitutional rights, and Defendants' motions therefore should be denied.

## STATEMENT OF FACTS

### A.      The Plaintiffs

Plaintiffs are three groups of owners of apartment buildings in New York City. Plaintiffs Dimos and Vasiliki Panagoulias immigrated from Greece to the United States in 1970 and 1967, respectively, and purchased a 10-unit building in Long Island City in 1974. Compl. ¶ 13. Their son, Plaintiff Dino Panagoulias, grew up in the building and continues to live there today; he manages the building in his spare time. *Id.* ¶ 12.

Plaintiff Eighty Mulberry Realty Corporation is a family-owned company that purchased a 33-unit building in the Chinatown neighborhood of Manhattan in approximately 1950 and has owned the building ever since. *Id.* ¶ 17.

Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, and 177 Wadsworth LLC are companies that each purchased buildings in the Washington Heights neighborhood of Manhattan in the 2000s. *Id.* ¶¶ 14-16.

## B.      The Rent Stabilization Scheme Before 2019

Each of the apartment buildings owned by Plaintiffs includes units subject to New York's Rent Stabilization Law (the "RSL"), a collection of intertwined state and local laws that together govern nearly one million apartment units in New York City.  *See* Compl. ¶ 29.  The RSL in its present form dates to laws passed in 1969 and 1974.  *Id.* ¶¶ 30-36.  Its stated purpose, to this very day, includes facilitating a "transition from regulation to a normal market of free bargaining between landlord and tenant." N.Y. Unconsol. Law § 8622.  Toward this end, the RSL included sunset provisions, which required the State legislature periodically to reevaluate whether and to what extent rent stabilization remained necessary.  Compl. ¶ 40.  Critically, the RSL permits municipalities to trigger application of rent stabilization by declaring a "public emergency requiring the regulation of residential rents" based on a local vacancy rate not in excess of five percent.  N.Y. Unconsol. Law § 8623(a).  A municipality must revisit this determination every three years. *See id*. § 8603.

Over the decades following the passage of the RSL, changes to the law sought to provide incentives for property owners to improve and maintain rent-stabilized apartments.  Compl. ¶ 37.  These included the availability of rent increases of up to 20 percent after a unit became vacant and rent increases to recover the cost of major capital improvements ("MCIs") and individual apartment improvements ("IAIs").  *Id.*  In 1993, the State enacted "luxury decontrol" provisions that permitted the deregulation of units whose rent exceeded $2,000 per month (later increased to $2,700 per month) once the unit became vacant or the tenant's income was above a designated threshold.  *Id.* ¶ 38.

These provisions also advanced the law's purpose of enabling transition from regulation to a free market.  *Id.* ¶ 39.  In particular, the combination of rent increases available upon vacancies and the ability to recover the costs of MCIs and IAIs, coupled with vacancy decontrol once the

4

rent exceeded the statutory threshold, gave owners of stabilized units a path to deregulation.  Plaintiffs operated their buildings under this legal regime without legal objection.

###   C.      The 2019 Amendments

On June 14, 2019, New York amended the RSL via the Housing Stability and Tenant Protection Act of 2019 (together with certain technical corrections enacted on June 25, 2019, the "2019 Amendments").  As acknowledged by several of the legislation's sponsors, the purpose of the 2019 Amendments was to eliminate property owners' ability to control the use of their own property.  As one sponsor stated, the amendments sought "to ensure that rent-stabilized apartments remain stabilized."  Compl. ¶ 5.  Another sponsor went even further, stating that real property "doesn't truly belong to" those who "have the monetary resources to purchase it and, to put it really bluntly, to take it away from . . . the collective."  *Id.* ¶ 9.

The 2019 Amendments achieve this confiscatory goal via a series of dramatic changes in the structure of the RSL.  *First*, they significantly narrowed property owners' right to reclaim apartments for use as a primary residence by owner or an immediate family member.  Before the 2019 Amendments, the RSL permitted property owners to reclaim multiple apartments for use by the owner or an immediate family member as a primary residence.  *Id.* ¶ 48(a).  Under the 2019 Amendments, owners may reclaim only a single unit for personal or family use, and only if they show an "immediate and compelling necessity" for use of the apartment as their primary residence. *Id.*  Thus, an owner who occupies a rent-stabilized unit and seeks to reclaim another that he or she owns—for example, to accommodate a growing family or house an elderly parent—is prohibited by law from recovering possession of that second unit.  *Id.*  An owner cannot reclaim *any* unit from a tenant who has lived in the unit for fifteen years or more.  *Id.* ¶ 59.

*Second,* the 2019 Amendments repealed the luxury decontrol provisions, and therefore removed the only option available to property owners to convert a rent-stabilized apartment into a

market-based rental. *Id.* ¶ 48(b). As a result, rent-stabilized units are now stabilized in perpetuity. *Id.*

*Third*, the 2019 Amendments repealed the provisions permitting property owners to increase the legal regulated rent when an apartment became vacant and even more so if a prior tenancy exceeded eight years. *Id.* ¶ 48(c). The 2019 Amendments thus impair an owner's ability to earn a reasonable return on investment.

*Fourth,* the 2019 Amendments enacted severe cuts to owners' ability to recoup the costs of MCIs or IAIs. *Id.* ¶ 48(d). These changes also substantially impair an owner's ability to earn a return on investment.

*Fifth,* the 2019 Amendments fundamentally rewrote the terms of certain existing leases. Prior to the 2019 Amendments, the RSL permitted property owners to offer "preferential" rents below an apartment's legal regulated rent, while reserving the right to charge higher rates (up to and including the legal regulated rent) in subsequent lease terms. *Id.* ¶ 48(e). For owners who had offered preferential rents, the 2019 Amendments lock in those preferential rents for the duration of the tenancy, even when the prior leases expressly stated that the preferential rent was a one-time concession. *Id.* Owners who agreed to preferential rents for a limited period with an express termination date are now bound to those terms for as long as a tenant chooses to stay.

*Sixth*, the amendments transferred to tenants control over whether an owner could convert a rent-stabilized building to a condominium or co-op. Prior to the 2019 Amendments, New York law permitted such conversions upon the owner obtaining written purchase agreements for at least 15 percent of residential apartments offered for sale, either by existing tenants or bona fide purchasers. *Id.* ¶ 48(f). Under the 2019 Amendments, however, such conversions are permitted only

if 51 percent of tenants agree to purchase units in the building.  *Id.*  These provisions shift to tenants control over use of the building.

The 2019 Amendments also repealed the RSL's sunset provisions, thereby making the RSL—as now amended—permanent rather than subject to periodic reevaluation of whether rent stabilization is necessary.  *Id.* ¶ 40.

### D.   The Effect of the 2019 Amendments

As amended, the RSL transfers core elements of property ownership from owners to tenants and forces owners to serve as caretakers of apartments that, as a practical matter, are now permanently conscripted into to the service of an off-budget public-assistance program.  *Id.* ¶ 49. The confiscatory rent stabilization scheme that now exists in New York is unprecedented.  *Id.*

***Loss of the Right to Possess.***  For one thing, the RSL prevents property owners from using and occupying their own apartments, even for use as a primary residence or a home for immediate family members.  As noted, the 2019 Amendments terminate owners' rights to possess and occupy for personal use all regulated units they own but—at most—one.  *Id.* ¶ 48(a).

And even that one unit often cannot be recovered.  Among other things, only owners who are "natural persons," not corporations or other artificial entities, may recover rent-stabilized apartments for residential use.  *Id.* ¶ 51.  In addition a property owner may recover a rent-stabilized unit only if the owner uses it as his or her primary residence.  *Id.* ¶ 56.

But even a natural person who wishes to recover possession of a single unit he or she owns to use as their primary residence has no unqualified right to do so.  An owner may recover an apartment only by demonstrating to the satisfaction of Defendant the Division of Housing and Community Renewal ("DHCR") and its Commissioner, Defendant RuthAnne Visnauskas, that the owner has an "immediate and compelling necessity" to use that single unit as his or her primary residence.  *See id.* ¶ 57; Ch. 36 of the Laws of 2019, Part I, § 2.

If the incumbent tenant is 62 years old or above or has an impairment that "prevent[s] the tenant from engaging in any substantial gainful employment," the property owner must "provid[e] an equivalent or superior housing accommodation at the same or lower stabilized rent in a closely proximate area" as a precondition of recovering the unit for personal residential use.  Compl. ¶ 58; N.Y.C. Admin. Code § 26-511(c)(9)(b); Ch. 36 of the Laws of 2019, Part I, § 1.  The age, physical, and physiological conditions of the *property owner*, by contrast, play no role in determining whether a property owner may recover possession of a rent-stabilized apartment that he or she owns—the circumstances of the tenant control.  *Id.*

Even if *all* of the foregoing criteria are met, however, a property owner may not recover possession of a rent-stabilized apartment if the incumbent tenant has been living in the building "for fifteen years or more."  Compl. ¶ 59; Ch. 36 of the Laws of 2019, Part I, § 2.  The RSL thus vests long-term tenants with superior rights to the owner with respect to use, occupancy, and leasing of an apartment.  These tenure rights apply regardless of the tenant's income.  Compl. ¶ 59.

***Loss of the Right to Exclude.***  The RSL also deprives property owners of "the power to exclude," which "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).  In particular, the RSL, including under regulations promulgated by Defendant DHCR and continued under Defendant RuthAnne Visnauskas, mandates that property owners must offer either a one- or two-year renewal each time a rent-stabilized tenant's lease ends.  Compl. ¶ 69.  This renewal right has no endpoint, such that a tenant has the right to renew a lease for as long as he or she lives—i.e., a life estate.  *Id.*

The RSL's lease-renewal rights extend beyond the original tenant to a broad range of individuals, all of whom have rights to take over a tenant's lease without the owner's consent.  *Id.*

¶ 71.  This is not limited to family members, but extends to "[a]ny other person residing with the tenant or permanent tenant in the housing accommodation as a primary or principal residence, respectively, who can prove emotional and financial commitment, and interdependence between such person and the tenant or permanent tenant."  *Id.*; 9 NYCRR § 2520.6(*o*).

***Destruction of the Value of Plaintiffs' Property.***  The RSL, as amended by the 2019 Amendments, has also significantly reduced the value of Plaintiffs' rent-stabilized apartments. Prior to the amendments, the approximate value per square foot of stabilized apartments ranged from $57 to $126, as compared to $135 to $234 for an unregulated apartment.  Compl. ¶ 94.  Following the 2019 Amendments, the values of the rent-stabilized buildings owned by Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, 177 Wadsworth LLC have been reduced by an additional 20 to 40 percent.  *Id.* ¶ 97.

In addition, the various features of the amended RSL outlined above have directly affected Plaintiffs and defeated their investment-backed expectations.  For example, Plaintiffs Dino, Dimos, and Vasiliki Panagoulias and Plaintiff Eighty Mulberry Realty Corporation undertook significant capital improvements with the expectation that the apartments could be converted to market-rate rentals under the decontrol provisions.  *Id.* ¶¶ 108, 112-13.

Plaintiff 141 Wadsworth LLC undertook an electrical improvement project in early 2019 with the reasonable belief that it would be entitled to rent increases consistent with the then-existing rules for MCIs.  *Id.* ¶ 139.  But because the DHCR took no action on the MCI application before the 2019 Amendments, Plaintiff 141 Wadsworth LLC will not be able to implement the anticipated rent increases.  *Id.*  Similarly, the changes to the IAI rules have caused Plaintiff Eighty Mulberry Corporation to leave vacant multiple units that it began renovating in April and May

2019 because offering the units for rent at the rates mandated by the 2019 Amendments would not allow for the recoupment of the costs of the renovations.  *Id.* ¶ 141.

The 2019 Amendments have forced all Plaintiffs to continue charging preferential rents, which, prior to 2019, could have been increased to the legal regulated rent at the next lease renewal. *Id.* ¶¶ 118-20.  For example, Plaintiff 74 Pinehurst LLC has had to keep in place preferential rents for certain tenants even though it executed lease agreements with those tenants before the enactment of the 2019 Amendments that would have increased the tenants' rents by an amount greater than that permitted by the Rent Guidelines Board's ("RGB") guidelines.  *Id.* ¶¶ 124-25.

### E. The RSL's Self-Defeating Economics

Aside from its confiscatory effects on Plaintiffs and other property owners, the RSL is self-defeating in that it does not increase the supply of affordable housing.  Instead, as detailed in the complaint, it reduces the quantity and quality of housing and decreases affordability.  *Id.* ¶¶ 159-61.  In New York City in particular, it drives up prices in uncontrolled units and ultimately leaves lower-income tenants worse off than if there had been no regulation at all.  *Id.* ¶¶ 167-68.

That is especially true now that the 2019 Amendments have eliminated any means testing. While the 2019 Amendments were intended to promote the availability of affordable housing, economic studies demonstrate that it will have the opposite effect: it will benefit the wealthiest tenants, decrease the supply of affordable housing, and reduce investment critical to maintaining existing stabilized units.  *Id.* ¶ 176.  Indeed, according to experts, the 2019 Amendments will only deepen housing inequality in New York City by disproportionately subsidizing affluent tenants, especially in Manhattan.  *Id.* ¶¶ 177, 179, 181.  The 2019 Amendments similarly will exacerbate the comparatively poorer condition of rent stabilized units.  *Id.* ¶ 185.

The RSL also perpetuates its own existence.  Although it applies in New York City only while the City's vacancy rate is not in excess of 5 percent, the most recent data shows that the

vacancy rate for unregulated units is 6.07 percent, as compared to 2.06 percent for rent-stabilized units.  *Id.* ¶¶ 169-70.  The total vacancy rate of 3.63 percent is thus *caused* by the artificially low vacancy rate in stabilized housing.  Compl. ¶ 45.  Moreover, by guaranteeing tenants and their heirs substantially below-market rents with unlimited rights of renewal and succession, the rent stabilization regime distorts choices and impedes ordinary unit turnover.  *Id.* ¶ 169.  That effect is substantially exacerbated by the 2019 Amendments; because the RSL now *prevents* rent-stabilized apartments from transitioning to market-rate rentals, the law ensures that regulated units, with their artificially low vacancy rates, will remain a significant enough percentage of the total housing stock in New York City to keep the overall vacancy rate at or below 5 percent.  *Id.* ¶ 170.  Combined with the elimination of the sunset provisions, these features of the RSL as now amended cause, and permanently lock in, the artificially low vacancy rate that is then invoked as the very justification for the RSL restrictions.  *Id.*

### F.    Plaintiffs' Claims for Relief

Plaintiffs assert six claims for relief, for facial and as-applied physical takings, facial and as-applied regulatory takings, violations of the Constitution's Contracts Clause, and violations of the Fourteenth Amendment's Due Process Clause.  *Id.* ¶¶ 189-275.  Plaintiffs seek a declaration that the RSL, as amended in 2019, is unconstitutional, and an injunction against enforcement of the provisions of the RSL as amended by the 2019 Amendments.  *Id.* ¶¶ 95-96.

### STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a party need only plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Leibowitz v. Cornell*

*Univ.*, 445 F.3d 586, 590 (2d Cir. 2006).  The Court cannot consider Defendants' factual allegations except to the extent they are contained in or based on documents incorporated by reference in the complaint.  *Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (noting that motions to dismiss are confined to the four corners of the complaint and any judicially noticeable facts).

