UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X Docket#
74 PINEHURST LLC, et al.,      : 19-cv-06447-EK-RLM
               Plaintiffs,     :
                               :
      - versus -               : U.S. Courthouse
                               : Brooklyn, New York
                               :
STATE OF NEW YORK, et al.,     : June 23, 2020
               Defendants      : 2:00 PM
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE ERIC KOMITEE
UNITED STATES MAGISTRATE JUDGE

A  P  P  E  A  R  A  N  C  E  S:

**For the Plaintiffs**:        **Kevin King, Esq.**
                               One City Center
                               850 Tenth St., NW
                               Washington, D.C. 20001

**For State Defendants**:      **Michael A. Berg, Esq.**
                               Office of the
                               NYS Attorney General
                               Litigation Bureau
                               28 Liberty Street
                               New York, NY 10005

**For City Defendants**:       **Rachel Kane Moston, Esq.**
                               New York City Law Department
                               100 Church Street
                               New York, NY 10007

**For Intervenor**:            **Michael Duke, Esq.**
                               Selendy & Gay PLLC
                               1290 Avenue of the Americas
                               New York, NY 10104

**Transcription Service**:     **Transcriptions Plus II, Inc.**
                               61 Beatrice Avenue
                               West Islip, New York 11795
                               laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1              (Distortion in audio creating indiscernible and
2    inaudible portions in the record.)
3              THE CLERK:  74 Pinehurst, LLC, et al, v. State
4    of New York, docket number 19-cv-6447.
5              Appearing on behalf of the plaintiffs, we have
6    Kevin King.  Mr. King, are you still on the line?
7              MR. KING:  Yes, I am.
8              THE CLERK:  Thank you.
9              Appearing on behalf of the State of New York,
10   defendants, we have Michael Berg.  Mr. Berg, are you
11   still on the line?
12             MR. BERG:  I'm on the line.  Thank you.
13             THE CLERK:  Thank you.
14             Appearing on behalf of the City of New York
15   defendants, we have Rachel Moston.  Ms. Moston, are you
16   still on the line?
17             MS. MOSTON:  Yes, I am.  Thank you.
18             THE CLERK:  Thank you.
19             And appearing on behalf of the intervenors, we
20   have Michael Duke.  Mr. Duke, are you still on the line?
21             MR. DUKE:  I am.
22             THE CLERK:  Thank you.
23             We are ready to start finally, Judge.
24             THE COURT:  Okay.  All right.  So thank you
25   everybody for your patience.  We apologize for the

3

Proceedings

1    technical difficulties.  I know that all the lawyers here
2    today, as well as everybody listening in on the spectator
3    line still have busy lives, despite the pandemic, and
4    we're sorry to keep you waiting.  You know, this is a
5    somewhat more convoluted conference than usual in the
6    sense that we have this dual-track with the speaker line,
7    and the spectator line, but I think we're ready to go.
8         I will again give the standard disclaimers that
9    because we are recording this, and it may be transcribed
10   one day, I will ask the lawyers to try to avoid speaking
11   over each other as much as possible, and when there is
12   some give and take along those lines, to please state the
13   name of the speaker each time you come on the line, so
14   that somebody transcribing this later knows to whom
15   they're listening.
16        I'll remind everybody listening, lawyers and
17   spectators that the Court prohibits -- we are making a
18   recording of this, and there will be a transcript, but
19   the Court prohibits additional recording by the parties
20   or the spectators, same as we would if we were in the
21   courthouse in person.
22        Finally, I'll just add that because this case
23   is, you know, and overlap in significant part with the
24   CHIP case, which we call the Community Housing companion
25   case, that we had oral argument in this morning.  We have

4

Proceedings

1   a number of the same lawyers representing the same

2   parties on the phone now.

3           You all can assume, obviously my familiarity

4   with the arguments that were made this morning in respect

5   of claims that overlap between this case and that case,

6   and I would urge people to please target their arguments

7   that are arguments for this case to the as applied

8   challenges, and other claims that are not common between

9   the two cases.  Obviously, if somebody thinks that an

10  argument was missed this morning, you should feel free to

11  make it, but if the argument was adequately made this

12  morning, you can assume that I'm as familiar with it for

13  purposes of this case, as I was this morning, and as I

14  indicated, I do intend most like, I would think, to issue

15  one opinion, albeit with two judgments, for the two

16  cases, given the number of overlapping issues.

17          And Mr. King, on behalf of your clients, you're

18  the only ones not to weigh in on that subject this

19  morning, please let me know if you have any qualms about

20  that when it's your turn to speak.

21          But otherwise, we will kick this off again,

22  with the defendants speaking first, given that it's their

23  motion, especially given the fact that this case overlaps

24  with this morning's argument, I would ask people to limit

25  their arguments in the first instance to thirty minutes,

5

Proceedings

1    and then I'll give each side ten minutes for rebuttal

2    with in each case, the defendants dividing their time

3    among themselves, as they see fit.

4              So Mr. Berg, are we starting with you on behalf

5    of the defendants?

6              MR. BERG:  We have to -- this is Assistant

7    Attorney General Michael Berg representing defendants,

8    the State of New York, the New York Division of Housing

9    and Community Renewal, and Commissioner RuthAnne

10   Visnauskas in this civil action.

11             At the outset, your Honor, I think we need to

12   clarify the scope of the complaint in this case because

13   the complaint on its face challenges the rent

14   stabilization law, a statute that's been on the books

15   since 1969, and it specifically challenges a number of

16   provisions of the RSL such as the requirement that

17   landlords tender renewal leases, grant succession rights,

18   limit the -- the provisions limiting evictions, and

19   others that we identified in our reply brief, that have

20   either been a part of the rent stabilization law from its

21   inception, or have long pre-dated the 2019 amendment to

22   the rent stabilization law.

23             Now in their opposition brief, plaintiffs

24   stated that they were not asserting a challenge to a 50-

25   year-old regime of rent stabilization, but only a nine-

6

Proceedings

1   month-old regime of rent stabilization.  In other words,

2   the enactment of June 14th, 2019.

3          If the relief plaintiffs are seeking is merely

4   to turn back the statutory clock to last June 13th, then

5   this is a very different case from the one that was plead

6   in their complaint.  They are not looking on that reading

7   of it, of the complaint, they are not looking to totally

8   uproot the rent stabilization system as it existed

9   previously, and it's just not clear to me what they are

10  seeking to challenge.

11         We have a feeling that the Court will know from

12  our briefs, that because they are challenging many pre-

13  existing provisions, that they are seeking to get rid of

14  the whole system, but if that is not their position, we

15  can have a different discussion and debate, and I don't

16  know if the Court would want to clarify that now, or

17  would just want to hear our arguments and proceed in the

18  ordinary course to (indiscernible).

19         THE COURT:  I think I'll weigh in with my

20  understanding, and then when it comes time for the

21  plaintiffs to speak, I'll let them at that point speak

22  for themselves.

23         You know, my understanding was that the reason

24  they walked through all of the provisions of the rent

25  stabilization law, including not only the 2019

7

Proceedings

1   amendments, but everything that pre-dated it, is because
2   they are making as I said this morning, a straw that
3   breaks the proverbial camel's back argument whereby
4   they're asking the Court to conclude that the 2019
5   amendments, together with everything that came before it,
6   you know, finally gets us to the point that Justice
7   Holmes hypothesized where regulation goes too far, and
8   that the remedy they're seeking is to remove that last
9   straw, not to remove all the straws going back to the
10  beginning of the rent stabilization law itself.

11          But I may be wrong about that, I will leave you
12  to make your argument, and we will hear from the
13  plaintiffs at the conclusion of the defense motion.

14          MR. BERG:  All right, Judge.  Thank you, your
15  Honor, and we'll proceed on that basis as well.

16          I am taking the Court's advice, I don't want to
17  belabor the issue of the facial challenge to the rent
18  stabilization law as amended as a physical taking.  We
19  continue to believe that that is a category error, and
20  there is no physical taking in this case, and certainly
21  not in all circumstances as applied to rent stabilized
22  landlords.

23          With respect to the same theory, the physical
24  taking theory, the plaintiffs purport to allege a
25  separate, as applied challenge, but in fact they don't.

8

Proceedings

1    They simply copy their physical taking claim word for

2    word and substitute the phrase "as applied to plaintiffs"

3    for the phrase "on its face".

4            There is no allegation that the State

5    defendants or any of the defendants have seized any of

6    the plaintiffs' property, taken easements, or imposed a

7    requirement as in Loretto (ph.), the physical structures

8    be placed on the property, and for the reasons that we

9    discussed this morning, merely telling a landlord who is

10   in the business of renting apartments to members of the

11   public, that it must tender a renewal lease, and can only

12   evict the tenant for certain violations of the lease, is

13   a regulation of the economic relationship.  It is not a

14   physical taking.

15           Finally on this point, there is not -- in the

16   complaint, it is not alleged that a single plaintiff

17   wants to exit the business of leasing apartments to

18   tenants.  So once again, we have a situation where nobody

19   is being forced to -- by the government to lease units to

20   tenants, they're only being compelled by law to comply

21   with regulations adopted by the legislature in the public

22   interest.

23           In terms of the regulatory taking claim, there

24   are -- again the arguments for (indiscernible) the facial

25   challenge are the same as those we discussed this

9

Proceedings

1   morning.  There's no allegation that on its face, the

2   statute deprives property owners of the economic

3   viability of their buildings.

4          Plaintiffs in the complaint, do make a somewhat

5   cursory effort as to identify specific circumstances that

6   could support an applied challenge, with respect to

7   certain apartments.  So for example -- and certain

8   buildings.  So for example, 74 Pinehurst and 141

9   Wadsworth allege that they lost 20 to 40 percent of their

10  value and it was from paragraph 234 of the complaint,

11  "jeopardizing the ability of these plaintiffs to

12  refinance their mortgages in the future."

13         That appears to indicate there's no allegation

14  of any actual obstacle to the entities attempting to

15  refinance, nor is there an allegation that they had

16  actually attempted or were about to attempt refinance.

17  So the specific allegations that are pled in this

18  complaint, as I say, are cursory, and don't really get

19  them to a well-pled claim as a regulatory taking as

20  applied to each plaintiff.

21         When you --

22  (Cross-talk)

23         THE COURT:  Well, the Panagoulias, if I am

24  pronouncing their name right, I mean, the Panagoulias

25  plaintiffs plead that they sought to take an apartment

10

Proceedings

1   for personal use out of rent stabilization in one of

2   their buildings, and that that application was denied

3   because the personal -- the apartment they were seeking

4   for personal use was a two-bedroom, and the Board decided

5   that if they really needed an apartment for personal use,

6   they should've acted years earlier to take a one-bedroom

7   that had been available previously.  How do you overcome

8   an allegation like that at the motion to dismiss stage?

9        MR. BERG:  Well, they are -- so what we do is

10  we go through -- in an instance where there is a specific

11  allegation like that, we accept the specific facts, but

12  not the legal conclusions, and we go to the Penn Central

13  analysis, and we look at the nature of the government's

14  action.  Plaintiffs argued, for example, that the

15  government's actions in a physical invasion of their

16  property, and for all the reasons that we briefed in the

17  context of physical taking, is not.

18        Plaintiffs also assert that this is a -- that

19  the rent stabilization law asks the individual

20  plaintiffs, in this instance, the Panagoulias family, to

21  bear a burden that should be born by the public as a

22  whole, but in fact, as the courts have held in prior

23  cases, rent stabilization is a broad-based economic

24  regulation.  It doesn't single out anyone.  It subjects

25  the owners of close to a million apartments in New York

11

                        Proceedings

1   City, to a regulatory scheme.

2            And so, you know, for example, we have the --

3   we cite the Jaydo Associates case where the question is

4   whether the RSL amounts to a physical invasion or merely

5   affects property interests through some public program

6   adjusting benefits and burdens of economic rights to

7   promote the common good.

8            We think there's no -- there has been -- on

9   that issue, the first prong of the Penn Central test, all

10  of the case law supports the validity of the goals of

11  rent stabilization, and supports that the nature of the

12  program is broad based, it's a program in the public

13  good, it affects economic -- the economic rights of

14  landlords and tenants, and is not calculated to single

15  out any individual property owner, nor does it affect the

16  physical occupation of their property.

17           We would then turn to the degree of economic

18  impact and that --

19           THE COURT:  So what we talked this morning

20  about -- can you hear me?

21           MR. BERG:  Yes.

22           THE COURT:  Okay.  Sorry.  What we talked this

23  morning about Yee a bit, and the question of whether --

24  you know, the plaintiffs in Yee allege look, we've

25  essentially been excluded from our own property in

12

Proceedings

1   perpetuity because we have to take the tenant who is

2   there, and not only them, but any of their successors,

3   people that they would pass the property to through

4   inheritance, or sell the property to and get no choice in

5   the matter, and you know, that permanent exclusion is a

6   physical taking.  And the Supreme Court said no, it's

7   not, and one way we know that is because there's these

8   off-ramps in the statute that say that you can get out of

9   the business of renting property in certain ways, and you

10  can take your property back and use it for other

11  purposes, at least on the face of the statute.