## ARGUMENT

### I.     Plaintiffs State Facial and As-Applied Physical-Takings Claims.

Plaintiffs' complaint plausibly alleges that the RSL, on its face and as applied, results in a compelled physical occupation of Plaintiffs' rent-stabilized apartments.  The provisions of the RSL, taken together as a whole, transfer significant property rights from property owners to tenants and a broad range of successors, all of whom have a right to occupy rent-stabilized apartments indefinitely and without the property owner's consent.  The 2019 Amendments also eliminate property owners' ability to regain control of their rent-stabilized apartments, including by repealing many of the pathways to deregulation available under prior law, and restricting the remaining pathways to such a degree that as a practical matter they no longer exist.  Indeed, proponents of the 2019 Amendments made clear that one of their main goals was to prevent rent-stabilized apartments from being used for any purpose other than owner-subsidized public housing stock.  The combined, mutually reinforcing effect of these provisions is to strip property owners of their rights to use, possess, and exclude—precisely the sort of deprivations the Supreme Court has held constitute physical takings.

Most of Defendants' arguments regarding Plaintiffs' physical-takings claims rest on an inaccurate understanding of the governing framework.  Part I.A therefore presents the proper legal

test for physical-takings claims.  Parts I.B and I.C then show that Plaintiffs' allegations, taken as true, plausibly state a claim that the RSL inflicts a physical taking, both facially and as applied.

### A.   Defendants Misstate The Law Governing Physical Takings.

#### 1.   *Loretto* Governs Physical-Taking Claims.

The Supreme Court's decision in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), prescribes the test for determining whether a law constitutes a physical taking of private property.  Under that test, government regulation results in a physical taking if it involves physical, nonconsensual occupation of the plaintiff's property by third parties.  *Id.* at 438-40.  Later decisions have adhered to this rule, explaining that the "touchstone" of a physical taking is "'required acquiescence' to the occupation of the property by an uninvited stranger or an 'interloper with a government license.'"  *Cablevision Systems Corp. v. FCC*, 570 F.3d 83, 98 (2d Cir. 2009) (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252-53 (1987)).

*Loretto* involved a challenge to a New York City law that permitted cable-television operators to install wiring and equipment on apartment buildings without the owner's consent, so long as the cable operator made a one-time $1 payment to the owner.  *See* 458 U.S. at 421-23.  Although the challenged law "serve[d] legitimate public purpose[s]," the Court explained that these public benefits were irrelevant to the takings analysis.  *Id.* at 425; *see also id.* at 434-35.  Instead, the sole question was whether the law authorized a "permanent physical occupation" of the building owner's property.  *Id.* at 426.  That test derived from precedent holding that "a physical intrusion by government [is] a property restriction of an unusually serious character," and that when the intrusion "reaches the extreme form of a permanent physical occupation, a taking has occurred." *Id.*  In particular, nonconsensual physical occupation "effectively destro[y]" owners' rights "to possess, to use, and to dispose of" their property—including by denying owners the "power to

exclude the occupier from possession and use of the space," which "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Id.* at 435. Laws that permit occupation by strangers compound this harm, and inflict a "qualitatively more severe" injury on property owners, because "the owner may have no control over the timing, extent, or nature of the invasion." *Id.* at 436. Applying this framework, the Court held that the challenged New York law constituted a physical taking because it "authorize[d] the permanent occupation of the landlord's property by a third party" cable company. *Id.* at 438-40.

Defendants' arguments for dismissal rely on a distorted and inaccurate view of the *Loretto* framework. In particular, Defendants seek to graft additional requirements onto the *Loretto* test and to transform prior decisions regarding less-intrusive housing laws into a categorical rule that rent-regulation laws can *never* constitute a physical taking. The Court should reject these attempts to fashion new law that diminishes the Constitution's protections for private property rights.

To begin with, Defendants err in arguing that a compelled physical occupation is "insufficient" to state a takings claim. Brief of Defendants-Intervenors ("Interv. Br.") 6. To the contrary: binding precedent dictates that Plaintiffs need only allege a "permanent physical occupation of property" to state a physical-takings claim. *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 93 (2d Cir. 1992); *see also Loretto*, 458 U.S. at 440. Moreover,"[i]n the context of physical takings 'permanent' does not mean forever, or anything like it.'" *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1357 (Fed. Cir. 2006) (citation omitted); *see also First English Evangelical Lutheran Church v. Los Angeles Cnty.*, 482 U.S. 304, 321 (1987) ("Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable." (citation omitted)). Rather, an occupation is sufficiently "permanent" "when the government's intrusion is a substantial physical occupancy of private property," even if the intrusion "is not exclusive, or continuous

and uninterrupted." *John R. Sand & Gravel Co.*, 457 F.3d at 1357 (cleaned up).  The "determina-

tion of whether government occupancy is 'permanent' is highly fact-specific," *Cablevision*, 570

F.3d at 98, and is therefore not well-suited to adjudication on a motion to dismiss.

 *Loretto*, which was decided at the summary-judgment stage, *see* 458 U.S. 419, is instruc-

tive.  The cable company argued that there could be no physical taking because the compelled

occupation was not permanent:  The law requiring installation of cable equipment applied only to

rental properties, such that the building owner could change the use of his land to avoid the instal-

lation.  *See id.* at 439.  The Supreme Court disagreed.  Although a property owner could avoid the

physical intrusion, the Court still held that there was a taking because "[s]o long as the property

remains residential and a CATV company wishes to retain the installation, the landlord must per-

mit it."  *Id.*  The mere prospect that the taking *might* end was not sufficient to undermine its

permanency.  The same principle applies equally here:  As long as Plaintiffs continue to use their

regulated apartments as rental housing, they must submit to nonconsensual, indefinite occupancy

by third parties.

 Defendants likewise err in asserting that Plaintiffs must allege that the occupation of their

property is "absolute."  *See* Interv. Br. 9 (quoting *Southview*, 980 F.2d at 93).  Supreme Court

precedent establishes that a "permanent physical occupation" occurs "where individuals are given

a permanent and continuous right to pass to and fro, . . . even though no particular individual is

permitted to station himself permanently upon the premises."  *Nollan v. Cal. Coastal Comm'n*,

483 U.S. 825, 832 (1987); *see also United States v. Causby*, 328 U.S. 256, 265, 267 (1946) (inter-

mittent flights over property constituted a physical taking).  Two decades after the Second Circuit

issued its decision in *Southview*, the Supreme Court clarified in *Horne v. Department of Agricul-

ture* that an absolute occupation is unnecessary—the raisin growers prevailed on their physical-

takings claim despite "retain[ing] a contingent interest" in the raisins taken by the government. 135 S. Ct. 2419, 2429 (2015).[1]

Defendants are also mistaken in arguing that Plaintiffs must plead that the "same type of physical occupation" would *not* continue absent the RSL. *See* Interv. Br. 8, 22. Defendants provide no supporting authority for that assertion—because *Horne* forecloses the argument. The raisin growers in *Horne* planned to sell their raisins to third parties, but the government required them to transfer a portion of their crop to the government for its own marketing use, which included "sell[ing]" the raisins to exporters and others. 135 S. Ct. at 2424. In holding that this confiscation constituted a physical taking, the Supreme Court's analysis was not affected by the fact that the raisins at issue would have been put to the same fundamental use—sale to third parties—even if the challenged law were not in place. *See id.* at 2428-30. The confiscation was an unconstitutional taking because—just as here—it was compelled by the government on terms to which the owners would not otherwise have agreed.

### 2.    No Different Standard Applies to Owner-Tenant Relationships.

In an effort to duck this case law, Defendants contend that rent-regulation laws do not effect a physical taking because they "merely regulat[e] the economic terms of the landlord-tenant relationship." Brief of State Defendants ("State Br.") 18; *see also* Brief of City Defendants ("City Br.") 14, 17; Interv. Br. 8. But there is no separate rule for laws that govern relationships between property owners and their tenants; the relevant consideration is what the law *does*, not its title. *See*

---

[1] Plaintiffs' allegations would be sufficient even if an absolute physical occupation were required. Specifically, the complaint alleges that the RSL grants tenants a renewal right that "has no endpoint, such that a tenant has the right to renew a lease for as long as he or she lives—i.e., a life estate," and that, as a result of the successor provisions, property owners "lack the right to select their tenants, and must allow strangers, their families, and other acquaintances to occupy and possess rent-stabilized apartments indefinitely." Compl. ¶¶ 69, 73.

*Loretto*, 458 U.S. at 440 (distinguishing prior cases upholding housing laws because none of those laws "authorize[d] the permanent occupation of the landlord's property by a third party").

The Supreme Court's ruling in *Yee v. Escondido*, 503 U.S. 519 (1992), on which Defendants purport to rely, proves the point.  The plaintiffs in *Yee* challenged two laws: one controlling rents and another limiting property owners' ability to evict tenants to specific circumstances, such as the owner's desire to change the use of his land or the tenant's failure to pay rent.  *See* 503 U.S. at 523-25.  In holding that those laws did not result in a physical taking, the Court concluded that "[a]t least on the face of the regulatory scheme, neither the city nor the State compels [property owners], once they have rented their property to tenants, to continue doing so."  *Id.* at 527-28. Rather, an owner could "change the use of his land [by] evict[ing] his tenants, albeit with 6 or 12 months' notice."  *Id.* at 528.

*Yee* explicitly cautioned, however—in language Defendants conspicuously fail to acknowledge—that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy."  *Id.*  The Court in *Yee* thus expressly *declined* to rule on the constitutionality of a law that—like the RSL as now amended—*requires* owners to continue renting their apartments to third parties and thus prevents owners from changing the use of their property.  Similarly, in *Florida Power* the Supreme Court left for a "future case" the question whether the FCC's pole-attachment rules would constitute a physical taking if the rules "required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements."  480 U.S. at 251 n.6.  These caveats are fatal to Defendants' sweeping arguments that *any* regulation of the landlord-tenant relationship is somehow immune from physical-takings liability, and they make

17

clear that that allegations of perpetual compelled third-party occupancy—such as Plaintiffs' allegations here, *see* Compl. ¶¶ 69-80—must be assessed under the general rule set forth in *Loretto.*

### B.   Plaintiffs Adequately Allege That The RSL, On Its Face, Effects A Physical Taking.

Plaintiffs state a facial physical-takings claim because they plausibly allege that the RSL as amended effects a physical taking by granting tenants and a broad range of successors the right to occupy rent-stabilized apartments in perpetuity and without the property owner's consent. These provisions strip property owners of the right to exclude and permit strangers with whom an owner has no prior dealings to occupy the owner's property.  The RSL also effects a physical taking by depriving owners of the right to use and possess the apartments they own.  Individually and collectively, these provisions result in an uncompensated and unconstitutional "permanent physical occupation" of private property.  *Loretto*, 458 U.S. at 426.  Defendants' briefs simply avoid addressing the new, invasive portions of the 2019 Amendments challenged by Plaintiffs, or the combined effect of those provisions and the rest of the RSL as amended.

### 1.   The RSL Deprives Owners of the Right to Exclude Others from Their Property.

Plaintiffs adequately allege that the RSL "effects a physical taking by requiring property owners, including Plaintiffs, to continually offer renewal leases" regardless of whether the owner consents or has a preexisting relationship with the occupant.  Compl. ¶ 194; *see also id.* ¶¶ 69-80. Under the RSL, property owners must offer either a one- or two-year renewal on the same terms each time a rent-stabilized tenant's lease ends.  *See id.* ¶¶ 69-70; N.Y. Unconsol. Law § 8623; 9 NYCCR § 2522.5(b).  This renewal right has no end date and thus has the same effect as a life estate in the regulated apartment.  *See* Compl. ¶ 69.  Indeed, fostering long-term occupancy is one of the RSL's core purposes.  *See, e.g.*, City Br. 8 (RSL designed to "promot[e] stability" and "avoi[d] disruptions to neighborhoods and communities").

The perpetual, tenant-controlled nature of these tenancies is underscored by the RSL's Byzantine eviction provisions.  Under the RSL, the tenant, rather than the property owner, determines whether the tenant remains in an apartment; owners do not have the right to unilaterally evict a tenant or to decline to renew a lease once a tenant is in place.  *See* Compl. ¶ 76.  A property owner may terminate a tenant's lease only if the tenant fails to pay rent, violates a material obligation of the lease agreement, commits a nuisance, or uses the apartment for unlawful purposes.  *See* 9 NYCRR § 2524.3.  Even if a tenant puts himself into one of those categories, a property owner is still precluded from regaining control of the unit if anyone else—even an individual not on the lease—resides in the unit.  *See* Compl. ¶ 146.[2]  In addition, property owners cannot immediately reclaim possession from a breaching tenant because, under the 2019 Amendments, tenants may now remain in their unit up to one year after a court determines that the tenant breached the lease—a finding that often comes months after the violation.  *Id.* ¶ 145.  Even then, the RSL dictates that courts must "vacate a warrant of eviction if a tenant makes payment at any time prior to execution," *id.* ¶ 147, and permits courts to reinstate tenants for good cause even *after* an eviction warrant is executed, *see* N.Y. RPAPL § 749(3).  Given these restrictions, the 2019 Amendments "severely limit—and in many instances effectively render unavailable—property owners' ability to" evict tenants.  Compl. ¶ 148.

The RSL compounds these harms by granting a wide-ranging set of successors an unqualified right to take over a tenant's leasehold.  *See id.* ¶ 71; 9 NYCRR § 2523.5(b)(1).  These successors include "any member" of the "tenant's family" who has lived in the apartment for at

---

[2] This restriction applies regardless of whether the third party resides in the unit lawfully or unlawfully, such that even the presence of an unlawful occupant prevents an owner from recovering possession of an apartment.  *See* N.Y. RPAPL § 749.  To recover a unit inhabited by an unlawful occupant, the owner must obtain a new warrant of eviction with respect to that person and then execute the warrant—a slow and costly process.  If, at the end of that process, a second person is found to be residing in the apartment, the property owner must follow the process again with respect to the second person, and so on.  *See id.*

least two years (one year in the case of senior citizens or disabled persons), a group that extends well beyond the tenant's immediate family to grandparents, grandchildren, and in-laws. *Id.* §§ 2523.5(b)(1), 2520.6(*o*).  In addition, the RSL grants successorship rights to "[a]ny other person residing with the tenant as a primary or principal residence" so long as there is "emotional and financial . . . interdependence" between the tenant and the person—a malleable standard judged according to a non-exclusive eight-factor test. *Id.* § 2520.6(*o*)(2); *see also 6914 Ridge Blvd. LLC v. Delao*, No. 86571/18, 2020 NYLJ LEXIS 182 (Civil Ct. Kings Cty. Jan. 28, 2020) (holding that a "deep friendship" between a tenant and home-care assistant vested the assistant with successorship rights).  A successor tenant need not obtain the property owner's approval to exercise these rights. *See* Compl. ¶ 73.  Moreover, once a successor takes over a leasehold, he or she may pass on the leasehold to any other successor, and so on—such that an unlimited number of persons with no relationship to the original tenant enjoy the right to occupy a rent-stabilized apartment once it is rented.  Adding insult to injury, the original tenant and each successor tenant has the right to sublet the apartment to third parties for two out of any four years. *See* N.Y.C. Admin. Code § 26-511(c)(12)(f).  The net effect of these provisions is to authorize an unbounded and unknowable collection of complete strangers to occupy a regulated apartment, irrespective of whether they have any prior relationship or dealing with the property owner, and irrespective of whether the owner consents to the occupation.