12          You know, here we've got an as applied

13  challenge where they're saying something I think almost

14  identical to what the plaintiffs in Yee had to say but in

15  the context of an as applied challenge, and they're

16  alleging look, you're telling me one of the off-ramps to

17  rent stabilization that renders it not a permanent,

18  physical occupation forever, is that I'm supposed to be

19  able to take one apartment back for personal use, and yet

20  we applied to do that, and the New York State Board

21  denied our application for reasons that made no sense.

22          So I mean, don't we have to have discovery then

23  on that issue to assess the validity of their claim that

24  the off-ramp is illusory?

25          MR. BERG:  No, your Honor.  We accept them at

13

Proceedings

1    their word that the -- that in that particular

2    circumstance, the application was denied.  If we're

3    talking about the physical challenge here, and the

4    application of Yee, the -- there's no need for discovery

5    because there is no allegation of any physical occupation

6    or encroachment on owners' property full stop.  And I

7    understand the  allegations about that -- (indiscernible)

8    Panagoulias family to sound more in (indiscernible) in

9    whether there's been regulatory taking or not.

10           In terms of Yee, we would argue that on the

11   face of that decision, there's -- just as there were off-

12   ramps there, and there remain off-ramps here, and the

13   owner does not have to -- the owner -- as long as it

14   becomes constitutionally suspect, in particular

15   circumstances, the owner applied for an off-ramp and was

16   denied.  I don't know whether that determination was

17   appealed.  There was no allegations that an Article 78

18   proceeding was brought to challenge that determination,

19   but a remedy for that is that does not sound in physical

20   taking, and we don't believe it states a regulatory

21   taking.

22           And I don't believe that the Yee analysis is

23   really germane to the point of a regulatory taking.  I'd

24   also point out that the Court doesn't have to take the

25   State's word for it because in a number of prior cases

14

Proceedings

1  which we cite, it including Harmon and 95 West, the
2  Second Circuit had cited Yee specifically, and relied on
3  Yee, to hold that there was no physical taking.  So I
4  think no matter how you slice it, there is no as applied
5  in claim, and as I recognized at the outset, the
6  plaintiffs do make somewhat more than attempts, a fairly
7  thin one on the face of the complaint, to identify
8  circumstances where one or another plaintiff had a
9  regulatory impact that went too far.
10          And we go through the -- again, a full Penn
11  Central analysis in our brief.  It sounds as if it may
12  not be the most useful thing to replicate that here, but
13  what I'm essentially saying is that the plaintiffs don't
14  even get to square one on an as applied physical taking
15  claim, it's just not there.  It's not something that's
16  validly pled in the complaint.
17          They do need to make more of an effort, and
18  they need to take seriously, the allegations that in a
19  couple of circumstances there were regulatory takings as
20  applied to individual plaintiffs, but we believe it
21  failed to state that claim for a variety of reasons, but
22  including when you look at the nature of the government's
23  action, and the extent of the alleged economic impact,
24  and I'll give the Court one example (indiscernible) if
25  there's a question, then I'll move onto contract claim

15

Proceedings

1    but they are related.

2              THE COURT:  Let me just stick with Yee.  Before

3    you move on, can I just stick with Yee for one second.

4              MR. BERG:  Sure.

5              THE COURT:  So the petitioners in Yee were

6    making the argument that the rent controlled ordinance in

7    California, transferred the discrete interest in land,

8    namely the right to occupy the land indefinitely at a

9    submarket rent from the owner to the renter.  And the

10   Supreme -- and this is a physical taking of the claim.

11   And the Supreme Court said we know that's not true

12   because the residency law there provides that a park

13   owner who wishes to change the use of his land can evict

14   the tenants, albeit with six or twelve months notice for

15   the purpose of changing the use of the land.

16             And the petitioners came back and said yes, you

17   know, Supreme Court, that off-ramp about changing the use

18   of the land exists in theory but in practice, it doesn't

19   -- you have to run a kind of gauntlet, they said in order

20   to avail yourself of that off-ramp.

21             And the conclusion from the Supreme Court is

22   look, a different case would be presented were the

23   statute on its face, or as applied to compel a landowner,

24   over objection to rent his property or to refrain in

25   perpetuity from terminating a tenancy.

Proceedings

1          Just tell me again, sort of why isn't this that

2   very different case that Justice O'Connor hypothesized

3   where it is an as applied challenge, and the plaintiffs

4   are actually saying look, I did seek to avail myself of

5   that off-ramp, and my request was denied.

6          MR. BERG:  Well, there are number of off-ramps

7   here.  There are a number of means of exiting rent

8   stabilization, and --

9          THE COURT:  So then -- sorry to interrupt you

10  but is it your contention then that in order to even get

11  past the motion to dismiss, in the as applied context, a

12  plaintiff has to try to avail him or herself of every

13  single potential off-ramp in sequence, and fail on every

14  score before they can survive the motion to dismiss?

15         MR. BERG:  No, your Honor.  What we're saying

16  is that by making -- if an owner makes an effort to run

17  the gauntlet and is denied, they have an Article 78 claim

18  made in -- and it could be conceivable that in some

19  instance where there's totally irrational denial of -- or

20  an equal protection violation, because the denial was

21  based on protective class or something like that, then

22  they might have a constitutional claim.

23         But I don't believe they have a due process or

24  taking claim, because in a particular case, they were

25  denied the opportunity to cease renting a particular

17

Proceedings

1 unit.  I think that's what Yee stands for and Yee has

2 been cited, and a good discussion of it is in the

3 Greystone Hotel case, in the Southern District  which was

4 affirmed on the Second Circuit, basically explaining the

5 difficulties of exiting the rent controlled regime in

6 Yee, and holding that it was comparable -- that because

7 those options existed, and because they exist as well

8 under the rent stabilization law, that the -- that there

9 was no taking under the RSL.

10        So I think they're -- I think Yee controls

11 here, and I think the Second Circuit has repeatedly

12 reached the same conclusion.

13        And the only point I was going to make about 74

14 Pinehurst is that -- and I understand that they raised

15 it, and we'll discuss it as well in the context of

16 contract clause claim, but they -- two of their

17 apartments were -- was denied -- they were denied the

18 opportunity to revoke preferential rents in two of the 27

19 units that they own.

20        Under regulatory takings analysis, that is not

21 substantial, nor as we argue in our briefs, was it

22 unforeseeable, and even if one could state a claim that

23 it was unforeseeable, and substantial, which we contend

24 they have not, we still think that the nature of the

25 government regulation being the broad-based economic

Proceedings

1  regulation, adjust to (indiscernible) benefit the

2  economic laws is enough to defeat, and mandate a

3  dismissal of their as-applied regulatory takings claim.

4  　　　　　THE COURT:  What about the MCI and IAI (ph.)

5  claims where they say look, we've made repairs and

6  capital improvements under the prior regime, expecting to

7  be reimbursed in accordance with that regime, and then

8  while our applications were pending, the new 2019 regime

9  comes into play, and is applied essentially

10 retroactively, to repairs completed before, where

11 applications are still pending.  How is that foreseeable?

12 　　　　　MR. BERG:  Well, the provisions governing MCI

13 and IAI's costs, and the costs that could be passed along

14 to tenants, have been revised over the years, as have

15 many of the other formulas for either enhancing or

16 reducing landlords rents or other add-ons that landlords

17 are entitled to collect.

18 　　　　　These are --

19 　　　　　THE COURT:  Have they previously been amended

20 in ways that applied retroactively though?

21 　　　　　MR. BERG:  I don't know that offhand, your

22 Honor.  The -- there have been changes to the regulatory

23 regime over time, that have affected ongoing tenancies.

24 So for example, a tenant who entered into a lease in the

25 late '80s, on the assumption that upon -- on the

19

Proceedings

1   assumption that that rent stabilized apartment was going

2   to remain rent stabilized for the duration of the

3   tenancy, would've been very surprised in the early '90s

4   to find that they had such a thing as vacancy, decontrol,

5   and high rent decontrol being in place by the

6   legislature.

7          Now I don't want to characterize that as

8   retroactive.  I don't think it is.  I think it is forward

9   looking, in the same way that I think these provisions

10  that we've been talking about, for example, MCI and

11  IAI's, are not being applied retroactively, were being

12  applied to applications that are still pending, or that

13  are filed after the effective date of the statute, but I

14  take your Honor's point that they do have an affect to

15  people who are already engaged in transactions, whether

16  it's tenants with leases or landlords with improvements.

17         Again, we don't think it's retroactive, but I

18  understand the concern there, and there have been changes

19  in the past that have affected ongoing leasehold

20  relationships, and so do these changes.

21         THE COURT:  Okay.

22         MR. BERG:  Just briefly on the contract clause

23  claims, in our brief, we gave plaintiffs credit for

24  carefully avoiding any claim that the RSL or that the

25  2019 amendments affected future contracts because it is

20

Proceedings

1    black letter law that over the contract clause, there's

2    no such thing as State interference with a future

3    contract.

4             State law is presumed to be the background law

5    that governs contracts that are entered into when that

6    law is on the books, and to their credit, plaintiffs

7    challenged in the complaint, or at least challenged

8    specifically, only two apartments, two apartments owned

9    by 74 Pinehurst where the lease was renewed prior to the

10   effective date of the statute, and 74 Pinehurst

11   complained that it cannot revoke those preferential

12   rents, upon renewal.

13            That's how narrowly we understood them to plead

14   their claim.  In their brief, they argued that there was

15   a broader claim which had to do with leases that existed

16   as of last June 13th, but that were renewed subsequently

17   and in the future, based on terms governed by the new

18   statute.

19            Again, you know, we may have given them too

20   much credit if that is part of what they are alleging,

21   that is just not a cognizable claim under the contract

22   clause because those lease renewals are subsequent to the

23   enactment of the statute, and have -- and are governed by

24   the State law that is in effect at the time of the

25   renewal.

Proceedings

1           With respect to --

2           THE COURT:  At the time of the --

3  (Cross-talk)

4           THE COURT:  Isn't -- can we just stick to that

5  point for a second?

6           MR. BERG:  Yes.

7           THE COURT:  The contract is made and binding

8  before the statute goes into effect.  It just calls for

9  performance in the future, right?  But it's a binding

10  contract by the time it's inked by both sides, not

11  necessarily at the time --

12           MR. BERG:  What I am --

13  (Cross-talk)

14           THE COURT:  Am I wrong about that?

15           MR. BERG:  -- what I am -- well, I may have

16  been a bit opaque.  I'm sorry, your Honor.  With respect

17  to the two apartments, that 74 Pinehurst is complaining

18  about, that indeed was a -- I believe that those were

19  indeed leases between 74 Pinehurst and two tenants of

20  record that were signed prior to June 14th, 2019, and

21  that gets them to the starting line.  That gets them to

22  -- 74 Pinehurst to a point where we will say yes, let's

23  engage with the merits of your claim, and see whether

24  they state a claim under the applicable pleading

25  standards, and the substance of law of the contract

22

Proceedings

1 clause.

2        What I was referring to separately, or trying

3 to, was their purported broader contract clause claim

4 where they say well, we now -- we have all sorts of other

5 apartments, and those apartments will come up for renewal

6 one day, and when those apartments come up for renewal,

7 the renewal will be governed by the HSTPA, the 2019

8 amendments.

9        And there, that --

10       THE COURT:  Wait, that I understand.

11       MR. BERG:  -- is not even a contract clause

12 claim but you're right, they do -- looking back to those

13 two leases, we do have to engage, and we do engage in our

14 brief, in a more substantive and deeper analysis, which

15 basically has two prongs; one is whether the impairments,

16 alleged impairment was substantial, and we submit that

17 because it was only two out of 27 apartments, and also

18 because the changes were foreseeable, that there -- that

19 there was no substantial impairment of the owner's

20 rights, and in this regard, it's worth noting that from

21 1969 to 2003, the rent stabilization laws did not permit

22 an owner to revoke preferential rents during a particular

23 individual's tenancy.

24       So this is something that was on the books from

25 2003 to 2018 -- '19 rather, the legislature being that

23

Proceedings

1    the type of sudden, abrupt, and quite costly increase

2    that could be imposed as a result of this provision, was

3    addressed with tenants, addressed to the goals of the

4    rent stabilization law, and this is an aside, that in

5    enacting the 2019 legislation, the legislature did not

6    just say there's still a housing crisis in New York, they

7    said there's still a housing crisis, and existing laws

8    threatens to exacerbate it, so we will change the

9    existing law.

10           So in furtherance of that goal, we -- the

11   legislature revoked this provision on -- sorry, renewed

12   the provision, that allowed landlords to revoke

13   preferential rents upon renewal.

14           THE COURT:  Okay.  Let's turn to the City --

15           MR. BERG:  But the (indiscernible).

16           THE COURT:  Let's turn to the City at this

17   point.

18           MR. BERG:  Well, just briefly the last point on

19   that, your Honor, is that even -- the plaintiffs have yet

20   another hurdle because even if the Court were to find

21   that a claim would arguably state -- not a claim, but

22   that element would arguably claim they would still have

23   to -- plaintiffs would still have to show that it was not

24   a valid exercise of the police power, and -- I'm sorry,

25   that there was not a valid public purpose and an

24

Proceedings

1  appropriate means and we brief -- it's written in our

2  briefs that they changed this (indiscernible). Okay.  And

3  with that, thank you for your time, your Honor.