The RSL thus burdens property owners in much the same way as the cable law at issue in *Loretto*.  There, the Supreme Court focused on the "special kind of injury [inflicted] when a *stranger* directly invades and occupies the owner's property"—harm that "is qualitatively more severe than a regulation of the *use* of property" because "the owner may have no control over the timing, extent, or nature of the invasion." *Loretto*, 458 U.S. at 436 (emphases in original).  Taking

Plaintiffs' well-pleaded allegations as true, tenancies under the RSL meet all of those criteria.  *See*

Compl. ¶¶ 71-75.  Indeed, the upshot of the provisions described above is to transfer wholesale the

right to exclude, "one of the most treasured strands in an owner's bundle of property rights,"

*Loretto*, 458 U.S. at 435, from the property owner to the tenant and his or her successors.  That

right "falls within th[e] category of interests that the Government cannot take without compensa-

tion." *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979).  Further, because the RSL provides

no endpoint for this transfer of rights, it is just as permanent as the wiring intrusion addressed in

*Loretto*.  *See* 458 U.S. at 439 & n.17; *Seawall Assocs. v. City of New York*, 74 N.Y.2d 92, 106 n.5

(1989) (holding that housing law was sufficiently "permanent" to constitute a physical taking be-

cause the law, "while not specifically made permanent," "remain[ed] in effect indefinitely" and

could "be extended for additional terms without limit").

The New York Court of Appeals held that a similar housing law constituted an uncompen-

sated physical taking in *Seawall*, and the same rationale applies here.  The "rent up" law at issue

in *Seawall* required property owners to lease single room occupancy properties, on pain of signif-

icant fines.  *See* 74 N.Y.2d at 99-100.  Relying on *Loretto*, the court held that the law resulted in

"a per se compensable taking" because it required owners "to admit persons as tenants" and submit

to "forced occupation by strangers" with whom the owner had "no existing landlord-tenant rela-

tionship." *Id.* at 103, 106.  The law's beneficial public purpose and its provisions allowing owners

to set rental terms had no bearing on this analysis; instead, "the nature of the intrusion [was] de-

terminative." *Id.* at 105.  Here, the nature of the intrusion is substantively the same:  The RSL's

successorship and sublet provisions subject property owners to forced occupation by strangers.[3]

---

[3] The *Seawall* court relied in part on the fact that the "rent-up" law required owners "to accept occupation . . . by persons not already in residence."  74 N.Y.2d at 103.  The same is true of the RSL, insofar as the successorship and sublet provisions require property owners to accept occupants who were not in residence at the outset of a leasehold.

### 2.      The RSL Prevents Owners From Using and Possessing Their Property.

The RSL also effects a physical taking by diminishing property owners' ability to use and possess their regulated apartments to the point that those rights no longer exist in practice.  This invasion of core property rights results from the combined effect of several parts of the RSL, including in particular new restrictions imposed by the 2019 Amendments.

*First*, the 2019 Amendments repealed the luxury and high-income decontrol provisions that provided the only means of transitioning regulated apartments to market-rate rentals.  *See* Compl. ¶ 48(b).  Prior to the 2019 Amendments, those provisions permitted owners to recapture control over apartments while still using them as rental units if (1) a unit with a legal rent of more than $2,774.76 became vacant, or (2) tenants made more than $200,000 in consecutive years.  *Id.* ¶ 108.  The decontrol provisions were consistent with the RSL's purpose of "transition[ing] from regulation to a normal market of free bargaining between landlord and tenant."  *Id.* ¶ 39 (quoting N.Y. Unconsol. Law § 8622).  After the 2019 Amendments, however, there is no mechanism whatsoever for owners to reclaim a regulated apartment and then offer it for rent at market rates.  Defendants point to a variety of other options available to property owners, but *all* of those options (which in reality are not options at all, as discussed below) require the apartment to be used for a purpose other than rental housing.

Defendants ignore the significance of the elimination of the high-income and luxury decontrol provisions to Plaintiffs' physical-takings claim.  They fail to grasp that the absence of those provisions—in conjunction with the RSL's other limitations—results in a regime under which owners have no control over their property and are required to serve as uncompensated caretakers of a government-run public-housing program.  New York's highest court confirmed as much in *Santiago-Moteverde*, observing that the RSL "provide[s] a benefit *conferred by* the government through regulation" of "private owners of real property," even though it "do[es] not provide a

benefit *paid for* by the government." 24 N.Y.3d at 291 (emphasis added). The absence of a pathway for owners to regain control over their apartments is exacerbated by the 2019 Amendments' repeal of the RSL's sunset provisions, which previously specified that the RSL expires every few years unless reauthorized by the state legislature. *See* Compl. ¶ 40. Any doubt about whether the open-ended tenancies created by the RSL are sufficiently permanent to constitute a physical taking was erased when the 2019 Amendments made the provisions that authorize those tenancies permanent.

*Second*, the RSL as amended prohibits owners from reclaiming nearly all the units in their properties for personal or family use. *Id.* ¶ 55. A property owner may now reclaim at most a *single* unit for personal use, regardless of how many apartments he or she owns. *See id.* For all those units no longer available to the property owner, the complaint alleges that the RSL has deprived Plaintiffs of the right to use and possess those units. *See Id.* ¶ 61. Whether a property owner loses the right to recover one unit or 99 units, the RSL has still eliminated the property owners' right to possess and use those units. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) ("where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation"); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel

or merely a part thereof." (citation omitted)).  Defendants do not explain how a law that bars property owners from using and possessing their own apartments—all while requiring owners to allow strangers to occupy those apartments indefinitely—passes muster under *Loretto*.[4]

With respect to the single unit that some property owners can recover for personal use, the complaint plausibly alleges that the many restrictions on that option deprive property owners of their rights in that unit.  *See* Compl. ¶¶ 51-60 (listing the restrictions).  An owner may recover a unit only to use as his or her primary residence or the primary residence of his or her immediate family.  To do so, the owner or family member must have an "immediate and compelling necessity" to use the unit as a primary residence.  *Id.* ¶ 57 (citation omitted).  Even when that high standard is met, owners are barred from recovering possession if a tenant has lived in the unit for at least 15 years, unless the *owner* finds equivalent or superior housing for the tenant.  *Id.* ¶ 59. The restrictions do not end there.  Where two or more individuals own a building, only one can recover the single unit.  *Id.* ¶ 54.  And persons who own regulated apartments through business entities are categorically ineligible from recovering units for personal or family use.  *Id.* ¶¶ 51-52.[5]

Together, these restrictions on an owner's ability to use and possess regulated apartments put this case squarely within the question left open in *Yee*—whether a statute that "compel[s] a

---

[4] Although the Second Circuit's briefly addressed the RSL's personal-use provisions in *Harmon v. Markus*, 412 F. App'x 420 (2d Cir. 2011), the version of the RSL in effect at the time did not limit the number of units a property owner could recover.  *See* 9 NYCRR § 2524(a)(3) (2011); *compare Fried v. Lopez*, 106 N.Y.S.3d 591, 595 (N.Y. Civ. Ct. 2019) (2019 Amendments precluded owner from recovering all units in building to convert to primary residence for owner).  *Harmon* thus has little bearing on the constitutionality of current law.

[5] The State Defendants contend that property owners retain the right to occupy, rather than offer for rent, vacant units. *See* State Br. 19 n.8.  But on March 3, 2020, State Assemblywoman Linda Rosenthal introduced proposed legislation that would impose penalties on owners of a "residential dwelling unit which remains vacant for a period greater than three months," equal to 100% of the last legal rent for the first month, and 150% of the last legal rent for each subsequent month.  *See* N.Y. State Assembly, Bill No. A09966, https://nyassembly.gov/leg/?bn=A09966&term=2019.  The bill would thus compel owners to offer their apartments for rent rather than leave them vacant, by imposing a penalty on vacant units greater than the monthly rental income the RSL permits owners to collect.

landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy" constitutes a physical taking.  503 U.S. at 528.  Here, as in *Loretto*, "the owner has no right to possess the occupied space himself."  458 U.S. at 435.

### 3. Defendants' Purported Pathways Out of Rent Stabilization Do Not Avoid a Physical Taking.

Defendants cite a host of provisions as supposedly offering property owners the opportunity to use their property for purposes other than leasing rent-stabilized units.  *See* State Br. 18; City Br. 17-18; Interv. Br. 8-9. Those provisions only highlight that the RSL causes a permanent physical occupation.

*First*, Defendants argue that property owners can leave the rental business by demolishing their building and making a series of payments to their tenants.  State Br. 18; City Br. 16; Interv. Br. 9-10.  But by requiring property owners to *destroy their apartments* as a prerequisite to changing the use of those apartments, the RSL effects a physical taking.  *See Loretto*, 458 U.S. at 431 ("an intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it" is a taking (citation omitted)); *Cebe Farms, Inc. v. U.S.*, 116 Fed. Cl. 179, 192 (2014) ("[P]hysical takings 'involve physical occupation or destruction of property.'" (quoting *CRV Enters., Inc. v. United States*, 626 F.3d 1241, 1246 (Fed. Cir. 2010))).

Defendants fail to appreciate that the properties at issue in this case are the regulated apartments owned by the property owners, which are a distinct form of property from the land on which they are situated.  *See, e.g.*, *United Health Servs. Hosps., Inc. v. Assessor of Town of Vestal*, 122 A.D.3d 1177, 1178 (3d Dep't 2014) ("land and buildings are separately defined as taxable forms of real property" under New York law).  Given that distinction, it is irrelevant that Plaintiffs can recover control over their *land* by demolishing their *apartments*; property owners would not have the ability to use, possess, or dispose of their apartments because the apartments *would no longer*

*exist.*  It would eviscerate the Takings Clause to allow the government to direct owners to destroy their apartments as the only way to stop third-party occupations of their property.

Although mandating demolition as a condition to changing the use of property would, on its own, be unconstitutional, the RSL does not stop there.  But the RSL does not stop there.  In a further affront to constitutionally protected property rights, the RSL permits owners to demolish their rent-stabilized apartments only *after* paying tenants a substantial stipend, covering the cost of their moving expenses, and relocating them to comparable nearby apartments that rent for the same or lower amount per month (or else pay the difference for up to six years).  *See* Compl. ¶ 84. The stipends required by this scheme alone "often exceed tens of thousands of dollars and can range as high as $342,720."  *Id.*  Rather than compensating property owners for the destruction of their property as required by the Takings Clause, the RSL makes property owners compensate tenants.

The Second Circuit's non-precedential decision in *Harmon* does not control here.  In holding that the plaintiffs did not allege a physical taking, the court observed that the plaintiffs could "'recover possession of housing accommodations for the immediate purpose of demolishing them,' provided that 'such demolition is to be made for the purpose of constructing other than housing accommodation.'"  412 F. App'x at 422 (quoting 9 NYCRR 2204.8(a)(2)).  The court offered no other analysis, did not attempt to explain how government-mandated destruction of property was acceptable under the Takings Clause, and did not recognize that property owners would have to pay tenants for the privilege of destroying their property.  Regardless, the Supreme Court has since reaffirmed that a law burdening property rights does not cease to be "a taking" merely "because a landlord could avoid the requirement by ceasing to be a landlord."  *Horne*, 135 S. Ct. at 2430 (citing *Loretto*, 458 U.S. at 439 n.17).

*Second*, Defendants rely on a provision permitting a building to be withdrawn from rent stabilization if the property owner has no intent to rent or sell all or any part of the land or structure, the building presents a serious safety hazard, and the cost of repairs "would substantially equal or exceed the assessed valuation of the structure."  9 NYCRR § 2524.5(a)(1)(ii); *see also* 9 NYCRR 2520.11(e) (RSL does not apply to units "substantially rehabilitated" from a "substandard or seriously deteriorated condition").  Like the demolition provision, this part of the RSL exemplifies the law's confiscatory nature.  *See* Compl. ¶¶ 91-92.  To change the use of the regulated apartments under this purported exception, an owner must let the apartments become so dilapidated that the cost of repairing them is greater than their assessed value.  At the point that the units have fallen into that level of disrepair, they cannot be used, possessed, or disposed of.  This outlet for changing the use of the land is a far cry from the property owner in *Yee*, who had the unencumbered right to change the use of his land so long as he provided notice to his tenants.  *See* 503 U.S. at 528 (challenged law allowed an "owner who wishe[d] to change the use of his land [to] evict his tenants" on "6 or 12 months' notice").

*Third*, Defendants cite a provision that allows an owner to remove a building from rent stabilization if the owner agrees not to rent or sell any part of the land, but will use the property for use in "connection with a business he or she owns and operates."  9 NYCRR § 2524.5(a)(1).  That argument fails because, as noted above, the Supreme Court has already "rejected the argument that" a housing law "[i]s not a taking because a landlord could avoid the [challenged] requirement by ceasing to be a landlord."  *Horne*, 135 S.Ct. at 2430.  Regardless, the provision cited by Defendants is so narrow and limited that it is a nullity in practice.  *See* Compl. ¶¶ 88-89; *see also Hodel v. Irving*, 481 U.S. 704, 716 (1987) (finding taking despite availability of narrow, "complex" procedure for retaining property rights).  Among other things, the provision does not

27

allow apartment buildings to be converted into commercial rental space and applies only if (1) the owner maintains a non-rental business, (2) the regulated apartments are suitable for business use, and (3) those apartments are in a building that is zoned for commercial use. *See* Compl. ¶¶ 86-88. Even then, owners still need to "pay all reasonable moving expenses" of tenants and relocate them to comparable nearby housing or pay a substantial stipend—a mandate that constitutes a taking in its own right. *Id.* ¶ 89.

*Fourth*, Defendants point to a provision allowing a property owner to convert a rent-stabilized apartment building into a co-op or condominium if at least 51 percent of tenants agree to purchase their units. *Id.* ¶ 90. Before enactment of the 2019 Amendments, property owners could convert regulated apartments into unregulated condominiums in two ways: (1) non-eviction plans, in which owners had to obtain 15 percent buy-in from purchasers (including non-tenants) and tenants could stay in their units if they did not want to convert to condominiums, and (2) eviction plans, in which regulated apartments could be converted to condominiums with 51 percent tenant buy-in, with the remaining tenants subject to eviction on three years' notice. *Id.* ¶ 48(f). Under current law, however, eviction plans are eliminated and non-eviction plans require a majority of tenants—not outside purchasers—to approve a condominium conversion. That amendment takes control over use of the property out of the property owner's hands and transfers it to the tenants. Furthermore, this new hurdle serves only to block property owners from making use of their property—as with the pre-2019 RSL non-eviction plans, tenants who do not want to convert "their" apartments to condominiums are entitled to continue renting at the stabilized rent even following conversion. *Id.* ¶ 90. Because tenants who want to stay at the stabilized rent can still do so, the only real change made by the 2019 Amendments is to prevent property owners from modifying the use of their property without the tenants' prior approval.