4          THE COURT:  Okay.  Thank you.  Let's turn to

5  the City.

6  (Audio recording at 0:54:00 becomes increasingly

7  distorted)

8          MS. MOSTON:  Yes, this is Rachel Moston for the

9  City defendants.

10          I'm just going to make a few points, and try

11  not to repeat any of the ground we've covered, as argued

12  by Mr. Berg.

13          In terms of the as applied claim, as your Honor

14  pointed out, I think the only factual -- one of the only

15  factual arguments is that (indiscernible) complaint

16  regarding the (indiscernible) and the fact that your

17  Honor (indiscernible).  In all of our (indiscernible)  I

18  think all of the (indiscernible) and the claim that

19  that's (indiscernible) time barred to the extent that

20  it's seeking relief on that claim, and certainly that

21  eight-year-old action pre-dates the HSPA restrictions

22  which went into effect in 2018, as we all know.

23          In our opposition papers, the plaintiffs

24  addressed everyone's claims as time barred, and actually

25  said they're not seeking a relief of denial of this

25

Proceedings

1    application (indiscernible).  So it's not -- they're not

2    only seeking the relief for the (indiscernible) this

3    building (indiscernible) the case law because it couldn't

4    make this mandatory showing.  There are plenty of other

5    exit options for him under the RSL, and they remain in

6    effect today --

7            THE COURT:  Well, let me just (indiscernible)

8    to you that --

9            MS. MOSTON:  -- (indiscernible).   Sure.

10           THE COURT:  So I agree, he's not saying he's

11   entitled to damages for the failure of the State to grant

12   (indiscernible) for that apartment.  He's saying look

13   when I say (indiscernible) the apartments, in the sense

14   that I have excluded from the benefit of the tenancy and

15   the right to stay in perpetuity, the State did not

16   (indiscernible) granted when it retorts to that, that

17   look, look, there are these other off-ramps because I

18   allege that the off-ramps are illusory, and here's some

19   evidence to that effect, right?

20           And that evidence is not time-barred, his

21   claims are time-barred.  So you know, why -- why

22   shouldn't that then count towards his as-applied

23   challenge together with all of the additional facts of

24   the Panagoulias family, and when we do ultimately a

25   question -- you know, why shouldn't we credit that

26

Proceedings

1   allegation that the off-ramp is illusory, as he alleges,

2   for purposes of the deciding whether he survives the

3   motion to dismiss, not whether he wins -- whether he

4   survives the motion to dismiss on his as-applied claim?

5          MS. MOSTON:  Well, first of all, the off-ramps

6   aren't illusory.  He doesn't make that many other factual

7   allegations.  The only other allegation I believe he

8   makes is that Maria Pangoulias has considered occupying a

9   rent-stabilized unit in her family's building.

10          So it's not like we have a factual record here

11   for the Panagoulias family.  We have these sort of

12   (indiscernible) claims -- and I just want to clarify

13   (indiscernible) apartments were used (indiscernible)

14   because we know that Mr. Panagoulias can get another two-

15   bedroom apartment theoretically when that tenant vacates

16   the unit.

17          Certainly that (indiscernible) --

18          THE COURT:  Let me (indiscernible) --

19          MS. MOSTON:  -- you can't --

20          THE COURT:  Let me just jump in there for a

21   second.

22          MS. MOSTON:  Yes, sure, sure.

23          THE COURT:  But the decision to deny his first

24   application for personal use of a two-bedroom, that there

25   once was a one-bedroom that was available, and he didn't

27

Proceedings

1  apply for personal use of that, then why wouldn't it also
2  be that -- wouldn't that reasoning also be sufficient to
3  deny his next application for a personal use exception.
4           MS. MOSTON:  He can get a unit -- sorry, your
5  Honor.  He can get a unit upon vacancy.  This personal
6  use exception only applies when somebody's been living
7  there that you're going to evict from their home.  It's
8  disruptive and you're taking a rent stabilized unit --
9  you're kicking a rent stabilized tenant out of their home
10  mid-tenancy, and the law --
11           THE COURT:  (Indiscernible) vacancy of a non-
12  stabilized apartment.  Can he do that?
13           MS. MOSTON:  We are not able (indiscernible).
14           THE COURT:  That's --
15           MS. MOSTON:  Yes, even a (indiscernible)
16  apartment.  It's about New York State (indiscernible) in
17  our papers, it's a time vacancy, for (indiscernible) a
18  single use, that's mid-tenancy, if you're actually
19  evicting somebody who (indiscernible) for your personal
20  use, but if that unit becomes vacant, and the tenant
21  leaves at the end of their tenancy, you can reclaim that
22  unit.  You don't have to (indiscernible) there.  It's
23  only a mid-tenancy.
24           THE COURT:  Understood.  Yeah, understood.
25           MS. MOSTON:  Okay, so the other issue I just

28

Proceedings

1   want to address that we bring up in our papers that we

2   didn't address yet, that is this issue of alikeness.

3            So when we're talking about as-applied

4   regulatory takings challenges, applied cases in the past

5   like Harmon and Greystone posed challenges just like this

6   because they said you didn't exhaust the DHCR.  You

7   didn't try to get hardship.  How are we supposed to know

8   how far this regulation goes with respect to your

9   property if you could potentially get a hardship, if you

10  could get some monetary relief from that.  It's our

11  position that line of reasoning still applies to

12  regulatory taking claims for as-applied challenges.

13           (Indiscernible) the Court, Harmon and Greystone

14  were decided, there was the Knicks case, a Supreme Court

15  case, that did overturn a prong of the Williamson (ph.)

16  doctrine that basically says not only do you have to

17  exhaust by going to the DHCR, or going to an agency to

18  get a variance, but you're supposed to go to state court

19  to try to get just compensation before you could even

20  come to federal court to bring your as-applied regulatory

21  takings claim.

22           And the Circuit has since then said that even

23  though the state court just compensation prong was

24  overturned by the Knicks case, that you still do have to

25  go to try to exhaust your administrative remedies, so

Proceedings

1  that you can really assess how far this statute goes with
2  respect to your property.
3        So I just wanted to make that point, that
4  arguably these regulatory takings claims are
5  (indiscernible), that they have to exhaust their
6  hardship, so we could even plead.
7        They're claiming that this is so egregious with
8  respect to their property.  Well, maybe we could find out
9  their options for relief and damages (indiscernible).
10  And so that's the bottom line.  The case law is that the
11  guiding principle here in this Circuit is that mere
12  diminution value, no matter how serious, is insufficient
13  to consider regulatory takings as a matter of law.
14        Owners of rent stabilized buildings are not
15  entitled to profit as they would under a market-based
16  system, so all of these claims, even if we accept them as
17  true, we don't need discovery on it (indiscernible) that
18  they are aggrieved.  That's what they're claiming, their
19  property is devalued 20-40 percent.  Even if we take that
20  on its face, even if we see that as true, as a matter of
21  law, that is not a constitutional challenge.
22        Their complaint is about the MCIs and the IAI
23  calculations, is really just goes to what is the actual
24  harm that you are pleading under this statute, how far
25  does this regulation go, and at the end of the day it's

30

Proceedings

1  our position that plaintiffs here are not really that far

2  and that their regulatory takings claims as a matter of

3  law fail and I think that that's it.  I don't have

4  anything further, unless the Court has questions.

5        THE COURT:  I'm sorry, everyone.  Thank you

6  very much.

7        Mr. Duke?  We'll go briefly to you, and then

8  over to the plaintiff.

9        MR. DUKE:  Thank you, your Honor.  Yes, just

10  very briefly.  I want to make one point with respect to

11  the Panagoulias allegations.  One thing that hasn't come

12  up yet is that four out of ten units are not rent

13  stabilized.  There's nothing that prevents plaintiff

14  Panagoulias or any of the (indiscernible) taking those

15  units over, and as Yee makes clear, a landowner is not

16  entitled to say I want this type of tenant, and not that

17  type of tenant.  They cannot choose amongst different

18  ones.

19        They're also not entitled to any unit they

20  want. That's made clear in the record in the

21  (indiscernible) case, which says all of the

22  (indiscernible) free (indiscernible) property exists

23  (indiscernible) standing (indiscernible), essential and

24  explicitly permissive.

25        Requests (indiscernible) in the occupancy, and

Proceedings

1    there are numerous off-ramps to allow them to do so.  And

2    as Ms. Moston stated, they can't occupy any of the units,

3    including the rent regulated ones, if the end of the

4    vacancy, they cannot evict the tenants from the very

5    beginning of the RSL, since they've had (indiscernible).

6            And another point that I'd like to make, your

7    Honor, is that MCI still allowed full coverage over a

8    longer period of time.  Taking of the rent is not a

9    physical taking, because it is not the functional

10   equivalent of direct appropriation or of ouster.

11           All that's happening, there's slight reduction

12   in the legal maximum amount of the rent that is not

13   necessarily the rent charged to any tenant.

14           And then last, your Honor, I would just direct

15   the Court with respect to the contract clause claims to

16   (indiscernible) which is (indiscernible) to the

17   (indiscernible) case is directly on point with respect to

18   (indiscernible) claim.  In that case, the Supreme Court

19   held that new regulations, which imposed a price cap on

20   natural gas, where a state price had not previously

21   existed, did not substantially impair an existing

22   contract to provide for a higher payment, and allow them

23   to remove regulations, and how heavily-regulated that

24   industry was in general.

25           And the exact same thing is true here.  This is

32

Proceedings

1  an extremely competitive, heavily-regulated industry.

2  (indiscernible).  The Second Circuit made that clear in

3  (indiscernible) Trust in (indiscernible), and these

4  languages could not have expected that the

5  (indiscernible) remain static and not be rolled back to a

6  prior iteration of any preferential (indiscernible) from

7  2003.

8          As far as (indiscernible), your Honor, if you

9  have any further questions, I'm happy to answer them.

10  Otherwise, we believe for these reasons and for the

11  reasons stated in our briefing, that plaintiffs' claims

12  should be dismissed.

13          THE COURT:  Thank you.

14          All right, let's turn to the plaintiffs.  I

15  think it's Mr. King.

16          MR. KING:  It is, your Honor.  May it please

17  the Court, Kevin King from Covington & Burling for

18  plaintiffs.

19          Good afternoon.

20          THE COURT:  Good afternoon.

21          MR. KING:  I have listened in on everything to

22  date, so I will do my best to tailor my argument as you

23  instructed at the outset.  There are a few issues where

24  we have overlapping claims with the CHIP plaintiffs  and

25  where we view the issues, just a little bit differently

33

Proceedings

1  in  terms of emphasis, I will develop those briefly and

2  then turn to the things that make our case different and

3  unique, if I may.

4            THE COURT:  Sure.

5            MR. KING:  So at a high level, from our

6  perspective, the defendants are dodging key issues in

7  three important ways, and the motion to dismiss fails as

8  a result.

9            First off, they overlook changes in the 2019

10  amendments, that the amendments sponsors and indeed, that

11  New York's highest court has acknowledged are sweeping

12  and unprecedented.

13            Defendants' arguments are focused on the law

14  prior to the RSL, but no court has addressed this law,

15  which burdens property rights in a way that fundamentally

16  alters the analysis, including by making it impossible

17  for plaintiffs to exercise their rights to possess, use,

18  and exclude others from their property.

19            We'll get into it later.  Those changes are the

20  changes that your Honor used the terms, "are the straw

21  that broke the camel's back", and so I'll begin with that

22  in just a minute, but before I do so, the arguments that

23  defendants are dodging, the second one is that they

24  engage generally in an improper divide-and-conquer

25  approach.

34

Proceedings

1      They look in trying to address each of the

2  challenges we pose in isolation, whereas our point is

3  that the combined effect of all of these restrictions and

4  requirements results in a constitutional violation.  And

5  there's Supreme Court precedent repeatedly requiring that

6  kind of (indiscernible) analysis.

7          Third, and finally, I just want to emphasize

8  that we're here at an early stage of the case, on motions

9  to dismiss, and so the issue whether our allegations

10  state a claim, the defendants in their arguments and

11  brief, repeatedly bypass that standard, for example, by

12  bringing in external facts, or arguing the merits of our

13  claims, rather than addressing whether we state a

14  plausible claim.  There is a low bar in considering

15  defendants' motions.

16          THE COURT:  What facts are in dispute?

17          MR. KING:  Yeah, sure, so there are a lot of

18  facts that are in dispute here, but let me just go

19  through a few of them.  One of the facts in dispute is

20  the due process claim, and it's whether, in fact, the RSL

21  that happened in 2019 achieves the objectives that

22  defendants say it does.  The defendants argue that it

23  does advance those objectives, and we argue that it does

24  not.  And not only do we argue that, we put in

25  significant documentary evidence indicating that it does

Proceedings

35

1   not.  So that's one area.

2            But in another area --

3            THE COURT:  So on that particular question,

4   something that came in this morning, and I'm sure that

5   you listening in this morning, you know, the hypothetical

6   I put to plaintiffs' counsel, what if the Court were to

7   conclude that there is a legitimate issue, legitimate

8   dispute of fact, with respect to one articulated

9   legislative purpose.