*Fifth*, Defendants assert that the RSL's hardship exemption precludes a physical taking. State Br. 18.  But the hardship exemption is immaterial because it only addresses the revenue an owner may collect.  It does not provide a mechanism for owners to exclude successor tenants, decline to renew a tenant's lease, occupy more than one regulated unit for personal use, or transition apartments into market rentals.  *See id.* ¶¶ 149, 158.  As a result, property owners "cannot obtain relief through the hardship process." *Id.* ¶ 158.  *Loretto* is a case in point:  The availability of hardship provisions that allowed property owners to seek "greater entitlement" to compensation based on a "special showing" of harm, 458 U.S. at 424-25, did not stand in the way of the owner's physical-takings claim.  *See also Hodel*, 481 U.S. at 716 (1987) (finding taking where law "effectively abolish[ed]" owners' ability to pass property on to heirs, even though owners could retain that right by engaging in "complex . . . transactions").  Accordingly, even if the hardship exemption were available here, it has no bearing on the physical takings challenge.

### 4.     Defendants' Remaining Counterarguments Lack Merit.

Defendants contend that Plaintiffs cannot plead a facial taking claim, and that their claims are untimely.  Neither assertion is correct.

***Plaintiffs Properly Plead A Facial Physical Taking.***  Defendants argue that Plaintiffs have failed to plead a facial physical taking under the "no set of circumstances" test in *United States v. Salerno*, 481 U.S. 739 (1987).  Defendants, however, ignore more recent Supreme Court case law on the proper standard for facial claims.  In *United States v. Stevens*, the Court explained that "[t]o succeed in a typical facial attack, [a plaintiff] would have to establish that no set of circumstances exists under which [the statute] would be valid, *or* that the statute lacks any plainly legitimate sweep."  559 U.S. 460, 472 (2010) (emphasis added) (cleaned up); *see United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (applying "plainly legitimate sweep test" in holding no Second Amendment violation (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S.

442, 449 (2008))).  Similarly, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Court held that an abortion statute violated the Constitution because "*in a large fraction of the cases* in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion."  505 U.S. 833, 895 (1992) (emphasis added).

Plaintiffs here adequately allege that the RSL lacks any plainly legitimate sweep because, at a minimum, the RSL is unconstitutional in a "large fraction of cases."  *See id.*  Plaintiffs allege that the RSL "generally requires that the owner of a rent-stabilized apartment must continue renting the apartment out to third parties" and that "the RSL prohibits property owners, including Plaintiffs, from retiring from the business of apartment leasing, closing his or her building to tenants, or holding the property as a long-term investment."  Compl. ¶¶ 82, 92.  That Defendants can conjure up some imaginary owner who might want to demolish their property in order to escape rent stabilization does not demonstrate that the RSL has a legitimate sweep.

Even under *Salerno*'s "no set of circumstances" test, Plaintiffs have satisfied their pleading burden.  *See, e.g.*, *Goodwin v. Walton Cty. Fla.*, 248 F. Supp. 3d 1257, 1264 (N.D. Fla. 2017) (plaintiffs "adequately alleged a facial physical takings claim" where they "alleged that the mere enactment of the County's ordinance is an unlawful, physical invasion of theirs and others' private dry sand beaches").  Defendants' position rest on hypothetical scenarios in which a property owner could somehow take advantage of the demolition, conversion, or eviction provisions.  *See* Interv. Br. 9.  But as Plaintiffs have argued, those provisions do not cure the RSL's constitutional infirmities.  *See supra* Part I.B.1-2.

Moreover, those speculative situations are irrelevant at this stage.  *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) ("[T]he [Supreme] Court has repeatedly considered

facial challenges simply by applying the relevant constitutional test to the challenged statute with-out attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid.").  In assessing Plaintiffs' facial challenge the "[l]egislation is meas-ured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2451 (2015).  For those property owners for which the provisions of the RSL are a restriction, the RSL is a facial physical taking.

*Plaintiffs' Claims Are Timely.* The State Defendants argue that "most" of Plaintiffs' claims are time barred but they never identify a single specific claim that is untimely.  State Br. 35.  In-stead, they concede that Plaintiffs' allegations "primarily target[ ] the 2019 Amendments."  *Id.* Because it is completely unclear what claims Defendants contend are not timely, the Court should not grant the motion to dismiss on that ground.  *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 157 (E.D.N.Y. 2010) ("[A] claim may be dismissed as time-barred under the statute of limitations only if the factual allegations in the complaint clearly show that the claim is untimely.")

As a matter of law, Plaintiffs' claims are timely for at least two reasons.  *First*,  Plaintiffs' claims accrued in June 2019 because they challenge the law as it exists today as a result of the 2019 Amendments, and the physical taking stems from a combination of new and existing provi-sions.  *See Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 956 (9th Cir. 2011) ("[S]ubstantive amendments to a takings statute will give rise to a new cause of action . . . if those amendments alter the effect of the ordinance upon the plaintiffs." (internal quotation marks and citation omitted)).  *Second*, even if Plaintiffs' claims accrued earlier, they allege a taking within the limitations period because they suffer continuing injury every day their properties are occupied

by rent-stabilized tenants. *See Sherman v. Town of Chester*, 752 F.3d 554, 567 (2d Cir. 2014) ("[B]ecause Sherman alleges that at least one of the acts comprising the taking occurred within three years of filing the case, his claim is not time barred.").

**Decisions Regarding Prior Versions of the RSL Are Not Dispositive Here.** Defendants incorrectly assert that decisions involving earlier versions of the RSL bar any takings challenge to later versions of the RSL, irrespective of the differences between those laws. *See, e.g.*, State Br. 16 ("Binding precedent holds that . . . the RSL do[es] not effect a physical taking of property"); City Br. 15 (same); Interv. Br. 10 (same). That argument is self-evidently wrong; legislation is not immune from challenge so long as it takes the form of an amendment to some pre-existing statute. Were that the rule, the legislature would be free to adopt new amendments simply trans-ferring fee title of rent-stabilized apartments from property owners to tenants, or dictating that Plaintiffs must allow their apartments to be used as government offices for the next 500 years, free of charge. *See Loretto*, 458 U.S. at 439 n.17 (indicating that such a mandate would constitute a physical taking).

Instead, courts evaluate the particular laws that come before them. *See, e.g.*, *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719 (2d Cir. 1993) ("[A] court should decline to give preclusive effect to a prior judgment if there have been changes either in the applicable legal rules or the factual predicates essential to that prior judgment."). And that is what prior decisions re-garding past iterations of the RSL have done. Although some of those decisions rejected takings challenges, they analyzed the particular facts and circumstances presented. Here, Plaintiffs' alle-gations concern an amended version of the RSL never addressed by any court, which invades

private property rights to a greater degree than its predecessors—as the 2019 Amendments' sponsors freely admit. *See* Compl. ¶¶ 11, 175.  The current version of the RSL must be assessed on its own merits.

The prior decisions cited by Defendants have little bearing on that analysis.[6]  The only published decision, *Federal Home Loan Mortgage Corp. v. N.Y. State Div. of Housing & Community Renewal*, 83 F.3d 45 (2d Cir. 1996) ("*FHL*"), concerned a company's claim that provisions subjecting a previously exempt building to rent stabilization constituted a taking. *See id.* at 47. The Second Circuit understood the issues in *FHL* to concern only "government regulation of the rental relationship," which it held did "not constitute a physical taking." *Id.* at 48.  Here, Plaintiffs' physical taking claim does not attack the mere "regulation of the rental relationship," but rather challenges the RSL's transfer of the core attributes of property ownership—the rights to use, possess, and exclude—from property owners to tenants.

*Harmon*, the Second Circuit's most recent RSL case, is equally inapposite.  That non-precedential opinion concluded that the plaintiffs could not state a physical-takings claim where they "acquiesced in [the properties'] continued use as rental housing."  412 F. App'x at 422.  Even under *Harmon*'s acquiescence theory, no Plaintiff or property owner acquiesced to *the current* version of the RSL.  No property owner could have known, before the enactment of the 2019 Amendments, that they would be foreclosed from reclaiming virtually all apartments for personal use or that they could never transition their regulated apartments out of rent stabilization.  That is especially true as to Plaintiff Eighty Mulberry, which bought its property before *any part* of the RSL was enacted.  *See* Compl. ¶ 17 (describing Eighty Mulberry's ownership since at least 1950).

---

[6] Several of the cases cited by Defendants were resolved on procedural grounds and so did not reach the merits of the plaintiffs' claims.  *See, e.g.*, *Rent Stabilization Ass'n of the N.Y.C. v. Dinkins*, 5 F.3d 591 (2d Cir. 1993) (dismissing challenges because plaintiffs lacked associational standing).

In any event, *Harmon*'s acquiescence theory is no longer good law in light of the Supreme Court's subsequent decision in *Horne*, which rejected the government's argument that a federal raisin reserve program was "not a taking because raisin growers voluntarily chose to participate in the raisin market." 135 S. Ct. at 2430. As the Court explained, "'a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation,'" and "a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." *Id.* (quoting *Loretto*, 485 U.S. at 439 n.17); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 628 (2001) ("A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken."). Property owners did not sacrifice their right to bring physical-takings claims by offering property for rent under a prior, much less invasive version of the RSL.

## C.    Plaintiffs State As-Applied Claims.

Plaintiffs plausibly allege that the RSL effects a physical taking as applied to each Plaintiff, other than 177 Wadsworth LLC, which exclusively asserts facial takings claims. *See* Compl. ¶¶ 49-92, 201-12. The structure of the as-applied claims is the same as the facial claims: The combined effect of the RSL's restrictions cause a "permanent physical occupation" of Plaintiffs' regulated apartments, *Loretto*, 458 U.S. at 426, by depriving Plaintiffs of their rights to use and possess the apartments, and to exclude others from occupying those apartments without Plaintiffs' consent, *see* Compl. ¶ 205.

In particular, Plaintiffs allege that the RSL grants tenants and their successors, rather than Plaintiffs, control over who lives in Plaintiffs' regulated apartments. *See* Part I.B.1, *supra*. All of the Plaintiffs are adversely affected by this regime, as evidenced by the fact that each of them has been required "on one or more instances to offer a renewal lease to tenants to whom they would

not have voluntarily offered such a lease."  Compl. ¶ 79.  Illustrating this harm, Plaintiff Eighty

Mulberry was required to lease an apartment to the children of an elderly tenant who passed away,

and the children, "now well into adulthood, continue to live in the apartment."  *Id.* ¶ 80.  This

forced physical occupation of Plaintiffs' apartments mirrors the intrusions held to constitute phys-

ical takings in *Loretto*, 458 U.S. at 435-40, and *Seawall*, 74 N.Y.2d at 103-07.  Courts have denied

motions to dismiss physical-takings claims where a plaintiff "claim[s] that the government has

permitted a third party to physically take[ ] possession of her property," *Bailey v. Spangler*, 2015

WL 3545964, at *5 (E.D. Va. June 4, 2015), and the same result is warranted here.

Plaintiffs also allege that the RSL prevents them from using and possessing their apart-

ments, for example by making it impossible to transition regulated units to free-market rentals,

and by prohibiting Plaintiffs from recovering more than one unit for personal or family residential

use.  *See* Compl. ¶¶ 48b, 50-68, 108-13, 207-08.  Most of the Plaintiffs are categorically ineligible

to recover even a single apartment for personal or family use because these Plaintiffs own their

regulated apartments through the corporate form, *see id.* ¶ 65,[7] and the remaining Plaintiffs have

already been rebuffed once when seeking to recover a single unit in their ten-unit building, *see id.*

¶¶ 12, 63-64.[8]  Thus, Plaintiffs "ha[ve] no right to possess the occupied space" themselves.

---

[7] Defendants err in arguing that corporate owners are incapable of using apartments for "personal" use.  *See* City Br. 20.  Plaintiffs' allegation is that the RSL prevents *the persons* who own regulated apartments through a corporate entity from using those apartments for personal use, and controlling precedent makes clear that persons who act through the corporate form retain their rights in that setting.  *See, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706-07 (2014) ("When rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of" the "*people* (including shareholders, officers, and employees) who are associated with [the] corporation.").

[8] Defendants misunderstand the complaint in arguing that the claim asserted by Plaintiffs Dino, Dimos, and Vasiliki Panagoulias is time-barred because it relies on an incident that occurred eight years ago.  *See* Compl. ¶ 63; City Br. 20.  Although the allegation illustrates the nature of the harm caused by the RSL and strengthens the plausibility of Plaintiffs' allegations regarding the RSL's *current* effects, Plaintiffs are not seeking relief for the denial of their application eight years ago.

35

*Loretto*, 458 U.S. at 435.  Nor can Plaintiffs use their regulated apartments for any other purpose: "the RSL prohibits . . . Plaintiffs[ ] from retiring from the business of apartment leasing, closing [their] building[s] to tenants, or holding the[ir] property as a long-term investment."  Compl. ¶ 92; *see also id.* ¶¶ 81-92.  Whether considered independently or as a whole, these deprivations of Plaintiffs' property rights constitute uncompensated physical takings of Plaintiffs' property.

Defendants give the as-applied claims short shrift.  They contend that Plaintiffs fail to allege that they applied for a hardship exemption or tried to use other statutory provisions to change the use of their land—such as provisions allowing owners to exit rent stabilization by demolishing their buildings and making substantial payments to tenants.  *See* City Br. 19; Interv. Br. 23.  But as discussed above, none of the provisions cited by Defendants would remedy the harms alleged by Plaintiffs.  *See* Part I.B.3, *supra*.

Defendants contend that the law permits forcing a property owner "'to accept tenants he does not like,'" City Br. 20 (quoting *Yee*, 503 U.S. at 529), but they take that language out of context.  The quoted language from *Yee* is accompanied by a citation to *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964), which held that Congress may prohibit owners of public accommodations from discriminating on the basis of race.  That principle does not modify the rule that the government effects a physical taking when it authorizes "a stranger" to "occupy [an] owner's property" indefinitely.  *Loretto*, 458 U.S. at 436; *see also Seawall*, 74 N.Y.2d at 106.  The government may bar property owners from discriminating against protected classes of prospective tenants, but that does not mean the government has carte blanche to treat privately owned apartments as public housing.  Indeed, if the law worked the way Defendants assert, the property owner in *Loretto* would have had no basis for objecting to the cable company's wiring.  The Supreme Court rejected a similar argument in *Loretto*, and the same conclusion is warranted here.

*See Loretto*, 458 U.S. at 439 n.17 ("The right of a property owner to exclude a stranger's physical occupation of his land cannot be" "conditioned on his forfeiting the right to compensation" for the occupation).  Accordingly, Plaintiffs state an as-applied physical-takings claim.