10           MR. KING:  Right.

11           THE COURT:  For example, you know, increasing

12  vacancy rates, and you contend profiteering, and

13  collection, but that there doesn't seem to be a

14  reasonable dispute as to another articulated

15  jurisdiction, such as for example, the goal of

16  neighborhood stabilization, and keeping, you know,

17  certain low and moderate income people in a continuous

18  way in neighborhoods they would otherwise have to leave,

19  as a result of rents increasing faster than they can keep

20  up with.

21           Do you also agree that (indiscernible) factual

22  dispute on one articulated jurisdiction justification?

23           MR. KING:  I mean, the test -- it depends on

24  what level of scrutiny would apply, your Honor.  You

25  know, we argue for heightened scrutiny on the due process

36

Proceedings

1   issue because fundamentally property rights at issue

2   here.  The defendants, in order to use a rational basis

3   approach, defendants need to show that the law is

4   rational overall.  And it's true that one of the ways

5   they can do that is they say their interest that we've

6   asserted is a valid interest, and I'll come back to the

7   validity issue in just a minute, and this law advances

8   that -- requires evidence.

9           We allege that there is absolutely no evidence

10  to establish that it does, and they say no, no we have

11  evidence that it does, and that's the kind of thing the

12  defendants can make a record of and come back at summary

13  judgment, but just to come back to the validity of the

14  interest, the defendants today for the first time

15  referred to the Nordlinger case from the Supreme Court.

16  That case, as far as I understand, was not cited in any

17  of the defendants' briefs in the case, so rather than

18  dwell on it here and now, your Honor, I would request

19  permission to expand the scope of the supplemental

20  briefing by two or three pages, and give us an

21  opportunity to respond on that point.

22          THE COURT:  So if as you're saying they invoke

23  the Nordlinger case for the proposition that neighborhood

24  stability and continuity is valid justification for rent

25  stabilization laws, and it was, if I understand

37

Proceedings

1   correctly, this morning it wasn't just Nordlinger that

2   they were citing for that proposition.  I think it was

3   the federal home loan mortgage -- I forget the acronym

4   here but the FHML case, and others, and that we -- if

5   it's your contention that no case other than Nordlinger

6   supports that, then it's only (indiscernible).

7         MR. KING:  Well, your Honor, I believe if I

8   heard correctly this morning, that the Federal Home Loan

9   case said that Mr. Berg (indiscernible) is from state

10  court. I'm not one hundred percent sure on that, but

11  that's what my notes indicate. And so that of course

12  would not show that federal courts acknowledge this is a

13  valid interest.

14        THE COURT: (indiscernible) the Second Circuit,

15  I'm just going to read. There's a legitimacy interest in

16  the RSL, in coping with an acute shortage -- what I'm

17  looking for -- the FHL said that one valid justification

18  for these clauses (indiscernible) slash lack of stable

19  housing. Is that also the same (indiscernible) reflected

20  in Nordlinger?

21        MR. KING: Well, I think that Nordlinger is a

22  tax case that dealt with diversity and (indiscernible),

23  so there may be differences here, there may not be. It

24  maybe we have to concede the point that we have not had

25  the chance to evaluate Nordlinger in full.

38

Proceedings

1      THE COURT: Okay. (indiscernible) in the
2  supplemental letter is fine.
3      MR. KING: We can do that.
4      THE COURT: That would be helpful.
5      MR. KING: So, coming back you asked the
6  question of the fact disputes. Let me just tick through a
7  couple of the other ones they have here. (indiscernible)
8  the denominator question for the Penn Central analysis,
9  and that question is extremely important because the
10  property as issue often has great significance because of
11  the outcome. Our allegation here is that the property for
12  Penn Central purposes, is the individual unit. The
13  Defendants of course take a different view. And so how do
14  you decide that? Well, one of the inputs to that, the
15  Supreme Court tells us, in Murr versus Wisconsin, are the
16  reasonable expectations of property ownership, and the
17  way you determine reasonable expectations of property
18  ownership is to solicit expert testimony, you conduct
19  surveys, you take discovery of government regulators to
20  look at how they approach whether apartments are separate
21  parcels from one another, right? Those facts are not
22  under plaintiffs' control, that goes to the denominator
23  issue.
24      THE COURT:  So, a legal question.  So I agree
25  with you that first off, the numerator and denominator

Proceedings

39

1    issue I think right because we have to compare apples to

2    apples, and it is tremendously important whether you're

3    looking at this on a rent stabilized apartment level

4    versus a building to building level.

5           Just if I could put two questions to you on

6    that, one is that of logic, is (indiscernible)

7    undisputedly the case that your client is making

8    investment decisions at a building level, rather than --

9    you know, they don't have the option to do that, rent

10   stabilized apartment by rent stabilized apartment, when

11   you're talking about diminution in value, and

12   interference with your investment-backed expectations,

13   just I don't see how it makes sense, to say that we

14   should look at that at the level of the individual

15   apartment.

16          And two, from a legal perspective, you have the

17   language in Penn Central itself that straddles pages 130

18   to 131, that says taking jurisprudence (indiscernible)

19   into discrete segments, and to determine whether a

20   particular segment had been abrogated, and in deciding

21   whether a particular government action has affected a

22   taking, this Court, and the Supreme Court focuses on the

23   nature and extent of interference (indiscernible) in the

24   parcel as a whole.

25          So how can that be as a legal matter, anything

40

Proceedings

1  other than the building in which your client is invested?

2        MR. KING:  The question then becomes, your

3  Honor, what is the parcel as a whole, and we can put in

4  evidence at the summary judgment (indiscernible) Murr

5  factors, which I agree that they concluded are

6  (indiscernible) of law, but the (indiscernible) between

7  the law, and as a matter of fact, treats each individual

8  apartment separately, and (indiscernible) a building,

9  (indiscernible) --

10        THE COURT:  Why separately, right?  Why is

11  that?

12        MR. KING:  Your Honor, we can cover this in our

13  supplemental briefing, but from my understanding is they

14  can count separately, even if its in the same building.

15  In fact, if you were to go back to (indiscernible),

16  that's the (indiscernible) case where there was a kind of

17  co-op conversion and you had, you know, units owned

18  separately at one point.

19        But beyond that, you know, there is a fact

20  question about how regulators deal with this, you know,

21  the reasonable expectations about property ownership,

22  these units (indiscernible) and locks, different utility

23  bills, different points of entry, different families

24  occupying them.  So you know, we think there's a lot of

25  factual development to be done there.

Proceedings

1        And then broadly, we need to come back to the

2   off-ramp conversations we're having with defense counsel

3   here about Yee and about the off-ramps, like one of the

4   issues that matters there is the credibility of the

5   defendant's assertions about off-ramps, and we can

6   contest it through discovery, how the government

7   regulators understand those to work, whether they're ever

8   granted, and whether the regulator is consistent with

9   what the law's stated purpose is.

10        We believe that the 2019 amendment are designed

11   to in fact, ensure that rent stabilized apartments remain

12   stabilized, that's the allegation of paragraph 5 of our

13   complaint, that's one of the focuses of the HSTPA that

14   was adopted last summer.  And so it seemed to us that if

15   would be plausible to credit our allegations that the law

16   does what it is set out to do.

17        So --

18        THE COURT:  I'm sorry, explain that to me?

19   There's factual disputes say, for example, about the

20   reasons why Mr. Panagoulias was denied the personal use

21   of the two-bedroom apartment.  We're just assuming at

22   this stage, the truth of every allegation that you make

23   in the complaint and then we're going to make a

24   determination of whether or not it's enough to state a

25   claim, but what would discovery on a subject like that

42

Proceedings

1  entail?

2          Are you entitled to look into, you know, the

3  internal deliberations at the board level?  Would next

4  phase of this litigation (indiscernible) the next phase

5  there?

6          MR. KING:  Certainly, your Honor.  The next

7  phase of this litigation would add perspective on

8  (indiscernible) and so, yeah, I don't think we'd be

9  entitled to discovery into this dispute that we were

10  involved in eight years ago, which we have a record of

11  now, we've evolved (indiscernible) but we have other

12  instances where we are (indiscernible) have been applied.

13  The defendants argue that there are these off-ramps that

14  people can use, but have they ever been used? Defendants

15  don't think a (indiscernible) has ever been granted.

16          And moreover, you can take discovery from the

17  employees of the DHCR, one of the defendants here,

18  indicating (indiscernible) apply all these provisions

19  consistent with (indiscernible) that HSPA's purpose is

20  ensuring that rent stabilized apartments remain

21  stabilized.  We have internal emails to that effect,

22  (indiscernible) would see that the off-ramps are not

23  credible, and do not exist, in fact.  So I think that's

24  what we would find, and there's sure to be more as well.

25          THE COURT:  Okay.

43

Proceedings

1      MR. KING:  I want to take you back to the

2   regulatory takings, if I could, and talk about, you know,

3   how the 2019 amendments and the changes they make are the

4   straws that break the camel's back, and at the outset of

5   that, confirm, your Honor, your understanding of how our

6   complaint worked.

7           Just as you said, we challenged the RSL as it

8   was amended last summer and that (indiscernible) a new

9   provision, (indiscernible) the pre-existing provision,

10  and that it was modified, and changed, and as they exist

11  (indiscernible) they've never been tested before.

12          We challenged the RSL as it exists today, and

13  that's not a sixty-year regime, but a nine-month regime.

14      THE COURT:  But then if they were to agree that

15  the 2019 amendments are that straw, then what does that

16  imply in terms of a remedy?

17      MR. KING:  Then your Honor, it implies what you

18  said during the first argument, which is that the remedy

19  is to remove the last straw, not all straws.

20      THE COURT:  Okay.

21      MR. KING:  So let me talk a little bit about

22  the specific straws that broke the camel's back, and then

23  go into the physical takings claim that is asserted on a

24  facial and an as-applied basis.  The key point for our

25  physical takings claims is that under the prior version

44

Proceedings

1   of the law, and (indiscernible) in a variety of ways and

2   retained their core property right to use, to possess,

3   and to exclude others from their property.

4           But the 2019 amendment repealed the provisions

5   (indiscernible) that made that possible, so now owners no

6   longer have the  ability to end the tenancy once it

7   begins, and in particular 2019 amendments burdened the

8   right to exclude by repealing the (indiscernible) which

9   we allege our plaintiff used in the past, and which he

10  would use in the future, that's at paragraph 112 to 113

11  of our complaint.

12          The 2019 amendment put condo and coop

13  conversion, and not into the hands of the owners, but

14  into the hands of the tenants by requiring 51 percent

15  tenant approval to engage in such a conversion, and the

16  2019 amendment causes significant changes to the eviction

17  procedures, but your Honor, that goes to the post-breach

18  remedy that we spoke about earlier, allowing the tenant

19  to occupy for up to one year.

20          And then beyond that, I just want to call out,

21  your Honor, that there's another element in our claim

22  about the eviction process, which is that under the 2019

23  amendment, a warrant of eviction applies only as to the

24  person named in the warrant, which usually is the

25  (indiscernible) tenant, if you will, and it's not valid

45

Proceedings

1   as to anybody else who happens to be present in the

2   apartment, whether they're there lawfully or not, and

3   that's paragraph 146 of the complaint, and page 19 of our

4   opposition brief.

5            So what that means is as a practical matter, is

6   the eviction process doesn't work and is not available

7   because if show up to evict tenant A, and person B

8   happens to be present, person B has the right to remain,

9   and if you go and you try to evict person B, then person

10  C is present, and so forth.

11           This is something we will address in our

12  supplemental brief, and so I don't want to belabor the

13  point, so I just want to hit the eviction as an unusual

14  change in 2019.

15           Moving onto the 2019 third prong of the

16  amendments, the 2019 amendments take away the right of

17  owners to occupy either for their own use, or for family

18  use, every apartment that is a rent-stabilized apartment

19  save one, and so according to Mr. Panagoulias, they've

20  got six rent-stabilized apartments in their building, and

21  they're filled (indiscernible), he can't.  There's no

22  off-ramp for the (indiscernible) apartments.  And so

23  (indiscernible) becomes a bigger imbalance.

24           (Indiscernible) if you could, (indiscernible)

25  said get back, (indiscernible) the restrictions are so

46

Proceedings

1  numerous that there is no way to do it, and I'll just

2  call out one example.  In paragraph 63 to 65, we would

3  say when going to corporate form, as the Wadsworth and

4  the Pinehurst plaintiffs do, they are categorically

5  ineligible for that particular off-ramp.

6          So (indiscernible) out that (indiscernible) the

7  caveat (indiscernible) but now that the (indiscernible)

8  gone, (indiscernible) the question the Supreme Court was

9  (indiscernible) which is (indiscernible) during Mr.

10  Berg's argument.

11          You don't have to take it from us.  It's the

12  stated purposes for the 2019 amendments to ensure that

13  these rent-stabilized apartments remain stabilized, and

14  it's plausible to say that the law achieves its intended

15  purpose.