## II.   Plaintiffs State As-Applied and Facial Regulatory Takings Claims.

The RSL inflicts a regulatory taking on Plaintiffs because its myriad restrictions force Plaintiffs "to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole."  *Penn Cent. Transp. Co. v. City of New York*,  438 U.S. 104, 123 (1978) (quoting *Armstrong*, 364 U.S. at 49).  New York's highest court confirmed in 2014 that the RSL provides "a public assistance benefit" "*conferred by* the government" but "*paid for*" by "private owners of real property."  *Monteverde*, 24 N.Y.3d at 291 (emphasis added).  The 2019 Amendments exacerbated that usurpation of private property by further eroding Plaintiffs' use, possession, and exclusion rights, by preventing Plaintiffs from recovering their capital investments, and by making it impossible for Plaintiffs to earn a reasonable rate of return.  Thus, regardless of whether the RSL previously passed constitutional muster, the current RSL "goes so far beyond ordinary regulation" of rental housing "as to amount to a [regulatory] taking" of their property.  *Kaiser Aetna*, 444 U.S. at 178.

### A.   The Threshold for Pleading a *Penn Central* Claim Is Low.

Government regulation causes a regulatory taking if it "goes too far" in interfering with the owner's property rights.  *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Murr v. Wisconsin*, 137 S. Ct. 1933, 1950 (2017).  Determining whether a regulation has "gone too far" requires courts to engage in "ad hoc, factual inquires."  *Kaiser Aetna*, 444 U.S. at 175.  The Supreme Court has set forth three factors for courts to consider: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct

investment-backed expectations"; and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124.  The Supreme Court has emphasized that no single factor is dispositive and that courts must weigh each as part of a holistic inquiry, engaging in "careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra*, 535 U.S. at 322 (citation omitted).  If these considerations reveal that a law requires property owners "to bear public burdens" that "should be borne by the public as a whole," the law constitutes a taking. *Penn Central*, 438 U.S. at 123 (citation omitted).

In addition, courts have repeatedly declined to dismiss regulatory-takings claims at the pleading stage so long as the plaintiff has plausibly alleged that at least one of the *Penn Central* factors weighs in favor of finding a taking.  For example, the court denied a motion to dismiss in *Colony Cove Properties, LLC v. City of Carson* because the plaintiff had sufficiently pled that the challenged law "interfer[ed] with its distinct investment-backed expectations," even though the law's "economic impact was small" and its "character d[id] not support a *Penn Central* violation." 2014 WL 12629951, at *11 (C.D. Cal 2014)*.  Likewise, in *Petworth Holdings, LLC v. Bowser*, the court held that "although Plaintiffs failed to plead sufficient facts specifically alleging a measurable economic impact to their property, their strong showing on the final and most important *Penn Central* factor—the extent to which the regulation interferes with the 'claimant's distinct investment-backed expectations'—nudge[d] them over the relatively low hurdle of a motion to dismiss." 308 F. Supp. 3d 347, 357-58 (D.D.C. 2018).

Rather than accept Plaintiffs' factual allegations as true, Defendants dispute them and seek to argue the merits of Plaintiffs' regulatory takings claims.  *See, e.g.*, City Br. 23 (arguing that "following the rent stabilization regulations, [Plaintiffs'] buildings retain significant value, and renting units remains a commercially viable enterprise"); Interv. Br. 16 (asserting that the IAI and

other changes in the 2019 Amendments have not had a significant economic impact); *id.* at 17 (contending that the 2019 Amendments effected only "marginal" changes from prior versions of the RSL). Defendants' approach is especially problematic in the context of a regulatory-takings claim, which "necessarily entail[s] complex factual assessments of the purposes and economic effects of government actions." *Yee*, 503 U.S. at 523. Indeed, the Second Circuit has held that a "fact-specific question cannot be resolved on the pleadings." *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001); *see also Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 142 (E.D.N.Y. 2010) ("deeply fact-intensive inquiry" "generally cannot be resolved at the motion to dismiss stage").

In view of these precedents, the Court's task at this early stage is straightforward: The motions to dismiss must be denied if Plaintiffs' allegations, taken as true and with all reasonable inferences drawn in Plaintiffs' favor, make a plausible case that the RSL "goes too far" in terms of its economic impact, its effect on Plaintiffs' investment-based expectations, *or* its interference with Plaintiffs' core property rights. As demonstrated below, Defendants' motions fail because Plaintiffs plausibly allege that the RSL goes too far with respect to all three of those factors.

**B.    Plaintiffs Plausibly Allege an As-Applied Regulatory Taking of Their Property.**

**1.    The RSL Causes Significant Economic Harm to Plaintiffs.**

The first *Penn Central* factor requires courts to weigh the economic impact of the regulation. 438 U.S. at 124. Plaintiffs allege that the RSL inflicts substantial economic harm in several ways, and those allegations, taken together, are more than sufficient to clear the "relatively low hurdle of a motion to dismiss." *Petworth*, 308 F. Supp. 3d at 358.

*First*, Plaintiffs allege that the 2019 Amendments have substantially reduced the value of Plaintiffs' rent-stabilized apartments. *See* Compl. ¶¶ 93-97. New York City's own financial data confirms the RSL's adverse effect on the value of regulated properties before enactment of the

2019 Amendments, and Plaintiffs allege that this gap has grown significantly since then—as illustrated by the 20 to 40 percent decline in the value of the apartments owned by Plaintiffs 74 Pinehurst LLC and 141 Wadsworth LLC after the 2019 Amendments were adopted. *Id.* ¶¶ 94-97. These reductions in value in turn jeopardize Plaintiffs' ability to refinance their mortgages in the future. *Id.* ¶ 107.

*Second*, Plaintiffs allege that the RSL has forced them to lease rent-stabilized apartments at substantially below-market rates. For example, the maximum permissible rent (known as the "legal regulated rent") for the rent-stabilized one-bedroom apartments owned and operated by the Panagoulias Plaintiffs is as low as $890 per month, whereas similar apartments *in the same building* rent at a market rate of approximately $1700 per month. *Id.* ¶ 106. In addition to these rate caps, restrictions added by the 2019 Amendments require Plaintiffs to continue charging preferential rents well below the legal regulated rent. *Id.* ¶¶ 114-26. This lock-in effect adversely affects all of the Plaintiffs, each of whom leased at least one rent-stabilized apartment at a preferential rate before the 2019 Amendments were enacted. *Id.* ¶ 120. Together, these provisions impose confiscatory rates that fall well outside the "zone of reasonableness" permitted by the Fifth and Fourteenth Amendments. *Permian Basin Area Rate Cases*, 390 U.S. 747, 790 (1968).[9]

*Third*, Plaintiffs allege that the RSL makes it difficult or impossible for Plaintiff to collect rent when tenants violate their lease or refuse to pay rent. Compl. ¶¶ 144-148. By permitting non-paying tenants to remain in an apartment for one year after they are determined to be in breach of

---

[9] Although Defendants maintain that the RSL would not inflict a regulatory taking even if it prevented Plaintiffs from earning a reasonable rate of return, *see* City Br. 24 (citing *Park Ave. Tower Assocs. City of N.Y.*, 746 F.2d 135, 138 (2d Cir. 1984)), that argument is contrary to Supreme Court precedent, which holds that the government "has taken the use of [] property without paying just compensation" if the rate it prescribes "does not afford sufficient compensation." *Duquense Light Co. v. Barasch*, 488 U.S. 299, 307 (1989); *see also Penn Central*, 438 U.S. at 136. Regardless, Plaintiffs allege that the RSL effects a taking when all of the *Penn Central* factors are considered *together*.

their lease agreements, the RSL in effect requires Plaintiffs to provide free housing for extended periods.  The RSL similarly prevents Plaintiffs from recovering and re-renting apartments occupied by holdover tenants by allowing removal only of the person (or persons) named on an eviction warrant.  *Id.* ¶ 146 (citing N.Y. RPAPL § 749).  As a result of that limitation, squatters have the ability to keep regulated apartments off the market for weeks or months on end.  Although these provisions may be intended to serve legitimate goals, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way."  *Horne*, 135 S. Ct. at 2428 (citation omitted).

Defendants respond by seeking to shoehorn Plaintiffs' claims into a different category of takings.  They assert that Plaintiffs' claim fails because they have not alleged that the RSL stripped all "economically viable use" from their apartments.  *See* Interv. Br. 14; State Br. 20.  But that argument confuses two separate categories of takings:  *per se* takings challenges under *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003 (1992), which require the plaintiff to prove loss of "all economically beneficial us[e]" of property, *id.* at 1018, and regulatory-takings challenges under *Penn Central,* which do not.  *Palazzolo*, 533 U.S. at 617 ("Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a [regulatory] taking nonetheless may have occurred.").

Defendants also err in contending that Plaintiffs' claims necessarily fail because some provisions of the current RSL were in place in 1996, and the Second Circuit previously rejected a takings challenge to one element of the 1996 version of the RSL.  *See* Interv. Br. 14 (citing *FHL*, 83 F.3d at 48); State Br. 20 (same).  Although Defendants aver that the 2019 Amendments do not significantly alter the RSL's overall economic impact, *see* Interv. Br. 14; State Br. 2, that factual assertion is improper at this stage in light of Plaintiffs' allegation that the 2019 Amendments have

inflicted significant and unprecedented economic harms, *see* Compl. ¶¶ 93-148.  Defendants' argument also fails because it skirts the relevant inquiry: whether the RSL as a whole—not any one provision standing on its own—constitutes a taking.  *See, e.g.*, *Tahoe-Sierra*, 535 U.S. at 322 (under *Penn Central*, courts must conduct a "careful examination and weighing of *all* the relevant circumstances" (emphasis added) (citation omitted)).  Indeed, Defendants' briefs are littered with cherry-picked assertions about how particular aspects of the RSL—for example, the provisions requiring Plaintiffs to charge substantially below-market rents—do not have a sufficiently significant economic impact when viewed in isolation.  *See, e.g.*, Interv. Br. 16, 24 (isolating changes to IAI and MCI cost-recovery provisions and asserting that these changes did not have a significant economic impact).  Those arguments fail because they do not assess the totality of the economic harm inflicted by the RSL on property owners.[10]

Plaintiffs plausibly allege that the RSL has slashed the value of their properties and the amount that Plaintiffs can collect on rent, and that the law therefore has significant economic impacts on property owners, including Plaintiffs.

### 2.    The RSL Interferes with Plaintiffs' Investment-Backed Expectations.

The second *Penn Central* factor is the degree to which the regulation interferes with property owners' reasonable investment-backed expectations.  438 U.S. at 124.  Plaintiffs plausibly allege that the RSL as amended has interfered with their expectations in significant and highly injurious ways.

---

[10] Defendants also miss the mark in arguing that the RSL cannot constitute a regulatory taking because courts have rejected takings challenges to other laws that caused greater diminutions in property value (in percentage terms).  *See* Interv. Br. 15; State Br. 21.  That argument is foreclosed by the Supreme Court's directive that courts must "resist the temptation to adopt per se rules in [] cases involving partial regulatory takings" and instead examine a "number of factors rather than a simple mathematically precise formula." *Tahoe-Sierra*, 535 U.S. at 326 (quotations omitted).

The complaint alleges that the restrictions prescribed by the 2019 Amendments prevent Plaintiffs from fully recovering their capital investments—past, present, and future.  For example, the 2019 Amendments make it impossible for Plaintiff 141 Wadsworth LLC to recover the cost of an $80,000 electrical-systems upgrade completed in in early 2019, before the law changed.  Compl. ¶ 139.  When this project was carried out, the RSL's rules governing MCIs allowed 141 Wadsworth to recoup the full amount of its investment.  *Id.*  141 Wadsworth promptly applied to Defendant DHCR to recover the project's cost through rate increases, but DHCR took no action on the application (and still has not done so).  The 2019 Amendments, which apply to all pending MCI applications, now limit the available recovery to less than the project's total cost.  *See id.* ¶¶ 132-139.  The 2019 Amendments have affected Plaintiff Eighty Mulberry Realty Corporation in much the same way.  *Id.* ¶ 141.  In addition to those injuries, the 2019 Amendments also prevent Plaintiffs from making new capital investments that would have been possible under prior law, and which Plaintiffs desire to undertake, but which are no longer economical due to the RSL's stringent new recovery limits.  *Id.* ¶ 142 (providing examples).

Compounding this harm, the 2019 Amendments prevent Plaintiffs from earning a reasonable rate of return on their regulated apartments.  The annual rent adjustments authorized by the Rent Guidelines Board have not kept pace with Plaintiffs' operating costs, and the 2019 Amendments' repeal of the RSL's vacancy-increase and decontrol provisions eliminate the principal means of covering that widening revenue gap.  *Id.* ¶¶ 101-105.  Further, as described above the 2019 Amendments (1) force Plaintiffs to charge below-market rents, (2) make preferential rents permanent for the duration of a tenancy, thereby overriding express contractual terms limiting preferential rents to a limited period, and (3) revise the RSL's eviction procedures in a manner that

43

prevents Plaintiffs from recovering and re-renting apartments after a tenant stops paying rent. *See* pp. 41-42, *supra.*

Finally, Plaintiffs allege that the RSL has interfered with their investment-backed expectations by eliminating their ability to use regulated apartments for any purpose other than rent-stabilized housing. The 2019 Amendments removed the only options for Plaintiffs to convert rent-stabilized apartments to market-rate rentals by repealing the luxury and high-income decontrol provisions. Compl. ¶ 108-113. Plaintiffs relied on those provisions in the past and invested in their properties when the RSL included these critical off-ramps or, in the case of Plaintiff Eighty Mulberry Realty Corporation, when the RSL did not exist at all. *Id.* ¶¶ 17, 108-109, 112-113.

Defendants assert, however, that because property owners knew that their apartments were subject to rent regulation and because the Second Circuit found a prior version of the RSL valid, the RSL, as amended in 2019, could not have interfered with their reasonable investment-backed expectations. *See* City Br. 28-29; Interv. Br. 16-17. This assertion fails for the same reason as Defendants' acquiescence theory, discussed above. *See supra* pp. 33-35.

Defendants likewise argue that as long as Plaintiffs' buildings as a whole—including both rent-regulated *and* market-rate apartments—generate a reasonable return, Plaintiffs cannot prove that the RSL has had an economic impact or interfered with their reasonable investment-backed expectations. *See* City Br. 23. But Defendants cite no authority for this proposition, and provide no explanation for why the Court should consider property that the RSL does *not* regulate in its analysis of the RSL's effects on property that it *does* regulate. The "denominator" to be used in assessing the portion of the property taken by the RSL is each regulated unit, not *all* of Plaintiffs'

rental units (unregulated and regulated) taken together.  *See Murr*, 137 S. Ct. at 1945 (explaining how to determine the "denominator").[11]

At bottom, the RSL clearly "interfere[s] with what must be regarded as [Plaintiffs'] primary expectation concerning the use of" their regulated apartments, *Penn Central*, 438 U.S. at 136—their ability to use, possess, and control the apartments in a way that covers the cost of capital and generates a reasonable return on their investment.  Compl. ¶ 6; *see Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440, 449 (2005) (plaintiff properly alleged interference with reasonable investment-backed expectations when it alleged "the destruction of [its] business[,] claim[ed] it had the expectation that it would not be eliminated from the industry by [regulation]," and asserted that it acted in reliance on that reasonable expectation).