16          A few remarks about the gauntlet.  Your Honor,

17  we looked at the gauntlet issue the same way you did

18  during the argument starting off with Mr. Berg about a

19  half-an-hour ago, but to clarify, all of the offerings

20  cited by the defendants would require the proper owner to

21  change in use, and that kind of requirement of a change

22  in use is foreclosed.  I will set up (indiscernible) 17,

23  and (indiscernible) where him talking about let them sell

24  the wine, right?

25          What the Supreme Court said in substance is, if

47

Proceedings

1   what it would have to do is avoid a physical taking is to

2   change how the property is used, then that's not an

3   answer on the government's part.

4           THE COURT:  Can we just -- I understand the

5   argument you're making now.  Can we just go back to the

6   question of how many off-ramps one needs to avail him or

7   herself of before they can bring an as-applied challenge

8   that's derived a motion to dismiss?  Is there any case

9   law -- I'm sure there is case law, that talked about the

10  impact of multiple successful potential off-ramps.

11          The case we have here is that plaintiffs allege

12  that, look, this is a permanent occupation, defendants

13  respond no, there isn't because there's all these off-

14  ramps, by which the apartment could come out of the rent

15  stabilization regime and you retort, no the Panagoulias'

16  tried one, and it revealed, and discovery will show that

17  that off-ramp is illusory, and the defendant will come

18  back and say, you know, three or four other off-ramps,

19  and plaintiff never tried those.  What case law, if any,

20  could you point to that would resolve that question?

21          MR. KING:  Well, I don't know of a case, your

22  Honor, although if I find one, and we'll mention it in

23  the supplemental briefing (indiscernible) there were

24  multiple avenues, and (indiscernible) multiple.

25          We've been (indiscernible) the case, our

48

Proceedings

1   (indiscernible) that case for the following reasons.  We

2   have alleged on an as-applied basis that these off-ramps

3   do not exist.  They (indiscernible) that there is no

4   (indiscernible) as to the plaintiffs, and because the way

5   the law is structured, and (indiscernible).

6           THE COURT:  (Indiscernible) necessarily likely

7   has (indiscernible) demolished the building and has been

8   denied that option.

9           MR. KING:  Well, your Honor, demolishing the

10  building would not get him back his apartments, and that

11  property is still subject to state law, so

12  (indiscernible).  And by the way, demolished

13  (indiscernible) as Mr. Pincus mentioned, you've got to

14  make enormous payment (indiscernible) so I don't think

15  that really is an option.

16          Mr. Panagoulias has alleged that this is

17  (indiscernible) property is owned such that you could

18  have commercial on the first floor, but not in the rest.

19  You couldn't do it.  And even if you could somehow create

20  a business, and occupy the length of the six stabilized

21  units with it, what are you going to do with the other

22  five, right?

23          So I think the more you look at, and carefully

24  evaluate, these potential off-ramps, the more you see

25  that they do not exist, and certainly we've alleged they

49

Proceedings

1    do not exist for our plaintiffs here, and your Honor,

2    just to mention again, the Wadsworth and Pinehurst

3    plaintiffs.  They have a corporate form, so the fancy and

4    the personal use exception don't exist.

5          So the off-ramps (indiscernible) caveat in Yee

6    and Florida Power, and should this case go forward, and

7    our allegations should see the light of the day, and if

8    the defendants are able to provide proof of claims to the

9    contrary, they can go for it.

10         But (indiscernible) certain about the

11   (indiscernible) could make factual allegations for our

12   plaintiffs, and there are certainly (indiscernible) that

13   include allegations about personal use, but let me just

14   to take you through a few of our other (indiscernible).

15         So (indiscernible) detail, you know,

16   (indiscernible).

17         THE COURT:  How are you --

18         MR. KING:  Yeah.

19         THE COURT:  -- I don't mean to sort of rush you

20   along, I think where rubber meets the road here is on the

21   is on the as-applied, and regulatory takings challenges,

22   so if you could get to the as-applied sooner than later,

23   then I think that would be helpful.

24         MR. KING:  I will tell you what, I will go

25   through those things now.  So on the regulatory takings

50

                         Proceedings

1   as-applied, you know, the allegations is (indiscernible)

2   had said (indiscernible) structure is that, you know,

3   (indiscernible) property (indiscernible) thoughtful,

4   (indiscernible) great case (indiscernible) public

5   (indiscernible) benefit that is provided by our

6   government, that the case (indiscernible).  The Penn

7   Central case establishes a multi-factor test, it's not

8   due to the (indiscernible) motion to dismiss, especially

9   (indiscernible) allegation (indiscernible) factual

10  analysis, that depends on a careful inquiry into the

11  specifics of the case.  That's on page 1943 of the

12  Supreme Court decision.

13           The Supreme Court has also taken

14  (indiscernible) case, which is what the Court said in

15  (indiscernible) and motion to dismiss, whether or not the

16  statute has gone too far.  As a result, the Court has

17  often rejected motions to dismiss where, as here,

18  plaintiffs make a reasonable showing on at least one of

19  the Penn Central factors (indiscernible) factors

20  (indiscernible) which is 31 and 32 of the brief.

21           So (indiscernible), your Honor, at a high

22  level.  (Indiscernible) allegations as they apply to each

23  of the three Penn Central factors.  I guess that would be

24  useful.

25           THE COURT:  It was.

51

Proceedings

1      MR. KING:  So starting at investment-backed

2  expectations.  Our allegations here are that plaintiffs

3  are (indiscernible) unable to recover their investment,

4  including infrastructure updates (indiscernible), and

5  (indiscernible), (indiscernible) Supreme Court raises,

6  and the inability to transition to market rentals, both

7  (indiscernible).

8      Under the 2019 amendment, IAIs are capped at

9  $15,000 and accruals spread out over 14 or 15 years,

10  depending on how old the building is, the defendant will

11  have the option (indiscernible).  This $15,000 cap is so

12  low that they cannot cover upkeep costs, and by the way,

13  the $15,000 is not indexed to inflation, which means that

14  it's going to get lower and lower over time, and since

15  these buildings have been in use, you know, for

16  residential apartments at least since 1974, and in the

17  case of the Panagoulias plaintiffs, since (indiscernible)

18  -- it's old.

19      So the upkeep costs are substantial.  You can't

20  keep the apartments up (indiscernible) which is in

21  paragraph 131 of our complaint.

22      THE COURT:  You say that the $15,000 is

23  recoverable over, I forget how many years, was it 15

24  years?

25      MR. KING:  17.

52

Proceedings

1        THE COURT:  14, 15 years, (indiscernible) or

2    (indiscernible) of the full amount?

3        MR. KING:  Your Honor, my understanding is that

4    the answer to your question is no, (indiscernible).  My

5    understanding is it's a straight line recovery.  You take

6    a straight line to invest, and divide it at 160 months or

7    180 months, and that averages out to (indiscernible).

8        Moreover, in calculating the amount that you

9    can recover, you have to exclude finance charges, and

10   other costs that are deemed not reasonable by the DHCR,

11   and then finally, there's no (indiscernible) structure on

12   non-paying tenants, which means (indiscernible)

13   available, and if they're (indiscernible) don't pay,

14   (indiscernible).  Now, likewise, if you happen to

15   (indiscernible).

16       On MCI, (indiscernible) the capital cost

17   (indiscernible) intellectual purposes.  The

18   (indiscernible) and MCI so states, there is a

19   (indiscernible) between the operating expenses of these

20   plaintiffs, and homeowners generally, and the rates of

21   (indiscernible) and you see that in paragraphs 101

22   through 104 (indiscernible), correct.

23       And finally, all of the regulatory burdens

24   posed by the RSL together (indiscernible) don't cover all

25   of the costs (indiscernible) the plaintiffs

53
                         Proceedings
1  (indiscernible), that's paragraphs 106 and 213.

2          And finally, I'd just like to note, some of

3  these plaintiffs, not all of them, invested in property

4  at the time, and for (indiscernible) at the time and

5  (indiscernible) and out of (indiscernible) expected use

6  of property.  That's paragraphs 108 through 113.

7          All of that together are allegations about

8  investment-backed expectations.

9          THE COURT: The (indiscernible) (indiscernible)

10  by if we -- if we assume that -- my reading of Penn

11  Central is that we need to show very significant

12  diminution in value of the property, it's necessary but

13  never sufficient element of a regulatory taking, and we

14  have further seen that when looking at that diminution in

15  value, you have to calculate that level of the building

16  that the, you know -- the (indiscernible) rent stabilized

17  apartments in the building, do you get anywhere near,

18  even pre-discovery, the 70-80-90 percent diminution that

19  the case in that Penn Central require? Or is it the case

20  that, you know, (indiscernible) level developing

21  (indiscernible) pattern, (indiscernible) are sufficient?

22          MR. KING:  Your Honor, two responses.  My first

23  response will be to respectfully challenge the premise.

24  The Supreme Court made clear in (indiscernible) any sort

25  of requirement or per se rules for Penn Central takings

54

Proceedings

1    claims, there's no such thing, as I understand it, and a

2    necessary condition for a Penn Central taking

3    (indiscernible) general (indiscernible) property rights

4    (indiscernible), but how far is too far is dependent in

5    every case on a careful examination on the

6    (indiscernible) stronger (indiscernible) factor and

7    (indiscernible) showing on one another.

8         THE COURT:  So if -- my understanding, okay,

9    (indiscernible) looked what was actually held to be a

10   regulatory taking, you know, I don't see anything like an

11   equivalent to what you see in regulatory or physical

12   takings where you've got something that's relatively de

13   minimis because it's (indiscernible) on the other Penn

14   Central factors, gives rise to regulatory takings.  Am I

15   missing a case there, or is that a relatively small

16   diminution in value in the overall scheme of things is

17   nonetheless, combined with other factors, sufficient to

18   lead to a Penn Central taking?

19        MR. KING: Well, your Honor, the case that comes

20   to my mind, and I'll admit it's a little unclear which

21   bucket this case falls into (indiscernible) whereas the

22   private (indiscernible) made it public, and the Court --

23   the Supreme Court (indiscernible) in examining regulatory

24   takings focused on physical inclusion, that we

25   (indiscernible) in looking to Penn Central factors at

55

Proceedings

1   least in part.  I'll talk about that (indiscernible) in

2   supplemental briefing.

3          That's one example, I believe, where it was a

4   sort of Penn Central analysis that involved, you know,

5   this more sort of (indiscernible) diminution of value.

6   Even accepting that there were some sort of necessary

7   diminution in value, my expectation is that discovery

8   would show very significant diminution in value as a

9   result of the 2019 amendment and the laws that exist

10  today.

11         THE COURT:  I'm not sure this (indiscernible)

12  understand you allege to be the -- has a diminution in

13  value for Penn Central purposes, including the allegation

14  of (indiscernible).

15         MR. KING:  I know that there was a way for

16  (indiscernible) significant difference in value between

17  regulated and stabilized apartments, and then, you know

18  in essence (indiscernible) and beyond that, you have the

19  allegation of a 20 to 40 percent reduction in value of

20  (indiscernible).

21         THE COURT:  So I'm looking at the as-applied

22  context here.

23         MR. KING:  Oh.

24         THE COURT:  The (indiscernible), I think you

25  said we suffer the full diminution in value from all rent

56

Proceedings

1  regulation going back to 1969 or for some plaintiffs --

2            MR. KING:  Right.

3            THE COURT:  -- or long before that, but so you

4  know if you can, explain -- the particular plaintiff with

5  the particular as-applied claim, the largest diminution

6  in value, and -- and how you get there and explain again

7  what you're alleging in terms of numbers?

8            MR. KING:  Certainly, your Honor.  So the

9  (indiscernible) I have owned since approximately 1950,

10  based off the diminution in value, is based off of the

11  RSL as a whole, not this 2019 amendment (indiscernible)

12  but the diminution from the RSL's (indiscernible)

13  property (indiscernible), and so that (indiscernible).

14            We (indiscernible) in 1974, so they would be

15  (indiscernible) relatively, not just (indiscernible) or

16  RSL regulation.  So I don't know that (indiscernible) go

17  to on this particular issue.

18            The Wadsworth and Pinehurst plaintiffs obtained

19  their buildings in 2000, and so the analysis would be

20  different, right?  And so your Honor (indiscernible)

21  expectations that shift in part on the laws that exist

22  when you acquire property.

23            You know (indiscernible) says that

24  (indiscernible) (indiscernible) color on that.  I think

25  that (indiscernible) a significant diminution in value.

57

Proceedings

1      THE COURT:  Okay, and then what does that mean

2  in terms of what you are alleging (indiscernible)?

3      MR. KING:  I think it means, you know, we're

4  alleging something in excess of (indiscernible) percent.

5  It was (indiscernible) percent as a result of 2019 and it

6  will be a larger number when you add to that the

7  diminution of value that came before from the RSL

8  (indiscernible). You're here today, your Honor,

9  (indiscernible). You can understand that it's been

10  (indiscernible) in excess of (indiscernible) percent.

11      THE COURT:  Okay.

12      MR. KING:  We can come back to the rest of the

13  Penn Central factors and acknowledge, you've got to look

14  at everything together.  In terms of the (indiscernible)

15  physical occupation that we talked about earlier, and

16  (indiscernible) left out, you know, the transfer of

17  rights.  The 2019 amendment (indiscernible) over to

18  tenants (indiscernible) an inability of owners to obtain

19  use of their property once the tenancy is in place.