### 3.   The Character of the RSL Supports a Taking.

The third *Penn Central* factor looks to the "character of the governmental action."  *Lingle*, 544 U.S. at 539.  Because the character of the government action here is the functional equivalent of a direct appropriation of private property, *see id.* at 539, it strongly supports a conclusion that the RSL effects a regulatory taking.  Indeed, Plaintiffs allege that the RSL "us[es] the occasion of rent regulation . . . to establish a welfare program privately funded by" property owners.  Compl. ¶ 221 (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 22 (1988) (Scalia, J., concurring in part and dissenting in part)).

---

[11] That is so in part because state law treats each apartment as a separate unit of property, *see, e.g.*, Ch. 36 of the Laws of 2019, Part I, § 2 (permitting owners to recover only a single unit for personal or family use), and applies fundamentally different sets of rules to rent-stabilized and market-rate apartments.  The "physical characteristics" of apartments, which are separated by walls and locked doors, occupied by separate groups of tenants each with their own lease agreement, and treated as distinct units for purposes ranging from mail delivery to utility bills, further reinforce this conclusion.  *Murr*, 137 S. Ct. at 1945.  Accordingly, each rent-stabilized apartment is subject to its own takings analysis, although the outcome will often be the same for similar apartments in the same building.

The Supreme Court has repeatedly held that the character of the government action favors a taking where, as here, the regulation destroys a property owner's right to exclude and deprives them of core property rights. *See Kaiser Aetna*, 444 U.S. at 179-80 ("In this case, we hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation."). The RSL does just that. *See* Part I.B.1-2, *supra*.

Plaintiffs also plausibly allege that the RSL strips Plaintiffs of the ability to pass along their property to another, given that the RSL bestows what amounts to a life estate on certain tenants. Compl. ¶ 69-80. This too supports a finding that a taking has occurred. See *Hodel*, 481 U.S. at 716 ("character of the Government regulation . . . [was] extraordinary," and law effected regulatory taking, where law "amount[ed] to virtually the abrogation of the right to pass on a certain type of property . . . to one's heirs").

Defendants assert that the character of the RSL does not support a taking because it applies to nearly one million apartments, and so its burdens are shared by many people. *See* Interv. Br. 17; City Br. 29; *see Penn Central*, 438 U.S. at 133. That argument fails because the RSL's burdens fall on property owners, not tenants; the RSL forces a small group of owners like Plaintiffs to bear burdens benefiting the "more than two million" tenants who live in rent-stabilized apartments. State Br. 3. That type of "public assistance benefit," *Monteverde*, 24 N.Y.3d at 291, is exactly the type of burden that the Fifth and Fourteenth Amendments require to be borne by the public as a whole. *See Armstrong*, 364 U.S. at 49; *Pennell*, 485 U.S. at 21-22 (Scalia, J., concurring in part and dissenting in part). Defendants also claim that the character of the RSL does not suggest a taking because the RSL is not equivalent to a direct appropriation of private property, *see* City Br. 29; Interv. Br. 23, but as discussed above, the opposite is true: The RSL, as amended, deprives

property owners of the core attributes of property ownership—the rights to use, possess, and exclude others from their property.  *See* Parts I.B.1-2, *supra*.

*         *         *

In sum, accepting Plaintiffs' factual allegations as true, Plaintiffs adequately allege far more than plaintiffs in other cases in which courts have denied motions to dismiss *Penn Central* claims.  *See, e.g.*, *Colony Cove Properties,* 2014 WL 12629951, at *11 (denying motion to dismiss where only one factor supported claim); *Petworth Holdings*, 308 F. Supp. 3d at 357-58 (same). The motion to dismiss this claim should therefore be denied.[12]

### C. Plaintiffs Plausibly Allege a Facial Regulatory Taking Under all Three *Penn Central* Factors.

Like the as-applied claim, Plaintiffs adequately allege that the RSL effects a facial regulatory taking under *Penn Central*.  Defendants suggest that such a claim is not viable under Second Circuit precedent.  But that is wrong—the Second Circuit has implied that just the opposite is true. And so has the Supreme Court.

In *Keystone Bituminous Coal Ass'n v. DeBenedictis*, the Supreme Court recognized the possibility of bringing a facial takings claim under *Penn Central*, observing that plaintiffs "face an uphill battle in making a facial attack on [a regulation] as a taking."  480 U.S. 470, 495 (1987).

---

[12] Defendants incorrectly assert that Plaintiffs' as-applied claims are not ripe because Plaintiffs do not allege that they applied for a hardship exemption.  *See* Interv. Br. 23.  But as discussed in Part I.B.3 above, the only relief that the hardship exemption provides pertains to a minor increase in rental rates.  That does not address Plaintiffs' inability to recover the property for personal use, collect rent when tenants violate their lease or refuse to pay rent, exclude strangers with succession rights, or put regulated apartments to other uses.  *See* Compl. ¶ 158.  Nor do the hardship exemptions permit rent increases more than six percent, even if it means that an owner stays unprofitable.  *Id.* ¶ 156. Indeed, Plaintiffs allege that the RSL's hardship exceptions are a "nullity" in practice and are "*de facto* unavailable" to parties who own regulated apartments subject to a mortgage.  *Id.* ¶¶ 150, 152-53.  Because the exemptions "provide no relief to property owners," *id.* ¶ 149, they are not an impediment to adjudication of Plaintiffs' claims.  *Cf. Hodel*, 481 U.S. at 716 (law that "virtually . . . abrogat[ed] the right to pass on a certain type of property" constituted taking despite availability of "complex" procedure for retaining transfer rights).  As the Supreme Court has explained, "once it becomes clear that the agency lacks the discretion" to alleviate the taking, "a takings claim is likely to have ripened." *Palazzolo*, 533 U.S. at 620.

An uphill battle does not mean that such a claim is not viable as a matter of law; it merely indicates that, in discovery, Plaintiffs must develop evidence of significant economic harm.  *See Keystone*, 480 U.S. at 495 (rejecting a facial attack *at summary judgment* because "[t]he record is devoid of any evidence" of the regulation's general economic harm); *see also Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 213, 224-28 (1986) (considering but rejecting facial claim under *Penn Central*); *Tahoe-Sierra*, 535 U.S. at 321 (finding that facial takings claim should have been brought under *Penn Central*).  The concept of an uphill battle is irreconcilable with the argument that facial *Penn Central* claims are not cognizable; if that were so, there would be no need for a battle at all, and likewise no need for the analysis conducted in the decisions cited above.

The Second Circuit—contrary to Defendants' assertions—has reached the same conclusion.  In *West 95 Housing*, the Second Circuit rejected a facial takings claim, but only because "plaintiffs ha[d] not pled facts that would support such a 'complex factual assessment' of the economic effects of the RSL on all [] property owners."  *See W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (quotation omitted).

Here, by contrast, the RSL has stripped regulated apartments of their economic value and deprived owners of core property rights.  And unlike the plaintiffs in *Keystone* or *West 95 Housing*, Plaintiffs here allege extensive, harmful economic effects, as explained below.  Indeed, this is exactly the type of facial challenge that should succeed because the RSL lacks a "plainly legitimate sweep," *Stevens*, 559 U.S. at 472, and simply "goes too far."  *Penn. Coal*, 260 U.S. at 415.

### 1.      The RSL Causes Significant Economic Harm to Property Owners.

Plaintiffs plausibly allege that the RSL has a tremendous adverse economic effect on property owners.  In particular, the RSL drastically limits rent increases, curtails the ability of property owners to recoup costs, and makes it virtually impossible for owners to leave the rental business. And even before the 2019 Amendments, the value per square foot of a rent-stabilized apartment

building ranged from around $57 to $126, and the value of unregulated buildings of similar age ranged from $135 to $244.  Compl. ¶ 93.  The RSL has therefore caused a decrease of 50 percent or more of units' values.  *Id.* ¶¶ 93-94.  And Plaintiffs allege that the 2019 Amendments have depleted that value even more.  *Id.* ¶ 96.

### 2. The RSL Interferes with Property Owners' Investment-Backed Expectations.

Plaintiffs plausibly allege that the RSL has interfered with property owners' investment-backed expectations.  *First*, the 2019 Amendments repealed the luxury- and high-income decontrol provisions, the only paths for property owners to receive market rents for their current rent-stabilized units and on which property owners had reasonably relied when they invested in their properties.  *Id.* ¶¶ 108-110.  *Second*, the 2019 Amendments restrict property owners' ability to recover the costs of IAIs and MCIs by restricting the availability of these basic cost recovery measures.  *Id.* ¶¶ 127-38.  *Third*, the 2019 Amendments force property owners to charge reduced "preferential" rents, which are less than the maximum legal rent—and less than property owners would have ever offered—even after a lease expires.  And *fourth*, constant rent freezes make it so that owners cannot keep up with increased operating costs.  *Id.* ¶¶ 70, 85, 101, 114-23.  In short, the 2019 Amendments, on top of the rent restrictions already in place, make it nearly impossible for property owners to generate a reasonable return on their investment.  *See* Part II.B, *supra*.

### 3. The Character of the RSL is One That Imposes a Severe Burden on Property Owners.

Like the as-applied claim, Plaintiffs plausibly allege that the RSL's numerous restrictions infringe core property rights and force property owners to subsidize more than their fair share of the burdens of government.

The RSL's effect on property owners is the functional equivalent of a direct appropriation of private property—a factor that supports finding a regulatory taking.  *See Lingle*, 544 U.S. at

539; Compl. ¶ 158.  The lease-renewal and successorship provisions effectively force property owners to grant tenants a life tenancy, with almost no ability to reclaim an apartment after it is rented, and thus "us[e] the occasion of rent regulation . . . to establish a welfare program privately funded by . . . landlords."  *Pennell*, 485 U.S. at 22 (Scalia, J., concurring in part and dissenting in part).  The RSL exacerbates that intrusion by preventing owners from using their apartments for purposes other than rent-stabilized housing.  Compl. ¶¶ 81-92.

The Supreme Court's analysis in *Yee* provides further support for Plaintiffs' claim.  The *Yee* Court explained that depriving property owners "of the ability to choose their incoming tenants . . . may be relevant to a regulatory taking argument, as it may be one factor a reviewing court would wish to consider in determining whether the ordinance unjustly imposes a burden on petitioners that should 'be compensated by the government, rather than remain[ing] disproportionality concentrated on a few persons.'"  503 U.S. at 531 (quoting *Penn Central*, 438 U.S. at 124).  The Court also observed that arguments made by the plaintiffs were relevant to a *Penn Central* regulatory takings claim: (1) that the laws caused an unfair wealth transfer from owners to "incumbent" home owners; (2) that there was an inadequate nexus between the effect of the laws and the objectives that they purported to advance; and (3) that the laws deprived owners of the ability to select their tenants.  *See id.* at 530-31.  Plaintiffs plausibly allege that all three factors favor a taking here: (1) the RSL has caused a significant wealth transfer from property owners to tenants; (2) the empirical data shows that the RSL fails to achieve the objectives that it claims to advance; and (3) property owners have almost no ability to choose their tenants.  *See* Compl. ¶¶ 69-73, 98-107, 171-88.

Finally, two additional factors that courts often consider within the "character" prong of the *Penn Central* analysis also favor finding a taking here.  Plaintiffs plausibly allege that the RSL

does not produce an "average reciprocity of advantage" for property owners. Compl. ¶¶ 240-41; *see Penn. Coal*, 260 U.S. at 415. Nor does the RSL seek to remedy noxious use of property, one of the primary reasons courts have relied upon in rejecting takings challenges to intrusive property regulations. Compl. ¶ 266; *see, e.g.*, *Penn Central*, 438 U.S. at 133-34.

## III.   Plaintiffs State A Due Process Claim.

Plaintiffs also state a claim that the RSL as amended violates the Due Process Clause. The parties disagree over the level of scrutiny that applies to the claim, but that disagreement need not be resolved on these motions to dismiss. Even if rational-basis review applies, as Defendants contend, Plaintiffs state a claim because they plausibly allege that the law is not rationally related to any legitimate state interest. Indeed, the complaint contains more than sufficient factual matter to show that the RSL creates and perpetuates the very housing "emergency" it is supposed to solve.

### A.   The RSL Is Subject To Heightened Scrutiny.

Defendants' arguments for dismissing Plaintiffs' due process claims depend entirely on their assertion that rational-basis review governs the claims. Indeed, no Defendant even attempts to argue that the due process claims fail if any heightened degree of scrutiny applies. Contrary to Defendants' assertions, however, the RSL is subject to heightened scrutiny because it interferes with Plaintiffs' exercise of their fundamental property rights.

The Supreme Court has held that laws affecting property rights violate due process if they fail to "substantially advance" a legitimate state purpose. *Lingle*, 544 U.S. at 540-41. This inquiry is a "means-ends test: It asks, in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose." *Id.* at 542. In other words, the test requires "a connection of some sort" between the regulation's means and its intended end. *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1040 (9th Cir. 2000).

Defendants treat the "substantially advance" test as if it were no different from rational-basis review. But Defendants offer no explanation for why the Supreme Court would develop and apply a "substantially advance" test for property regulations if the test is identical to the rational-basis test that already governs due-process claims in other contexts. In any event, the two tests are not the same. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 836 n.3 (1987) (Supreme Court's decisions "do not establish that these standards are the same," and "the language of our cases gives some reason to disbelieve" they are the same); *Herrington v. Sonoma Cty.*, 834 F.2d 1488, 1498 n.7 (9th Cir. 1987) ("substantially advances" test is "less deferent" that rational-basis test); *Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency*, 311 F. Supp. 2d 972, 999 (D. Nev. 2004) ("substantially advances" test requires "a stricter standard of review" than the rational-basis test). For example, under the "substantially advances" test, the Court "must inquire into the legislative findings, the documentation of past problems, the alternatives considered, and other relevant factors to determine if the regulation is a reasonable response to the perceived problem." *Id.*

Finally, if *Lingle* abrogated the "substantially advance" test, as Defendants suggest, the Court should apply strict scrutiny rather than rational-basis review. Strict scrutiny applies when a law interferes with "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quotation marks and citation omitted). Property rights are so fundamental and deeply rooted in our Nation's history that they received explicit protection in the Bill of Rights. *See* U.S. Const. Amend. V; *see also GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th Cir. 2012) ("The Founding Fathers placed the right to private property upon the highest of pedestals . . . . It is simply beyond rational dispute that the Founding Fathers, through the Constitution and the Bill of Rights, sought

to protect the fundamental right of private property, not to eviscerate it."). The RSL significantly interferes with fundamental property rights by restricting, among other things, "the power to exclude," which "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto*, 458 U.S. at 435.

### B.    Plaintiffs State a Due Process Claim Even Under Rational-Basis Review.

Defendants urge the Court to dismiss Plaintiffs' due process claim because it "fails on the merits" under rational-basis review. State Br. 31; Interv. Br. 20. Relying on a single unpublished decision, they contend that "discovery is not a necessary predicate for" deciding the merits of a due process claim. Interv. Br. 21 (quoting *Balentine v. Tremblay*, 2012 WL 1999859, at *11 (D. Vt. June 4, 2012)). That is not the law.