20      And then we explain about the economic effect

21  and the fact that (indiscernible) with operating costs --

22      THE COURT:  Can you -- so I understand when

23  Penn Central talks about (indiscernible), tell me if I'm

24  understanding this correctly, I think it would have to be

25  understood to mean something, you know, other than

58
Proceedings

1   financial expectation  because then you have lost me
2   (indiscernible) overlap (indiscernible) and so these
3   kinds of expectations that give rise to a claim of
4   interference are things like with are (indiscernible)
5   property, and (indiscernible) the highest and best use of
6   the property  was actually (indiscernible) that I can't
7   use it for X anymore.
8           Am I understanding that fact correctly to say
9   that, and that you allege specifically about interference
10  with your clients' impact and expectations.
11          MR. KING:  Well your Honor again, I think I
12  challenge the premise of what you just said, not, but you
13  know, the Supreme Court (indiscernible) expectations
14  reference to the investment (indiscernible) necessarily
15  (indiscernible) person has conducted the (indiscernible)
16  but that's certainly part of the analysis.
17          THE COURT:  And (indiscernible) case there is
18  discussion, you know, about (indiscernible) diminution in
19  value to be measured as a value of your investment, but
20  as a diminution in, you know, your return.  They are kind
21  of the same thing, right, in that one leads to the other?
22          MR. KING:  We'll make economic impact
23  (indiscernible) investment expectation of profit and
24  analysis overlap with one another, for lack of a
25  (indiscernible) expectations, and (indiscernible) are

59

Proceedings

1    some significant expectation would be non-economic

2    (indiscernible), but what your question went to, you

3    know, I'm a plaintiff who's living here, and I want to be

4    able to put my sister in the unit next door, and

5    (indiscernible) through college I want to put her

6    upstairs in unit C, and so those are the kinds of

7    interferences we allege here, and including plaintiffs,

8    that that was exactly what we said in, I believe,

9    paragraphs 63 and 64 of the complaint.

10           So you know, that's one type of a non-economic

11   (indiscernible) --

12           THE COURT:  Well, isn't (indiscernible)

13   expectations at the time the investment was made, and do

14   you allege -- do you allege that when parents bought the

15   building they were intending to put their future son and

16   daughter into these apartments?  How does that work?

17           MR. KING:  You know, that's not addressed

18   specifically in the complaint, what the complaint, your

19   Honor, said is that plaintiff Panagoulias grew up in this

20   building and he continues to live there, and his sister

21   remained interested in living there if she could, to be

22   close to the family.  So I think there's a lot there that

23   (indiscernible) who (indiscernible) identical allegations

24   include the specific (indiscernible) to get through

25   (indiscernible).

60

Proceedings

1        Then if you put it all together, there's a
2   thoughtful allegation here, that's borne out in the
3   brief, that's something the plaintiffs (indiscernible)
4   and I think that's something they have been asking for.
5        So (indiscernible) that's (indiscernible), you
6   know, prong of the Penn Central test (indiscernible)
7   again, look at the practical effects on the plaintiffs
8   here (indiscernible) to you, and (indiscernible) if you
9   operate this building and you own it together with your
10  parents.  What can you do to get those stabilized
11  apartments back so that you can use them yourself
12  (indiscernible) and the answer is you can't.  Under the
13  RSL, as amended in 2019, there is nothing you guys can do
14  to regain four elements (indiscernible) of the
15  (indiscernible) saying here.  That's  why
16  (indiscernible).  That's (indiscernible).
17       THE COURT:  The State and the City says you can
18  wait for a vacancy, and that you can (indiscernible) for
19  personal use.
20       MR. KING:  Two responses to that, your Honor,
21  the first is you can wait for a vacancy (indiscernible)
22  tend to go on for decades, and whether there is a vacancy
23  is one hundred percent in the tenant's control and zero
24  percent in the owner's control.
25       Second, at most, you can get one of your

61

Proceedings

1  apartments back that way if you don't hold a corporate

2  form after all (indiscernible) the right is

3  (indiscernible), as the Court pointed out.

4          So I think you can (indiscernible) offering

5  happened to be.

6          THE COURT:  Okay.  And anything else before you

7  turn onto the defendants?

8          MR. KING:  I realize that we're a little over

9  time, if you give me a little bit of (indiscernible) and

10 contract clause.

11         THE COURT:  Yes, (indiscernible).

12         MR. KING:  And that's sort of (indiscernible).

13         Yes, your Honor, that's sort of (indiscernible)

14 less than five minutes.  Due process, you know,

15 (indiscernible) whether or not the law served its

16 purposes in (indiscernible), so I am not going to retread

17 that territory.

18         But what I will say is (indiscernible)

19 plaintiff has which is this.  The trigger for initiating

20 for rent stabilization is a finding that the vacancy rate

21 is not in excess of five percent.  What we've alleged in

22 paragraphs 169 to 170 of our complaint, is that the RSL

23 and its restrictions (indiscernible) caused the vacancy

24 rate to go below five percent, and that interaction

25 (indiscernible) because what we explain is the very

62

Proceedings

1   emergency the RSL purports to address, it's causing that

2   emergency.  So it's a perpetuating cycle, and that's

3   irrational (indiscernible) onto page 5 where the City

4   says there's a 15 percent vacancy rate for

5   rent-stabilized units (indiscernible).  If the problem is

6   low vacancy rates (indiscernible) also (indiscernible)

7   solution, and not only that but let's go back to

8   (indiscernible) rent stabilization law is that there is

9   (indiscernible).

10          The defendant dismissed (indiscernible) made no

11   effort to show that the RSL as amended serves that

12   purpose and indeed it does not.

13          THE COURT:  And you just show, you know, for

14   (indiscernible) purposes of this conversation, that I

15   agree there's a disputed fact on what I will call the

16   equipment (indiscernible) that rent stabilization may

17   work contrary to the goal of easing housing shortages,

18   but you know, I think it's also the case, we all agree,

19   that that's not the only (indiscernible) asserted as

20   (indiscernible) the extent to which other justifications

21   like neighborhood stability and continuity have been held

22   to be valid purposes.  Is that -- can -- and assuming

23   that they are, isn't it clearly the case that there are

24   at least some people who (indiscernible) facial

25   challenge, who are attributing, you know, critical

63

Proceedings

1   (indiscernible) of New York City as, you know,

2   (indiscernible) has teachers, or firefighters, or

3   whatever else, who can live here only because they reside

4   in rent-stabilized units and that would be some impact at

5   least, (indiscernible) some impact on the

6   (indiscernible), you know, were those apartment no longer

7   to be rent-stabilized?

8           MR. KING:  It may be, your Honor, that the

9   evidence would show that, (indiscernible) evidence that I

10  believe is to the contrary, and that -- to me that's a

11  fact question and maybe the defendants are right about

12  all of that, but this is the kind of fact issue that gets

13  borne out not on a motion to dismiss but on a motion for

14  summary judgment.

15          I think so -- second of all, your Honor, just

16  one other point, (indiscernible) consideration of things

17  like neighborhood stability after you get to that five

18  percent trigger, and that five percent trigger and I'm

19  consolidated law (indiscernible) for that standing, and

20  we think that that threshold is irrational.

21          I (indiscernible) factual law passes for

22  decades didn't have that threshold, and in that time rent

23  stabilization (indiscernible).  (Indiscernible).

24          THE COURT:  Okay.

25          MR. KING:  I'm sure there's more we can discuss

64

Proceedings

1   on the due process, but if I could, let me turn to

2   contract clause, which is covered only in this case, not

3   in the CHIP case.

4           You're exactly right, our complaint alleges two

5   different claims here.  One claim is a broad claim that

6   applies to all our plaintiffs, and the other is specific

7   to plaintiff Pinehurst. ,The argument was made that we

8   did not include the (indiscernible) claim -- excuse me,

9   (indiscernible) claim is not correct, (indiscernible)

10  that would be the broad claim there, and (indiscernible)

11  complaint (indiscernible) preferential rent agreements

12  that are going to be forced to continue under the 2019

13  amendments.

14          And in our allegations in that regard --

15  (Cross-talk)

16          THE COURT:  That's (indiscernible) more broader

17  point than that, that it's only a subset of the

18  plaintiffs who actually had a contract to recapture some

19  of the preferential rent where the contract was executed

20  prior to the effective date of the 2019 amendment, and

21  the contract which was supposed to be (indiscernible)

22  after that is now is invalidated,  Is that a fair

23  understanding?

24          MR. KING:  Close, your Honor, and let me see if

25  I can clarify.  I should say it's (indiscernible) claim

65

Proceedings

1   which is that (indiscernible) to be (indiscernible).  To

2   add to the broader claim, our allegation is, you know, to

3   the plaintiffs' side, is that what the legislature did

4   with the 2019 amendment was that it stripped the end date

5   of the price term off of all the existing contracts.  So

6   we, you know, on June 1st, 2019, before the

7   (indiscernible) was enacted, we -- all our plaintiffs had

8   contracts that allowed us to increase the rent going

9   forward, and the legislature said, nope, there's no end

10  date on that contract, at least as to the price term, and

11  it's stripped off, and so that's the broader claim.

12       And the defendants have their argument that, I

13  would cite to Buffalo Teachers, which by the way is a

14  summary judgment case, not a motion to dismiss case,

15  which is positive for us on the substantial impairment

16  point, and so now you have to deal with the other two

17  prongs:  whether the law serves a significant public

18  purpose, and whether the law was really tailored to that

19  purpose, and (indiscernible) motion brief (indiscernible)

20  on summary judgment.  So that's what I have to say about

21  the broad claim.

22       On the narrow claim, you know, just on

23  (indiscernible) contracts that 74 Pinehurst signed before

24  the 2019 amendments were enacted, that called for rent

25  that now can't be charged.  Basically the 2019 amendments

66

Proceedings

1  did was that it forced the parties to adopt a price term

2  that no one bargained for or agreed to.

3         And as Mr. Berg conceded, that gets us into --

4  unquestionably, gets us into the contract clause

5  analysis, the same point would apply on substantial

6  impairment per Buffalo Teachers, where the Court said

7  that even a minor effect on, you know, having a

8  relatively minimal economic impact, nevertheless, when

9  you're dealing with price terms that that's substantial

10  impairment.  And so once again you're bound to the

11  tailoring analysis.

12         So that's I would say about all of that. I'd

13  like to make a point your Honor on the structure of the

14  decisions, you know, we're not seeking formal

15  consolidation here the significance of (indiscernible)

16  plaintiffs who are making the claims in CHIP with our

17  plaintiffs (indiscernible) it would be sensible in our

18  view to dispose of the cases in a single opinion.

19         And in fact, one of our plaintiffs, 177

20  Wadsworth, brings only facial challenges, which means

21  there may be a reason (indiscernible) plaintiff to be in

22  the same judgment as CHIP (indiscernible) plaintiffs

23  (indiscernible) as-applied claims that have been dealt

24  with.

25         And a final point, Mr. Mr. Berg asserted this

67

Proceedings

1  morning that neither of today's cases made challenges to

2  the real property law, the RPAPL, and that's just not the

3  case.  We've challenged all parts of the RPAPL, if you

4  look at paragraphs 90, 91, 94, 124, and 128 of our

5  complaint, you'll see we challenge among other things,

6  the condo co-op provisions and the eviction provisions.

7           With all of that, your Honor, we would submit

8  that the motion to dismiss should be denied.

9           THE COURT:  All right.  Mr. King.

10          All right, I will turn it back over to the

11 defendants.  I'll give you more time than those ten

12 minutes we reserved given that we've heard from the

13 plaintiffs, for more time than they were expected to

14 speak.  And all of this, I should say, has been very

15 helpful from all parties.  I do think it's time well

16 spent.

17          Mr. Berg, before we turn back to you, I just

18 urge all of the defendants, and once it's their turn to

19 wrap up, to speak only to issues that came up in

20 connection with the plaintiffs' argument, rather than

21 ranging beyond that scope.

22          MR. BERG:  Okay.  Thank you, your Honor,

23 Michael Berg.

24          I actually think I can be fairly brief in

25 rebuttal with (indiscernible) characterize

68

Proceedings

1   (indiscernible) Pinehurst (indiscernible) to discussing
2   the (indiscernible).  I understand that to the extent the
3   plaintiffs are seeking to challenge the (indiscernible)
4   provisions of law that are set up by the defendant and
5   they clearly are (indiscernible) level.
6           I want to touch on the point of the contract
7   clause claim that the law somehow alters the price terms,
8   to inflate the price terms of contracts going forward,
9   again, it does not (indiscernible) contract clause
10  (indiscernible) because it not affecting the prior
11  contract, it's affecting the future contracts.
12          More factually, there is (indiscernible) of the
13  (indiscernible) term of the contract.  Contracts
14  (indiscernible) contracts (indiscernible) and certain
15  circumstances (indiscernible) by the statute,
16  (indiscernible).
17          The percentage of -- the (indiscernible) rent
18  is charged in these contracts, (indiscernible) increased
19  by the guidelines for (indiscernible) percentages of
20  (indiscernible) increases for capital improvement and the
21  other increases authorized by law.  So it's really not
22  the case that the case that the 2019 amendment not
23  existing contracts.  (Indiscernible) contracts
24  (indiscernible) which (indiscernible) reaches their
25  conclusion.