The Supreme Court has long made clear that rational-basis review is conducted on an evidentiary record. *See, e.g., United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938) ("Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry. . . ." (internal citations omitted)). As the Fifth Circuit has explained, "although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) (affirming district court's findings of fact, made after a bench trial, that a law failed rational-basis review).[13]

---

[13] The law is also clear that the "substantially advances" test—which Defendants equate to rational-basis review—"involves an essential factual component." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 721 (1999); *see also Cayetano*, 224 F.3d at 1041 (whether rent cap substantially advanced stated objective involved material factual issues); *W.J.F. Realty Corp. v. Town of Southampton*, 351 F. Supp. 2d 18, 27 (E.D.N.Y. 2004) (denying summary judgment where government action raised genuine issues of material fact).

Plaintiffs' due process claim must thus be treated like any other claim on a motion to dismiss. The issue before the Court is not, as Defendants contend, whether Plaintiffs' claim "fails on its merits." State Br. 31. It is whether Plaintiffs plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. This liberal pleading standard applies even for claims subject to rational-basis review. *See, e.g.*, *Wroblewski v. City of Washburn*, 965 F.2d 452, 459-60 (7th Cir. 1992) ("The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard."). That is because the Rule 12(b)(6) "standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on" the merits. *Id.*; *see also Lexjac, LLC v. Beckerman*, 2008 WL 11313761, at *8 (E.D.N.Y. Sept. 30, 2008) (for constitutional claims subject to rational-basis review, motion to dismiss should be denied "if the complaint alleges that a defendant's actions were irrational, and the complaint provides sufficient allegations, which if taken to be true, would support this claim").

"While rational basis review is indulgent and respectful, it is not meant to be toothless." *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (cleaned up). As detailed below, Plaintiffs state a claim because they plausibly allege that the RSL is "not rationally related to a legitimate government interest." *Id.* at 566.

### 1. Plaintiffs Plausibly Allege That the RSL Is Not a Rational Attempt to Remedy the Purported Housing Emergency.

The RSL was originally enacted in 1974 to remedy "a serious public emergency" in the housing market while also furthering the "ultimate objective" of facilitating a "transition from regulation to a normal market of free bargaining between landlord and tenant." N.Y. Unconsol. Law § 8622; *see also* Compl. ¶¶ 8, 35, 41-43. Although the RSL delegated authority to the City

to determine whether a housing "emergency" existed, the law identified one necessary condition for a housing emergency: the housing vacancy rate cannot be "in excess of five percent." N.Y. Unconsol. Law § 8623. The law has remained in effect for nearly half a century because the vacancy rate in New York City has consistently remained below five percent and City lawmakers have re-declared the "emergency" every three years. *See* Compl. ¶¶ 8, 43.

Plaintiffs plausibly allege that history has proven the RSL ineffective in ending this "emergency" and facilitating a transition to a market system. Defendants invoke problems in the housing market in the early 1970s as justifying the original enactment of the RSL. *E.g.*, State Br. 6-7; City Br. 4. But it is irrelevant whether the RSL was a rational response to a purported housing emergency *in the 1970s*. The question is whether the State's reauthorization of (and accompanying amendments to) the RSL *in 2019* rationally furthers any legitimate purpose. *See, e.g.*, *Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935) ("A statute valid as to one set of facts may be invalid as to another. A statute valid when enacted may become invalid by change in the conditions to which it is applied."). This determination requires consideration of the "factual context" in which the law was passed, *Romer v. Evans*, 517 U.S. 620, 632 (1996), including the "history of [the] challenged rule" and the "context of its adoption," *St. Joseph Abbey*, 712 F.3d at 226.

Plaintiffs plausibly allege that the State's reauthorization of the RSL in 2019 was not a rational approach to remedying a purported housing emergency given the factual context in which it occurred. *First,* the complaint alleges that the RSL actually creates and perpetuates the emergency that it is supposed to remedy. In 2017, for example, the vacancy rate of rent-stabilized units was 2.06% while the vacancy rate of non-stabilized apartments was 6.07%. *Id.* ¶¶ 45, 170. The complaint thus plausibly alleges, with specific factual support, that the RSL is the *cause* of the vacancy rate not being in excess of 5%. Treating this allegation as true—together with its logical

corollary, which is that *repealing* the RSL would result in vacancy rates exceeding the 5% emergency threshold—the complaint necessarily states a claim that the RSL is not rationally related to solving the vacancy-rate "emergency."  That alone is enough to defeat Defendants' motion.  *See Bass Plating Co. v. Town of Windsor*, 639 F. Supp. 873, 880 (D. Conn. 1986) (striking down on due process grounds regulation that had "no reasonable relationship [to] the asserted objectives"); *see also St. Joseph Abbey*, 712 F.3d at 226  ("The great deference due to state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation.").[14]  And because the 2019 Amendments eliminate the ability for rent-stabilized units to transition to market-rate rentals, the RSL as amended ensures that regulated units will remain a significant enough portion of the total housing stock to keep the vacancy rate at or below 5%.

 *Second*, Plaintiffs plausibly allege that the 2019 Amendments were not rational measures to address the existing law's failure to remedy the housing emergency.  To the contrary, Plaintiffs' allegations demonstrate that these amendments will further drive the vacancy rate down and exacerbate any "emergency."  *See* Compl. ¶ 176.  By guaranteeing rent-stabilized tenants substantially below-market rents and unlimited rights to renewal and succession, the RSL impedes ordinary unit turnover and depresses the vacancy rate.  *Id.* ¶ 169.  For example, the 2019 Amendments reduce incentives to rent and maintain rent-stabilized units, to the point of making it uneconomical, by jettisoning vacancy and longevity increases (*id.* ¶ 48(c)); locking in "preferential" rates below an apartment's legal regulated rent (*id.* ¶ 48(e)); and eliminating decontrol provisions, effectively making all current rent-stabilized units rent-stabilized forever (*id.* ¶ 48(b))*.*  The Amendments also

---

[14] In fact, Defendants argue that the RSL "encourag[es] new construction by exempting newly constructed buildings from rent stabilization."  State Br. 2.  This admission that the *absence* of rent-stabilization leads to the creation of more housing supply that would necessarily increase vacancy rates only further supports Plaintiffs' claim.

eviscerate critical incentives to improve units by significantly limiting the amount owners can recover for improvements. *See id.* ¶ 48(d).

Plaintiffs further allege substantial economic evidence that rent stabilization schemes like the RSL reduce the quality and quantity of housing and leave lower-income tenants worse off. *See, e.g.*, *id.* ¶¶ 161-168. Defendants may dispute these effects, but Plaintiffs' allegations must be accepted as true on a motion to dismiss. *See, e.g.*, *Muchmore's Cafe, LLC v. City of New York*, 2016 WL 11469539, at *20 (E.D.N.Y. Sept. 29, 2016) (accepting as true, on a motion to dismiss, the plaintiff's allegation that a law will have the effect of restraining certain types of music).

Repeating their response to Plaintiffs' other claims, Defendants contend that precedent forecloses the due process claim. But none of the cases on which Defendants rely—nearly all non-binding and from decades ago—analyzed the recently amended version of the RSL, much less the specific features of the RSL challenged by Plaintiffs. Nor did the cases purport to uphold any and all rent control schemes in their entirety. They simply resolved challenges to particular provisions in rent control laws *other* than the provisions Plaintiffs challenge here.[15] Moreover, those cases necessarily did not consider the factual context—such as the current vacancy rates—in which the 2019 Amendments were adopted. Thus, nothing about these cases requires dismissal of Plaintiffs' due process claim.

---

[15] *See W. 95 Hous. Corp.*, 2001 WL 664628, at *10 (challenging application to buildings constructed before 1974); *Pennell*, 485 U.S. at 10 (challenging considerations in hardship hearings); *Greystone Hotel Co. v. City of New York*, 13 F. Supp. 2d 524, 528 (S.D.N.Y 1998) (challenging hotel provisions); *Manocherian v. Lenox Hill Hosp.*, 84 N.Y.2d 385, 390 (1994) (challenging provision relating to non-profit hospitals); *Rent Stabilization Ass'n of New York City, Inc. v. Higgins*, 83 N.Y.2d 156, 164 (1993) (challenging provisions expanding succession rights); *Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*, 87 N.Y.2d 325, 330 (1995) (challenging provisions reverting cooperative apartments to rent-regulated apartments).

In short, Plaintiffs state a claim because they plausibly allege that the RSL causes the very problem it was premised on solving—an "emergency" predicated on a less than five percent vacancy rate—thereby guaranteeing its continued existence.  Nothing more is required at the motion to dismiss stage.  If Plaintiffs prove those allegations after discovery, the Court should hold that this self-perpetuating statutory scheme is irrational and violates due process. *See, e.g., Richardson v. City & Cty. of Honolulu*, 759 F. Supp. 1477, 1494 (D. Haw. 1991) ("To the extent that the drafters intended to provide renters with more affordable housing, the approach chosen by the drafters of Ordinance 90–95 is not constitutionally rational.").

### 2. Plaintiffs Plausibly Allege That the RSL Is Not Rationally Related to Any Other Purported Objective.

Defendants also defend the RSL by arguing that it serves numerous purposes in addition to remedying the purported housing emergency.  But Plaintiffs plausibly allege that the RSL does not rationally further these goals either.  While due process does not require a "perfect fit," "the fit must be reasonable.  There must be some congruity between the means employed and the stated end or the test would be a nullity." *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1106 (S.D. Cal. 1999); *see also Reno v. Flores*, 507 U.S. 292, 305 (1993) (impairment of non-fundamental interests requires "a 'reasonable fit' between the government purpose . . . and the means chosen to advance that purpose").  The RSL has no rational relationship to these purported goals.

*First*, Defendants contend that the RSL provides assistance to lower income tenants. City Br. 8.  But Plaintiffs plausibly allege that the RSL is not a rational measure for assisting low-income residents, because the RSL is not in any way tied to a tenant's income.  Indeed, the 2019 Amendments changed the law to ensure that high-income residents could obtain its benefits, by eliminating the "luxury" decontrol provisions—the sole, minimal income-based tailoring that existed in the RSL.  Compl. ¶¶ 110, 117, 183.

*Second*, Defendants contend that the RSL prevents "unreasonable and oppressive" rents and "rent profiteering." State Br. 2; City Br. 8.  But they do not even attempt to define those terms, much less explain how the RSL is rationally related to those objectives.  As alleged in the complaint and confirmed by economic studies, rent control artificially drives up rental prices in the market—by some estimates, between 22 and 25 percent higher.  *See* Compl. ¶¶ 161, 162, 167, 267.  The 2019 Amendments further undermine this objective.  For example, by requiring landlords to continue to pay "preferential" rents even when they have a contractual right to increase the rent above that amount, the 2019 Amendments will often prohibit a landlord from charging even the legal regulated rent.  But Defendants cannot seriously contend that the rent set by the RSL is "unreasonable and oppressive" or that charging this amount is "rent profiteering."

*Third*, Defendants contend that the RSL prevents "disruptions to neighborhoods and communities" and promotes "stability." State Br. 2, 4; City Br. 8.  This argument is necessarily premised on the view that a neighborhood is harmed by the arrival of new residents, but there is no basis to accept that premise, much less accept it as a matter of law on a motion to dismiss.  Defendants do not explain why new residents are so harmful to a community that the law must ensure that a rent-stabilized apartment can remain with the same family for generations.  That the RSL increases gentrification while discriminating against young tenants and recent immigrants to the State, Compl. ¶¶ 162-63, 176, should cause the law to be viewed with skepticism, not touted as a basis to uphold the law.  Providing special benefits to an arbitrarily selected subset of tenants while simultaneously increasing the burden on all others cannot be deemed rational.  Even "rational basis review imposes a requirement of some rationality in the nature of the class singled out." *Winston*, 887 F.3d at 560 (cleaned up).

### C.    Plaintiffs' Due Process Claim is Not Duplicative of Their Takings Claims.

Defendants contend that Plaintiffs' due process claim should be dismissed as duplicative of their takings claims.  State Br. 31.  The claims are not duplicative.  Plaintiffs due process claim is based on allegations that the RSL as amended is invalid and unenforceable because it does not substantially advance a legitimate state interest.  *See* Parts III.A-B *supra*.  In contrast, the takings claims assume that the RSL would be valid and enforceable so long as Plaintiffs received just compensation and they seek relief to redress Defendants' from interfering with their property rights without providing such compensation.  *See* Parts I-II *supra*; *see generally Lingle*, 544 U.S. at 543 (explaining difference between takings and due process claims).

Defendants again rely on *Harmon*, but that decision merely held that the plaintiff *there* had pleaded duplicative claims.  *Harmon*, 412 F. App'x at 423.  It did not purport to hold that no plaintiff can ever plead both takings and due process claims.  Such a categorical rule would directly contravene *Lingle*, as other courts have explained.  *See, e.g.*, *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 960 (9th Cir. 2011) (noting that post-*Lingle* plaintiffs may bring claims under both the Due Process and Takings Clauses); *see also TZ Manor, LLC v. Daines*, 815 F. Supp. 2d 726, 735 n.5 (S.D.N.Y. 2011), *aff'd*, 503 F. App'x 82 (2d Cir. 2012) (refusing to read *Harmon* as categorically foreclosing due process claims where a plaintiff also asserts a takings claim).[16]

---

[16] Intervenors misread *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 597 (2d Cir. 1993), as precluding facial due process claims.  The Second Circuit did not categorically bar facial challenges; it merely held that the plaintiffs there failed to state a facial claim because they alleged that the RSL's hardship provisions deprive landlords of a constitutionally adequate return, but they could not show that every landlord subject to the RSL was so deprived.  Plaintiffs' claim is properly brought as a facial challenge because the RSL interferes with the property rights of all landlords subject to the law.  *See, e.g.*, *Yee*, 503 U.S. at 534 (deciding facial due-process challenge to rent control ordinance); *Cayetano*, 224 F.3d at 1037 (denying motion for summary judgment on facial due process claim).

IV.     **Plaintiffs State As-Applied Contracts Clause Claims.**

The "threshold issue" for any Contracts Clause claim "is whether the state law has operated as a substantial impairment of a contractual relationship." *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018) (cleaned up). A state law that substantial impairs a contractual relationship violates the Contracts Clause unless it is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (citation omitted).

Plaintiffs plausibly allege Contracts Clause claims under two different theories. *First*, all Plaintiffs plausibly allege that Part E of the 2019 Amendments substantially impairs their "preferential" lease agreements in effect on June 14, 2019, by requiring the preferential rent amount in those contracts to be extended in perpetuity. Compl. ¶¶ 256-58. *Second*, Plaintiff 74 Pinehurst LLC ("74 Pinehurst") plausibly alleges that Part E of the 2019 Amendments substantially impairs its preferential lease agreements entered into before June 14, 2019, but that took effect after that date, by retroactively changing the monthly rent. Compl. ¶¶ 249-54. Plaintiffs also plausibly allege that Part E of the 2019 Amendments is not a reasonable way to advance a legitimate public purpose. Indeed, Defendants do not identify any purpose served by Part E's impairment of existing contracts.