69

Proceedings

1    With regard to the so-called illusory off-

2  ramps, I just want to refer back to (indiscernible) that

3  the provision of law (indiscernible) illusory, and in

4  particular, plaintiff (indiscernible) on a particular

5  occasion is denied a lease under that provision.

6  (Indiscernible) allegations (indiscernible) probably

7  denied a lease under the owner's lease exception in rent

8  stabilization.

9    So if I understand that plaintiffs want to

10  (indiscernible) and hold without (indiscernible) to rent

11  stabilization.  Indeed they argue to the contrary, so I

12  just want to make sure that the Court is not

13  (indiscernible) because property owner X lost a claim to

14  the DHCR, that means that that theory of injury for all

15  (indiscernible).

16    THE COURT:  So we're not deciding whether the

17  off-ramp is illusory.  We're deciding only whether the

18  plaintiff has made out sufficient allegations that it's

19  illusory, for that to factor into the question of whether

20  it survives a motion to dismiss, and they've alleged, you

21  know, A, they denied my application for reasons that made

22  no sense, I needed a two-bedroom for my extended family,

23  and they denied the application on the theory they

24  could've -- in a year prior applied for personal use of a

25  one-bedroom.  You know, that then supports the

70

Proceedings

1  allegation, you know, taken together with the comment
2  from legislators that Mr. King cited, and from the DHCR,
3  the fact that the owners keep every apartment possible in
4  the system, and make sure that New York City loses as
5  little rent-stabilized apartment stock as possible,
6  taking those things together, would you conclude that the
7  off-ramps are not everything they're cracked up to be,
8  simply for purposes of a motion to dismiss.
9          MR. BERG:  And (indiscernible) know, your
10 Honor, I think the (indiscernible).
11         THE COURT:  Why is that not a question of fact?
12 You say they're real, they say they're not.  Look, what
13 happens is that the Court can't conclude one way or the
14 other at this stage.
15         MR. BERG:  Well, the plaintiff said that to
16 (indiscernible) -- I think it was that the fact that
17 (indiscernible) apartments (indiscernible) for personal
18 use (indiscernible) necessity, does not state a claim.  I
19 guess (indiscernible) and I think they witnessed this.
20         THE COURT:  Sorry, say that again?
21         MR. BERG:  I think it's in the Harmon case, but
22 I would have to double-check that.  And (indiscernible)
23 part of the (indiscernible) trying to be (indiscernible)
24 standard.  It is not (indiscernible) evidence if you
25 don't state a claim (indiscernible) because

71

Proceedings

1  (indiscernible) my application for (indiscernible)

2  residence (indiscernible) because I lost my application

3  to evict a rent-stabilized tenant, that I suffered a

4  credible constitutional injury.

5           Again, as Ms. Moston pointed out, that depends

6  upon a vacancy, and (indiscernible) and (indiscernible)

7  had therefore -- well, I will leave it at that, your

8  Honor.  I will (indiscernible).  I appreciate

9  (indiscernible).

10           I want to (indiscernible) and say that the

11  legislature relied (indiscernible) had to be in 1974,

12  after the initial (indiscernible), the legislature relied

13  on data showing that (indiscernible) with rent-stabilized

14  (indiscernible) and without having adverse effects on the

15  (indiscernible) and its neighborhood and tenants, and

16  socioeconomic diversity.  And that is a -- and so, for

17  the legislature to recognize that, (indiscernible) --

18           THE COURT:  You're breaking up (indiscernible)

19  here.

20           MR. BERG:  Sorry, your Honor. For the

21  legislature to say, we have lost a lot of rent-stabilized

22  units and we need to slow those losses, you need a

23  different legislative line drawn than you did in 1993 and

24  1997.  We need to draw up a line now in a way that

25  encourages more tenants to stay in their homes, and

72

Proceedings

1  discourage owners from taking actions that, while

2  completely lawful, to have the effect of bribing tenants

3  out of their units.

4          THE COURT:  I understand.  No need to argue

5  that the legislature can have it both ways, in that on

6  the one hand, they're saying look, we're going to require

7  you to offer the low market leases to not only our

8  tenants but their successors potentially in perpetuity,

9  don't worry, that's not a taking because there are all of

10 these off-ramps in the statute, and then say at the same

11 time, saying you know we need to do everything we can to

12 close off those off-ramps because we can't lose rent-

13 stabilized --

14         MR. BERG:  Well, that --

15         THE COURT:  I think that's the point that

16 they're making.  They're finding out if it's illusory or

17 not, and you have to consider that as it relates to, you

18 know, the question of how permanent, and how physical

19 this alleged taking might be.

20         MR. BERG:  Right, and I think that's -- I think

21 that's an accurate description, your Honor.  We are not

22 arguing that in this case, the legislature committed to

23 (indiscernible) occupants as permanent occupancy rent

24 stabilized units.  The argument is that the legislature

25 drew the line on the tenant back in (indiscernible), they

73

Proceedings

1   have valid reason for doing so, and adopts reasonable

2   measures to achieve the goals that the plaintiffs

3   (indiscernible) proceeding indicated at that time.

4           I haven't (indiscernible).  The five percent

5   (indiscernible) line drawn, and with those written

6   arguments by plaintiffs, I think (indiscernible) five

7   percent cutoff that has (indiscernible) four-and-a-half

8   to five percent (indiscernible) a constitutional right,

9   and call it (indiscernible), in addition to the five

10  percent threshold, needs to be (indiscernible) by City

11  counsel with (indiscernible).

12          That's all I have to say from (indiscernible)

13  plaintiffs, your Honor.

14          There is one other important (indiscernible).

15          THE COURT:  I lost you for a second there

16  again.

17          MR. BERG:  Sorry, your Honor.  There is

18  (indiscernible) don't want to (indiscernible).  With the

19  recent (indiscernible) other cases, we made an argument

20  that certain claims against the State would be brought

21  (indiscernible) sovereign immunity.  That is not an

22  argument that we make in our papers in this case, and

23  (indiscernible) jurisdictional matter, so (indiscernible)

24  can at any time.

25          I just want to flag it because the

74

Proceedings

1    (indiscernible) plaintiffs (indiscernible) and see if

2    there's something we can do to address that concern

3    before raising it with the Court.  It would have no

4    effect on plaintiffs' claim  relief, against Commissioner

5    Visnauskas in her official capacity for injunctive

6    relief, the declaratory relief going forward.

7           So it's not going to affect the substance of

8    the allegations, I'd just like to have a conversation

9    with plaintiffs' counsel offline about the other

10   (indiscernible) and DHCR proper second (indiscernible)

11   and report back to your Honor as to whether we reach a

12   resolution on that.

13          THE COURT:  Yes, certainly if you all agree on

14   that, that would be preferable to not have everybody

15   brief the issue, and then you just tell me you agree with

16   each other's briefs, so please do have that conversation

17   and if you don't see eye-to-eye on it, we will cross that

18   bridge when we come to it.

19          Before I call on another defense counsel, can I

20   just ask you to clarify for me distinctly between exactly

21   what happened between 1969 and 1974?  I'm a little

22   unclear on that part of the history here.

23          MR. BERG:  Yes, your Honor.  I will do my best.

24          THE COURT:  (Indiscernible) the start of rent

25   regulation in New York, the start of that

75

Proceedings

1    (indiscernible).

2            MR. BERG:  It's 1969.

3            THE COURT:  Okay.

4            MR. BERG:  It's my understanding that there was

5    some legislation passed by the legislature in

6    (indiscernible).  Pursuant to that (indiscernible)

7    regulation, in 1969, when the New York City Council

8    adopted the original rent stabilization law.

9            I don't know when the regulations pursuant to

10   that law were adopted.  In 1974, the state legislature

11   essentially readopted rent stabilization law by adopting

12   an Emergency Tenant Protection Act or ETPA, which

13   (indiscernible).

14           That -- that (indiscernible) between and

15   described it, I don't know if it (indiscernible) factual

16   and procedural history, and I believe in 1971, there had

17   been attempts to renew (indiscernible) from rent

18   stabilization law (indiscernible), and for a number of

19   reasons for that, for example, there was the thought that

20   it might encourage new housing construction.

21           What happened was that an awfully large number,

22   in the eyes of the state legislature and (indiscernible)

23   large number, I believe one hundred thousand plus

24   apartments were permanently regulated as a result of

25   that, and at the same time, they did not see the increase

76

Proceedings

1   in new construction for the other benefit that the

2   tenants had hoped for.

3          In 1974, rent stabilization (indiscernible)

4   simply adopted by the state legislature in an effort to

5   respond, but also reimposed it in New York, the City

6   Council in Nassau, Rockland and Westchester Counties, and

7   made it a matter of state law, rather than a matter of

8   city law, (indiscernible) administrative (indiscernible).

9          THE COURT:  That's (indiscernible) of it, Mr.

10  Berg, your command of it.  So thank you very much, that's

11  helpful.  All right.

12         MR. BERG:  Thank you.

13         THE COURT:  Ms. Moston, do you have anything

14  (indiscernible) brief for the City?

15         MS. MOSTON:  Sure.  This is Rachel Moston, just

16  a few very brief points.

17         To respond to the question again came up this

18  morning about (indiscernible) discovery, and whether or

19  not the RSL is effective, we are (indiscernible)

20  affected, I just want to reiterate this is exactly what

21  the Supreme Court cautioned against in Lingle.  Now these

22  laws (indiscernible) rent controlled (indiscernible) is

23  (indiscernible) fact finding (indiscernible) and the

24  Supreme Court said it's (indiscernible).

25         The City (indiscernible) is from the New York

77

Proceedings

1    Court of Appeals, the exact argument was raised by the

2    plaintiffs in that case.  The plaintiffs' RSA action

3    (indiscernible), (indiscernible) decision.

4           The owner (indiscernible) that rent regulation

5    perpetuates (indiscernible) housing shortage for New York

6    City.  This is not a new claim.  These arguments raised

7    here by the plaintiff have been going around for a long

8    time, and the New York Court of Appeals said that's not a

9    question for us, that is a question for the legislature.

10          It will (indiscernible) the Governor

11   (indiscernible) about the efficacy and (indiscernible)

12   housing policy and economic theory.  We requested

13   (indiscernible) legislature.  It's not clear

14   (indiscernible) fact finding on a rational basis review.

15   I'm not saying that (indiscernible) is a view, while

16   we're (indiscernible) the RSL (indiscernible) 2019

17   (indiscernible).

18          The other thing that I just want to briefly

19   touch on briefly is --

20          THE COURT:  I'm confused.  Can you

21   (indiscernible) --

22          MS. MOSTON:  Sure.

23          THE COURT:  -- cases that say look, the

24   legislature articulated the multiple jurisdiction, the

25   multiple (indiscernible), multiple justifications of the

78

Proceedings

1    law, and there's potentially an open question under one

2    that comes under rational basis review that there's no

3    real dispute of fact under (indiscernible) 2, 3 or 4?

4    That would be helpful (indiscernible).

5              MS. MOSTON:  Absolutely.  Yes, the denominator

6    that we were talking about it, and I think the case law

7    (indiscernible) issue of fact or law, I just wanted to

8    point out that the Second -- Second Circuit

9    (indiscernible) --

10             THE COURT:  I think I lost you there.

11             MS. MOSTON:  Sorry.  I will (indiscernible)

12   real quick.  The Second Circuit (indiscernible) Greystone

13   case and (indiscernible) restrictions that

14   (indiscernible) but the Court clearly said.  So both of

15   those programs (indiscernible).  We need to

16   (indiscernible) on that issue.

17             Those (indiscernible) the off-ramps, I just

18   wanted to (indiscernible) on what Mr. Berg was saying,

19   that the Second Circuit (indiscernible) exit ramp from

20   the rent stabilization laws.

21             According to (indiscernible) the individual

22   plaintiffs (indiscernible) and the Court says no, there's

23   no physical taking, you have the opportunity to exercise

24   three exit strategies, or (indiscernible) and so

25   (indiscernible) building (indiscernible) satisfactory

79
Proceedings

1  (indiscernible).

2          But if you have a off-ramps, adopting

3  (indiscernible) but the Second Circuit talks about

4  (indiscernible) of that, (indiscernible) and

5  (indiscernible).

6          THE COURT:  Okay.  Did the --

7          MS. MOSTON:  (Indiscernible).

8          THE COURT:  -- City require a plaintiff to

9  avail themselves of multiple -- because that's what I

10  thought we heard varying things on the question of, you

11  know, how many off-ramps was one required to test before

12  we can say, with their best off-ramps they're illusory as

13  to us and offer an as-applied challenge?

14          MS. MOSTON:  It is (indiscernible) with respect

15  to the plaintiff there is no physical taking.