A.     **Plaintiffs Plausibly Allege That Retroactively Extending the Preferential Rate Amount in Perpetuity Is a Substantial Impairment.**

Plaintiffs entered into lease agreements that provide a "preferential" rent—an amount less than the legal amount set by the RSL—for a fixed period of time, typically one or two years. Compl. ¶ 120. Part E of the 2019 Amendments fundamentally changes the pricing term of these leases by: (i) requiring Plaintiffs to enter into new leases with the same tenants, (ii) at the same preferential rent offered in the existing leases, which effectively extends the term of the existing leases and makes their voluntary, time-limited discounted price term permanent. *Id.* ¶¶ 257-58.

Relying on this retroactive change in the law, all Plaintiffs plead a sufficient impairment to existing contracts to support their Contracts Clause claims.

Recognizing that there is no defense to the State's decision to single out parties who entered into one- or two-year preferential rent contracts and make those contractual arrangements permanent, Defendants do not meaningfully oppose this Contracts Clause claim.  Instead, their motions focus almost exclusively on grounds for dismissing 74 Pinehurst's additional Contracts Clause claim.  *See* Part IV.B *infra*.  The State and Intervenor Defendants do not properly present any argument for dismissing this claim, and cannot do so for the first time on reply.  *See Anghel v. Sebelius*, 912 F. Supp. 2d 4, 14 (E.D.N.Y. 2012) ("It is well settled in the Second Circuit that a party may not raise an argument for the first time in his reply brief." (citation omitted)).[17]  And although the City Defendants address the claim, they present only one argument for dismissing it: That "[t]he Complaint does not contain <u>any</u> specific factual allegations as to" all but one Plaintiff, and thus "[t]hese vague allegations of potential injury—with no factual support—are tenuous and speculative at best."  City Br. 31-32.

Far from having "no factual support," however, Plaintiffs specifically allege the key fact to support this claim: "Prior to enactment of the 2019 Amendments, all Plaintiffs leased one or more rent-stabilized apartments to a tenant at a preferential rate."  Compl. ¶ 120.  Plaintiffs further allege that "[t]he RSL requires property owners, including Plaintiffs, to continually renew leases based on the preferential rent of the previous lease, thereby extending the term of such contracts beyond that to which the parties agreed."  *Id.* ¶ 257.  Those allegations are plainly sufficient to

---

[17] The State Defendants do not address this portion of the claim at all, and the Intervenors do so only in a single footnote.  Interv. Br. 24 n.7.  But "an argument mentioned only in a footnote" is not "adequately raised."  *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993).  In any event, Intervenors' argument lacks merit.  They contend that a contract cannot be impaired by a law in effect when the contract was made, but Plaintiffs allege that the impacted contracts were in effect before the 2019 Amendments were enacted.  Compl. ¶ 120.

support the Contracts Clause claim brought on behalf of all Plaintiffs:  That their existing prefer-

ential lease agreements were substantially impaired when the pricing term was converted from a

temporary reduction from the legal rent to a permanent one.  *See Buffalo Teachers Fed'n v. Tobe*,

464 F.3d 362, 368, 375 (2d Cir. 2006) (holding that statute affecting contractual price term consti-

tuted a substantial impairment, even though it affected "only a small increase in wages" and had

"limited economic impact")

### B.    Plaintiff 74 Pinehurst LLC Plausibly Alleges That the Change to the Monthly Rent in Existing Lease Agreements Is a Substantial Impairment.

Plaintiff 74 Pinehurst also states a Contracts Clause claim under a different theory:  That

Part E of the 2019 Amendments substantially impairs some of its existing lease agreements by

prohibiting it from collecting the amount of rent specified in the contract.  *See* Compl. ¶¶ 253-54.

Specifically, 74 Pinehurst alleges that it entered into leases before the RSL was amended, in which

it and its respective tenants agreed to rents that are higher than is now permitted under the 2019

Amendments.  *See id.* ¶¶ 124-25.  As a result of the 2019 Amendments, 74 Pinehurst must charge

a lower monthly rent than the rent provided in those signed, executed, and operative lease agree-

ments.  *See id.* ¶¶ 249-51.

The Supreme Court has considered three factors to determine whether a law substantially

impairs a pre-existing contract:  "the extent to which the law undermines the contractual bargain,

interferes with a party's reasonable expectations, and prevents the party from safeguarding or re-

instating [its] rights."  *Sveen*, 138 S. Ct. at 1822.  74 Pinehurst satisfies all three factors.

*First*, 74 Pinehurst plausibly alleges that the law substantially undermines the contractual

bargain because it fundamentally changes key terms in the agreement.  Defendants contend that

74 Pinehurst has not adequately alleged that the impairment is substantial because it has not alleged

the specific "amount of money it lost."  City Br. 32.  But such an allegation is unnecessary, because

it makes no difference whether the amount affected is small or large. The Second Circuit has expressly held that a law can substantially impair an existing contract—even though its financial impact is "relatively small," if it alters "the most important elements" of the agreement, including those provisions that induced the parties to enter into the agreement. *Buffalo Teachers*, 464 F.3d at 368, 375. In *Buffalo Teachers*, the Second Circuit therefore held that a New York statute affecting the contractual price term constituted a substantial impairment, even though it affected "only a small increase in wages" and had "limited economic impact." *Id.* at 375; *see also Baltimore Teachers Union v. Mayor and Council of Baltimore*, 6 F.3d 1012, 1012, 1018 (4th Cir. 1993) (annual salary reduction of 0.95% constituted substantial impairment). 74 Pinehurst plausibly alleges that Part E similarly impairs the most important terms of the lease agreement because the law reduces the amount of rent 74 Pinehurst can charge and keeps that lower rate in effect in perpetuity. Compl. ¶¶ 249-54.

Nor is it relevant that the RSL provides a hardship exemption. Defendants cite an unpublished decision for the proposition that if "a mechanism [exists] by which property owners may seek adjustments of the regulated rent to reflect market conditions, the impairment 'cannot be described as substantial or severe for purposes of the contract clause' even if resort to that mechanism imposes some burden and delay." *W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 2001 WL 664628, at *8 (S.D.N.Y. June 12, 2001) (quoting *Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 403 (2nd Cir. 1992)). But 74 Pinehurst plausibly alleges more than just "some burden and delay"—it alleges that the exemption is *unavailable*. Compl ¶ 153. Indeed,

DHCR has acknowledged the hardship process is available "only in 'unusual situation[s].'" *Id.* ¶ 150 (citation omitted).[18]

*Second*, 74 Pinehurst plausibly alleges that this retroactive change to the rent amount in its preferential leases interferes with its reasonable expectations. *See id.* ¶¶ 119-21. As 74 Pinehurst plausibly alleges, it reasonably expected that the rent it agreed to with tenants would remain in place and would not be retroactively changed by the State. *See id.* ¶¶ 124-25.

Defendants contend that 74 Pinehurst should have expected the change in law because it is "involved in a heavily-regulated industry." *Kraebel*, 959 F.2d at 403. The Second Circuit made clear that the regulated nature of the industry is only one factor to be considered in the substantial impairment analysis—it is not dispositive. *See id.* Indeed, Defendants completely ignore other relevant factors in the substantial impairment analysis, such as the lack of any grace period to adjust to the 2019 Amendment's restrictions, which weighs in favor of Plaintiffs' claim. *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 53 (2d Cir. 1998) ("relevant to the determination of the degree of impairment is the extent to which the challenged provision provides for gradual applicability or grace periods").

In any event, even if 74 Pinehurst knew that the RSL could change, it did not have any reason to expect *this change*. The State points to past amendments related to the decontrol provisions, State Br. 29, but nothing in the law before the 2019 Amendments put property owners on notice that the legislature would retroactively extend preferential rents in perpetuity. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249 (1978) ("sudden, totally unanticipated, and

---

[18] The decision in *W. 95 Hous. Corp* is unpersuasive because it misreads the Second Circuit decision on which it relies. In holding that the impairment in *Kraebel* was not substantial, the Second Circuit relied on a finding that "the city ultimately reimburse[d] [the plaintiff] to the extent that its regulations den[ied] her of her expected rent payments." 959 F.2d at 403. That reimbursement was mandated by law. No reimbursement is coming to 74 Pinehurst.

substantial retroactive obligation" violated Contracts Clause).  As the Second Circuit held in *Buf-falo Teachers*, freezing workers' wages—the central part of a labor contract—"so disrupts the reasonable expectations of . . . workers" that it caused a substantial impairment.  464 F.3d at 368.

*Third*, 74 Pinehurst plausibly alleges that it cannot reinstate its rights.  74 Pinehurst cannot contract around the RSL, nor can it escape rent-stabilization.  Instead, it must now forever offer the tenants and their successors renewed leases with the same terms, including preferential rents, subject only to RGB-permitted increases.  *See Donohue v. Mangano*, 886 F. Supp. 2d 126, 156 (E.D.N.Y. 2012)  ("A law that provides only one side of the bargaining table with the power to modify any term of a contract after it has been negotiated and executed is perhaps the epitome of a substantial impairment to a contractual relationship."); *cf. Sveen*, 138 S. Ct. at 1823 (party can reinstate its rights where it "can reverse the effect of the . . . statute with the stroke of a pen").  Defendants do not dispute this point.

### C.  Plaintiffs Plausibly Allege That the 2019 Amendments Do Not Reasonably Advance a Legitimate Purpose.

"When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law."  *Buffalo Teachers*, 464 F.3d at 368.  Plaintiffs sufficiently plead the absence of such a purpose, because Defendants do not identify any purpose served by the challenged provisions—*i.e.*, Part E of the 2019 Amendments.

That is because the 2019 Amendments contain no findings specifically justifying the retroactive changes to preferential rent contracts.  Defendants therefore resort to relying solely on platitudes about the RSL as a whole.  *See, e.g.*, City Br. 33 (arguing that "the RSL" "serves a 'significant and legitimate public purpose' insofar as it was enacted in response to the housing emergency that existed"); State Br. 32-33 (similar).  But the purported justification for enacting the entire RSL to respond to a housing emergency—whether in 1974 or 2019—is simply not the

same thing as explaining why the RSL was amended to change the terms of existing contracts to mandate that any preferential rate remain in perpetuity, when the parties contracted for a preferential rate to apply only for a fixed period of time.

Even accepting the RSL's general purposes as specifically applicable to Part E's preferential rent lock-in, however, "[t]hat a contract-impairing law has a legitimate public purpose does not mean there is no Contracts Clause violation." *Buffalo Teachers*, 464 F.3d at 369.  The law still must be "specifically tailored to meet the societal ill it is supposedly designed to ameliorate." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997).  "Broad reference to an economic problem simply does not speak to the policy consideration and tailoring that is required to pass scrutiny under plaintiffs' Contracts Clause challenge."  *N.Y. State Corr. Officers & Police Benev. Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 146 (N.D.N.Y. 2012).

Here, Plaintiffs state a claim because they plausibly allege that Part E's treatment of existing preferential lease agreements is not reasonably drawn to advance the RSL's purposes.  For example, Plaintiffs allege that by forcing property owners to charge rents lower than those previously agreed to, and by indefinitely extending preferential rent contracts, the RSL will not achieve its aims.  *See* Compl. ¶ 259.  Property owners, like Plaintiffs, will now be less likely to offer such lower rents if they are unable to increase those rents to the legal regulated rent in the future.  That incentive will only benefit more affluent tenants with the resources to pay non-preferential rents. In addition, it is wholly arbitrary that only property owners who charge less than the legal rent are locked into a lower price. The complaint also alleges there are "more effective alternatives to New York's rent-stabilization regime," such as providing cash vouchers to tenants.  Compl. ¶ 186. "Taking those facts as true, there may be 'an evident and more moderate course' that would have

served [New York's] 'purposes equally well.'" *See Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 823 (7th Cir. 2019) (quoting *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 21 (1977)).[19]

Defendants contend that the Court should give deference to the legislature's determination that Part E's preferential-rent restrictions are a reasonable way to achieve the State's objectives. Interv. Br. 25.  This argument fails for numerous reasons.  *First*, the complaint specifically alleges that the RSL is designed to serve the State's own fiscal interests by placing onto owners costs that otherwise would be borne by the government.  Compl. ¶¶ 220-221, 188.  Because the State's interest in the RSL is self-serving, the State is owed minimal deference.  *See Buffalo Teachers*, 464 F.3d at 370 (explaining that courts should "focus[] on whether the contract-impairing law is self-serving" when assessing deference to the State).

*Second*, the Court can defer only to a legitimate purpose that the legislature actually provided.  That is because "[t]here is no presumption of legislative validity under the Contracts Clause," *Alarm Detection*, 930 F.3d at 823.  Because the 2019 Amendments contain no findings to justify the changes to preferential rent contracts, there is nothing to which the Court can defer. *See Donohue v. Paterson*, 715 F. Supp. 2d 306, 323 (N.D.N.Y. 2010) (where "actual legislative findings in support of the provision cannot be located," then "there is no adequate basis before the Court on which it may be established that the provisions are reasonable and necessary").

*Third*, whether the Part E amendments are "reasonable and necessary" is an inherently factual inquiry.  As a result, "courts have held that resolution of . . . whether the contract-impairing

---

[19] Even *Buffalo Teachers*, which the motions to dismiss frequently cite, held only that—on summary judgment—a substantial impairment was reasonable because of its "prospective and temporary quality," and the undisputed "very real fiscal emergency." 464 F.3d at 368, 372.  In contrast, the preferential rent changes here are retroactive, affecting previously entered into contracts, and are permanent, as the State has repealed the RSL's sunset provisions.  *See* Compl. ¶¶ 40, 114-26.  Plaintiffs also allege that no "real" emergency exists. *See id.* ¶ 8.

enactment was reasonable and necessary to serve an important public purpose . . . is not appropriate in the context of a motion to dismiss." *N.Y. State Corr. Officers*, 911 F. Supp. 2d at 146 (cleaned up); *see also Alarm Detection Sys.*, 930 F.3d at 823 (affirming denial of motion to dismiss because "it is too early to tell" whether "the proffered interests justify the" impairment).[20]

## CONCLUSION

For the foregoing reasons, the motions to dismiss should be denied.

Dated: March 6, 2020

Respectfully submitted,

COVINGTON & BURLING LLP

  s/ Jonathan M. Sperling
Jonathan M. Sperling
Jordan S. Joachim
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 841-1000
Fax: (212) 841-1010
jsperling@cov.com
jjoachim@cov.com

Mark W. Mosier (admitted *pro hac vice*)
Kevin King (admitted *pro hac vice*)
Michael Maya (admitted *pro hac vice*)
Ivano Ventresca (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000
Fax: (202) 662-6291

---

[20] The State's reliance on *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170 (1921) is misplaced. The rent control statute creating the substantial impairment there expired *one year* after the Supreme Court's decision and was passed in response to a housing emergency that occurred after World War I. *Id.* (citing *Block v. Hirsch*, 256 U.S. 135 (1921)); *Block*, 256 U.S. at 157 ("A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change."). That decision, which did not address the facts that Plaintiffs allege, does not insulate the permanent impairments caused by the 2019 Amendments. *See Buffalo Teachers*, 464 F.3d at 373 ("Contracts Clause cases involve individual inquiries, for no two cases are necessarily alike.").

mmosier@cov.com
kking@cov.com
mmaya@cov.com
iventresca@cov.com

*Attorneys for Plaintiffs*