16          THE COURT:  Okay.

17          MS. MOSTON:  Now with (indiscernible).

18          THE COURT:  Yeah, now (indiscernible) question

19  (indiscernible) resolution from the Second Circuit and

20  (indiscernible) but we will take a look.  All right.

21  Thank you very much.

22          And Mr. Duke, anything (indiscernible)

23  yourself?

24          MR. DUKE:  Yes, your Honor, just a few brief

25  points, with respect to the off-ramps, I guess there's

80

Proceedings

1  been a lot of air play today, and it -- I believe that

2  their allegations concerning the off-ramps hardly matter

3  at all here, because no plaintiff is asserted to have

4  alleged they want to take advantage of an off-ramp.  If

5  they decide that they no longer want to rent to tenants,

6  if they (indiscernible) of them.  In their

7  (indiscernible) off-ramps, they have not brought an

8  as-applied challenge here.

9            THE COURT:  (Indiscernible) this.

10           MR. DUKE:  Panagoulias (indiscernible).

11           THE COURT:  Look through the motion papers, you

12  know, the off-ramps are an important factor, right?

13  You've essentially got plaintiffs saying look, the State

14  have essentially commandeered rental housing that I own,

15  requiring that I offer it at below market rates in

16  perpetuity essentially to not only the current tenants,

17  but also their successors, and (indiscernible) and the

18  reason I think (indiscernible) that that's held out to be

19  a taking (indiscernible) but other taking cases, is that

20  there are (indiscernible) the system and (indiscernible)

21  here, you had luxury decontrol and vacancy decontrol, and

22  those happened significant in 2019, you had personal use,

23  that was capped as of 2019, and you have the Panagoulias'

24  alleging their as-applied challenge that, you know, (a) I

25  had the expectation of luxury and vacancy decontrol and

81

Proceedings

1   that's gone now and (b) I actually tried to avail myself

2   of the personal use exemption, and my application was

3   denied for irrational reasons.

4         So I don't understand why you're saying that's

5   not at issue here.

6         MR. DUKE:  Right, your Honor, because with

7   respect to specifically the high rent, and high income

8   individual rent control, I don't (indiscernible).

9   (Indiscernible) state if they want -- if they deregulate

10  an apartment, their high rent, high income control, which

11  I could point out didn't even exist until 1993, with the

12  prior (indiscernible) the RSL, did not have that option

13  (indiscernible).

14        The (indiscernible) grant it so that the exit

15  means the richer tenants or the same tenants have a

16  heavier burden (indiscernible), very specific

17  (indiscernible).

18        And with respect to the Panagoulias', they

19  wanted to take over one unit, eight years ago.  They

20  don't want just one unit now, if they want to do it now,

21  they can, they're more than welcome to use the

22  guidelines.  The tenant law claims (indiscernible), there

23  are four units vacant that they can take over, that they

24  can evict those tenants at the end of the lease because

25  they're not regulated units, and if they do that, then

82

Proceedings

1  there would still be the same exact amount of people

2  occupying the property, than if they took over one of the

3  rent regulated units.  And Yee makes it very clear that

4  he cannot pick and choose what type of people he has

5  coming into the property.  Particularly, I want rent

6  regulated people (indiscernible) in my properties, it

7  just says I want not rent regulated people.  It's not

8  something that the Supreme Court allows.  It's not

9  (indiscernible), your Honor.

10          The second point is that with respect to the

11  as-applied regulatory takings claim, in my view, the

12  plaintiffs are trying to profit as much as they would in

13  a market-based system, the plaintiffs alleges

14  (indiscernible) rent roll, regulated rents, they cannot

15  charge rent sufficient to make a profit to cover their

16  operating costs.

17          That they found that sufficient to reject a

18  regulatory takings claim, and to be sure that there are

19  -- FHL and (indiscernible) as-applied claims involving a

20  building that had been converted to a co-op and there was

21  a default (indiscernible) under the law.

22          THE COURT:  (Indiscernible).

23          MR. DUKE:  Correct.  So in that case, they're

24  still allowed to collect regulated rents, and so I think

25  FHL still gives (indiscernible) clear and it shows that

83

Proceedings

1   they're not going to collect as much, and that that is

2   not enough.  That is not enough, your Honor.

3           And then the last point I'd like to address is

4   that -- and I think Ms. Moston touched on this a little

5   bit, she was breaking up, so I just wanted to make sure

6   that this point is made clear because it's important, I

7   heard plaintiffs' counsel say that they allege that the

8   default, and that (indiscernible) and that they need a

9   record in order to determine what their -- the law does

10  mean to them, otherwise it's got to fall on rational

11  basis review.

12          And the Second Circuit has been abundantly

13  clear on this, and I quote, "It did not strike down the

14  law as irrational simply because it may not succeed in

15  bringing about the results it seeks to accomplish,

16  because the wrongs it addresses could be redressed some

17  other way, but because the statute's (indiscernible). The

18  (indiscernible) will be returned on the basis of no

19  empirical evidence support the assumption underlying the

20  legislature choice."

21          The Supreme Court said this is an

22  (indiscernible) communication that properly

23  (indiscernible) which stated that a legislative board was

24  not subject to fact finding, and may be based on rational

25  speculation unsupported by evidence under

84

Proceedings

1  (indiscernible), and (indiscernible).

2          There the district court was required to choose

3  between the appropriate comments that rent controlled

4  statutes that would help to prevent concentration

5  (indiscernible) in the face of (indiscernible) retail

6  market.  The Court found (indiscernible) more persuasive

7  than the other, and included that the (indiscernible)

8  legislature -- the (indiscernible) legislature had chosen

9  (indiscernible) not actually achieved its objectives.

10          The Supreme Court, and I quote said, "these

11  kinds of proceedings were remarkable to say the least.

12  The (indiscernible) given that we have long-eschewed such

13  heightened scrutiny in addressing the substantive due

14  process challenges to government regulations. The reason

15  for (indiscernible) legislative judgments about the need

16  for (indiscernible) and effectiveness of regulatory

17  actions are by now well-established and we think are no

18  less applicable here."

19          That's all I have, your Honor.  I you have any

20  further questions, I'll be happy to answer them.

21          THE COURT:  Thank you.

22          All right, Mr. King?

23          MR. KING:  Thank you, your Honor.  I'll be

24  brief.  I have four straight points to make

25  (indiscernible).

85

Proceedings

1        The first is that as Mr. Duke was just arguing,
2   and that as some of the defendants brought out in their
3   rebuttals, they're really arguing the merits, and not the
4   plausibility of our allegations, and in just one example,
5   Ms. Moston referred to the Greystone case in which in
6   1999, was very specific about the (indiscernible)
7   language that might be (indiscernible)  but the Supreme
8   Court said that (indiscernible) decision in June of 2017,
9   and it specifically said there that every case needs to
10  be taken on its own individual merits.
11        What (indiscernible) our analysis in Greystone
12  (indiscernible) going to be trickier, and it's going to
13  require careful attention to the individual facts that
14  our plaintiffs have applied.
15        Number two, Mr. Berg mentioned the
16  (indiscernible) issue about (indiscernible) allegations
17  (indiscernible) gone through, you know, a round of
18  briefing and many hours of argument about.  I'll be glad
19  to discuss it with him and will be prepared to report
20  back to the Court on that point.
21        Number three, (indiscernible) comments about
22  the Harmon case.  You know, Harmon is fundamentally
23  different for three reasons. And Mr. Pincus touched on
24  this, but let me be clear, first off, the RSL works in a
25  fundamentally different way today than it did in 2011

86

Proceedings

1    when the Second Circuit dealt with it - and that goes to

2    all the changes, the straws we allege broke the camel's

3    back, but beyond that, the plaintiff in that case bought

4    into the version of the RSL that he challenged, not so as

5    to our plaintiffs here, at least as to the Panagoulias'

6    and (indiscernible).

7           And the third thing is, and I think the most

8    important thing, the Second Circuit in Harmon did not

9    address the (indiscernible) which says that when a law

10   compelled the owner to bring (indiscernible) that could

11   result in physical taking, and you know, because the

12   Court didn't engage on that point, and I really don't

13   know how much it tells us here.

14          Fourth, and finally, the Supreme Court has said

15   in the realm of takings, that there is a line that there

16   are laws that go too far.  The 2019 Amendments, even

17   according to their own sponsors, are unprecedented, and

18   excluded changes from the (indiscernible) come before

19   them.  We reserve here and show that those laws and the

20   methods crossed that line, and that's what summary

21   judgment is for, and we therefore submit that the motion

22   to dismiss should be denied.

23          Unless your Honor has further questions,

24   (indiscernible) that.

25          THE COURT:  All right.  So I have failed

Proceedings

1    miserably at my effort to bringing this in at an hour-

2    and-a-half or so, but again, with good reasons because

3    this is a very complicated set of constitutional, legal,

4    and factual issues that regulate us here.  This has been

5    extremely helpful to me in terms of positiveness and

6    informing my thinking, and so again, I'm grateful for the

7    briefing by all of you.

8              Recently, (indiscernible) submit that the

9    quality of the advocacy that we've heard today, as well

10   as these are very important issues, so (indiscernible).

11   So I will look forward to the supplemental briefing.

12   We've discussed here the same schedule that we

13   articulated this morning should apply here as well, and

14   the parties (indiscernible) arguments in both cases, and

15   (indiscernible) can do that in one submission, rather

16   than do separate ones.

17             With that --

18             MR. BERG:  Your Honor, this is Michael Berg for

19   the (indiscernible).

20             If I could have a moment or two to discuss

21   (indiscernible).  What are the specific issues that the

22   Court wants supplemental briefing on in this case?

23             THE COURT:  So the only thing that's new to

24   this case, was the one that Mr. King articulated, and

25   (indiscernible) relying on Mr. King on that -- well, it's

88
Proceedings

1   the question of the denominator issue, I think that we

2   were talking about the possibility of you submitting

3   supplemental briefing on.

4           MR. BERG:  Yes.  We certainly could do that,

5   your Honor, but where I made expressly the request for on

6   Nordlinger, on obviously, whether particular interests

7   were valid for these purposes.  That would be in addition

8   to, or on top of the two you identified this morning, the

9   first of which is the post-breach remedies, the second of

10  which is this idea of applying and weighing the Supreme

11  Court authority.

12          THE COURT:  Okay.

13          UNIDENTIFIED SPEAKER:  Your Honor?

14          THE COURT:  I'll give Mr. King for plaintiffs

15  until next Friday, and ten pages -- not ten letter pages

16  of single-spaced text, but ten pages as a brief, and give

17  each of the defendants or the defendant in both cases an

18  extra eight pages on top of the ten we talked about this

19  morning, given that you may be responding to additional

20  arguments as well.

21          So ten pages from the plaintiffs in this

22  morning's case, and the plaintiffs here, for a total of

23  20, and then -- why don't we do actually 16 pages each

24  from defendants for the City, State, and intervenors, for

25  a total of 48 pages from the defendants?

89

Proceedings

1          MR. KING:  Your Honor, this is Kevin King for

2    the plaintiffs in this case.

3          Are you saying that the plaintiffs should file

4    their supplemental briefs first on Friday, let's see,

5    July 3rd, and the defendants would submit by

6    (indiscernible) motion (indiscernible) the first week or

7    second?

8          THE COURT:  Yeah, that's fine with me.  Yeah.

9    I don't want to set a whole additional briefing schedule

10   here.  We had set it up that way this morning because I

11   think the issue that we're anticipating supplemental

12   briefing on, were mostly issues being requested by the

13   plaintiffs, and I think that may be true here as well.

14   So, you know, why don't we hold the schedule as we

15   (indiscernible) as.

16         Let me refer to (indiscernible) equalize, and

17   I'm thinking out loud as I go here, in an effort to

18   equalize the page limits in the aggregate for both sides,

19   Mr. King should take 15 pages each, and then the

20   plaintiffs can have 16 pages for each of their three

21   submissions.

22         MR. KING:  This is Mr. King for the plaintiffs.

23   I think that process makes sense to us, and works for us.

24         THE COURT:  All right.

25         MR. BERG:  Your Honor, this is Michael Berg.

90

                          Proceedings

1    (Indiscernible) dates that you're looking for it?

2              THE COURT:  Yeah, the plaintiffs should submit

3    by a week from Friday.

4              THE CLERK:  Judge, I'm sorry, this is Alicia.

5    I just want to say that next Friday is actually July 3rd,

6    and --

7              THE COURT:  Holiday.

8              THE CLERK:  Yes, because July 4th is on a

9    Saturday.  Do you want to move that July 6th?

10             THE COURT:  I don't want to ruin anyone's July

11   4th weekend, and so it makes sense to move that to July

12   10th for the plaintiffs, and July 17th for the

13   defendants' response.

14             It's hard for me to tell these days how

15   holidays are different from nonholidays and weekdays from

16   weekends, but someone on the phone may have better July

17   4th plans than I do, so let's fix the deadline

18   accordingly.

19             All right.  With that, I think we settled it.

20   Again, thanks everybody for the time, and we will be in

21   touch.

22             IN UNISON:  Thank you, your Honor.

23             THE COURT:  Take care.

24                  (Matter Concluded)

25                       -o0o-

91

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **21st** day of **August**, 2020.

*Linda Ferrara*

Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.